662 A.2d 367

JOHN DOE (A FICTITIOUS NAME), INDIVIDUALLY AND ON BE-
HALF OF ALL OTHERS SIMILARLY SITUATED, PLAINTIFF–
APPELLANT AND CROSS–RESPONDENT, v. DEBORAH POR-
ITZ, ATTORNEY GENERAL OF THE STATE OF NEW JERSEY,
DEFENDANT–RESPONDENT AND CROSS–APPELLANT.

Argued May 2, 1995—Decided July 25, 1995.

1

4

*John S. Furlong* argued the cause for appellant and cross-respondent (*Furlong and Krasny,* attorneys).

*Deborah T. Poritz,* Attorney General of New Jersey, argued the cause *pro se* (*Ms. Poritz,* attorney; *Joseph L. Yannotti* and *Jane A. Grall,* Assistant Attorneys General, and *Madeleine W. Mansier,* Deputy Attorney General, of counsel; *Ms. Grall, Ms. Mansier, Michael J. Haas* and *Karen L. Suter,* Senior Deputy Attorneys General, *Rhonda S. Berliner, Patrick DeAlmeida, B. Stephan Finkel, Todd A. Wigder,* and *Sharon M. Hallanan,* Deputy Attorneys General, on the briefs).

*Matthew Astore,* Deputy Public Defender II, argued the cause for *amicus curiae* Public Defender (*Susan L. Reisner,* Public Defender, attorney).

*John J. Gibbons* argued the cause for *amicus curiae* American Civil Liberties Union of New Jersey (*Crummy, Del Deo, Dolan, Griffinger & Vecchione,* attorneys; *Mr. Gibbons, Lawrence S. Lustberg, Jonathan Romberg,* and *Christopher T. Walsh,* on the briefs).

*Faith S. Hochberg,* United States Attorney, argued the cause for *amicus curiae* United States (*Ms. Hochberg,* attorney; *Stuart J. Rabner* and *George S. Leone,* Assistant United States Attorneys, Leonard Schaitman, a member of the New York bar, Wendy M. Keats and Lowell V. Sturgill, members of the District of Columbia bar, on the briefs).

*Glenn R. Paulsen* argued the cause for *amicus curiae* New Jersey Senate (*Capehart & Scatchard,* attorneys).

*Ronald K. Chen* submitted a brief on behalf of *amicus curiae* Carlos Diaz.

*Geoffrey S. Berman* submitted a brief on behalf of *amici curiae* Maureen and Richard Kanka, Hon. Dick Zimmer, Hon. Randall Cunningham, Hon. Nathan Deal, Hon. Jennifer Dunn, Hon. Tillie Flower, Hon. Thomas Manton, Hon. Susan Molinari, Hon. Jim Saxton, and Hon. Christopher Smith (*Mudge Rose Guthrie Alexander & Ferdon,* attorneys; *Mr. Berman* and *Jacklyn K. Bartlett,* on the brief).

### Table of Contents

I The Legislative Purpose: Addressing the Problem
 of Repetitive Sex Offenders.......................14
II The Laws and the Attorney General's Guidelines......20
III The Challenges to the Law........................26
IV Interpretation of Statute; Revision of Attorney
 General's Guidelines; Judicial Review..............28
V Challenges Based on the Claim that the Laws
 Constitute Punishment ...........................40
VI Privacy .........................................77
VII Equal Protection.................................91
VIII Administrative Procedure Act.....................95
IX Procedural Due Process and Fairness and Right-
 ness ............................................99
X Conclusion ......................................109

The opinion of the Court was delivered by

WILENTZ, C.J.

On October 31, 1994, a group of bills concerning sex offenders became law. They are generally referred to as "Megan's Law," named after the second female child abducted, raped, and murdered during the prior year. The question before us is whether two of those bills, the Registration and Community Notification Laws, are constitutional. *L.*1994, *c.* 133 (Registration Law, *N.J.S.A.* 2C:7–1 to –5) and *L.*1994, *c.* 128 (Community Notification, *N.J.S.A.* 2C:7–6 to –11). We hold that they are, but that the prosecutor's decision to provide community notification, including the manner of notification, is subject to judicial review before such notification is given, and that such review is constitutionally required. In most respects, we affirm the judgment of the trial court.

The essence of our decision is that the Constitution does not prevent society from attempting to protect itself from convicted sex offenders, no matter when convicted, so long as the means of protection are reasonably designed for that purpose and only for that purpose, and not designed to punish; that the community notification provided for in these laws, given its remedial purpose, rationality, and limited scope, further assured by our opinion and

judicial review, is not constitutionally vulnerable because of its inevitable impact on offenders; that despite the possible severity of that impact, sex offenders' loss of anonymity is no constitutional bar to society's attempt at self-defense. The Registration and Notification Laws are not retributive laws, but laws designed to give people a chance to protect themselves and their children. They do not represent the slightest departure from our State's or our country's fundamental belief that criminals, convicted and punished, have paid their debt to society and are not to be punished further. They represent only the conclusion that society has the right to know of their presence not in order to punish them, but in order to protect itself. The laws represent a conclusion by the Legislature that those convicted sex offenders who have successfully, or apparently successfully, been integrated into their communities, adjusted their lives so as to appear no more threatening than anyone else in the neighborhood, are entitled not to be disturbed simply because of that prior offense and conviction; but a conclusion as well, that the characteristics of some of them, and the statistical information concerning them, make it clear that despite such integration, reoffense is a realistic risk, and knowledge of their presence a realistic protection against it.

The choice the Legislature made was difficult, for at stake was the continued apparently normal lifestyle of previously-convicted sex offenders, some of whom were doing no harm and very well might never do any harm, as weighed against the potential molestation, rape, or murder by others of women and children because they simply did not know of the presence of such a person and therefore did not take the common-sense steps that might prevent such an occurrence. The Legislature chose to risk unfairness to the previously-convicted offenders rather than unfairness to the children and women who might suffer because of their ignorance, but attempted to restrict the damage that notification of the public might do to the lives of rehabilitated offenders by trying to identify those most likely to reoffend and limiting the extent of notification based on that conclusion.

The legislative choice was undoubtedly influenced by the fact that if the law did not apply to previously-convicted offenders, notification would provide practically no protection now, and rela-

tively little in the near future. The Legislature reached the irresistible conclusion that if community safety was its objective, there was no justification for applying these laws only to those who offend or who are convicted in the future, and not applying them to previously-convicted offenders. Had the Legislature chosen to exempt previously-convicted offenders, the notification provision of the law would have provided absolutely no protection whatsoever on the day it became law, for it would have applied to no one. The Legislature concluded that there was no justification for protecting only children of the future from the risk of reoffense by future offenders, and not today's children from the risk of reoffense by previously-convicted offenders, when the nature of those risks were identical and presently arose almost exclusively from previously-convicted offenders, their numbers now and for a fair number of years obviously vastly exceeding the number of those who, after passage of these laws, will be convicted and released and only then, for the first time, potentially subject to community notification.

I

### The Legislative Purpose: Addressing the Problem of Repetitive Sex Offenders

The challenged laws before us in this case have two basic provisions. First, they require registration with law enforcement authorities of certain convicted sex offenders and spell out the offenses that trigger the registration requirement, registration of those convicted prior to their passage limited to offenders found to have repetitive and compulsive characteristics. Second, they provide for notice of the presence of such offenders in the community, the scope of that notice measured by the likelihood that such offenders will commit another sex offense: where the risk of such reoffense is low, only law enforcement authorities are notified; where it is moderate, institutions and organizations having the responsibility to care for and supervise children and women are notified; and where the risk is high, those members of the public likely to encounter the offender are notified.

The purpose of the registration and the subsequent notification is set forth in the legislation itself.

1. The Legislature finds and declares:

 a. The danger of recidivism posed by sex offenders and offenders who commit other predatory acts against children, and the dangers posed by persons who prey on others as a result of mental illness, require a system of registration that will permit law enforcement officials to identify and alert the public when necessary for the public safety.

 b. A system of registration of sex offenders and offenders who commit other predatory acts against children will provide law enforcement with additional information critical to preventing and promptly resolving incidents involving sexual abuse and missing persons.

[*N.J.S.A.* 2C:7–1.]

The legislative concern about the problem, and the remedy selected, are best understood in the light of the nature and extent of the problem. There are varying views on that subject, but it is clear that the Legislature in formulating its policy accepted the view of the problem, and the facts concerning it, that follow. Such a legislative determination is beyond judicial review.

Based on statistical and other studies the Legislature could have found, and presumably did find, the following facts, essentially reflected in its statement of purpose, and its enactment of the laws: [1]

[S]tudies describing recidivism by sex offenders indicate the severity of the problem the Legislature addressed in Megan's Law. Studies report that rapists recidivate at a rate of 7 to 35%; offenders who molest young girls, at a rate of 10 to 29%, and offenders who molest young boys, at a rate of 13 to 40%. Further, of those who recidivate, many commit their second crime after a long interval without offense. In cases of sex offenders, as compared to other criminals, the propensity to commit crimes does not decrease over time.... [I]n one study, 48% of the recidivist sex offenders repeated during the first five years and 52% during the next 17 years....

As Doe acknowledges, successful treatment of sex offenders appears to be rare. He correctly notes that very few offenders sentenced to ADTC [Adult Diagnostic and Treatment Center] ever meet the dual standards required for parole from ADTC. Indeed, according to Department of Correction's statistics between 1980 and 1994 only 182 inmates were paroled from ADTC. While plaintiff was among

---

[1] Citations to the supporting studies are omitted but may be found in the briefs of the Attorney General and the United States. Conflicting studies and interpretations, especially concerning the precise numbers, abound, but as noted above, the resolution of the controversy in this area is solely a legislative matter. Concerning the basic facts, however, there is no dispute: as far as society is concerned, sex offenses of the kind covered by the law are among the most abhorrent of all offenses; the relative recidivism rate of sex offenders is high compared to other offenders; treatment success of sex offenders exhibiting repetitive and compulsive characteristics is low; and the time span between the initial offense and re-offense can be long.

the few who were released as "capable of making an acceptable social adjustment in the community," the large majority of ADTC inmates leave only after having served their maximum sentences. During the same time frame, 1980–1994, 712 inmates were released from ADTC at expiration of term.

[Response Brief for Attorney General at 6–8 (citations omitted).]

Further information gleaned from similar studies strongly reinforces the foregoing:

Sexual crimes are notoriously underreported. Such data as are available, however, demonstrate that their impact is substantial and widespread. A nationwide sampling of households by the Justice Department for the years 1987 to 1991 indicates that every year nearly 133,000 women in the United States age 12 or older were victims of rape or attempted rape, 44% committed by strangers. Twenty-one percent of the total involved weapons (29% of stranger rapes), and 47% of all victims (60% of victims of strangers) sustained injuries in addition to the rape itself. The Justice Department also estimates from police reports that nationwide about 17,000 girls under age 12 were raped in 1992, 54% by non-family members (acquaintances and strangers). And based solely on incidents reported to the police, a Justice Department study shows that in 1988 as many as 4,600 children of both sexes were abducted or detained by non-family members, nearly always by force (85–87%) and usually with a weapon (75–85%), and more than two-thirds of these children were sexually assaulted.

Sexual assault takes a heavy toll on its victims, particularly on children. Recent research indicates that a number of psychosocial problems—including chronic depression and anxiety, isolation and poor social adjustment, substance abuse, suicidal behavior, and involvement in physically or sexually abusive relationships as either aggressor or victim—are more common among adults molested as children than among those with no such childhood experiences. Victims of sexual abuse can suffer an impaired ability to critically evaluate the motives and behavior of others, making them more vulnerable to revictimization. An especially disturbing finding about child sexual abuse is its strong intergenerational pattern; in particular, due to the psychological impact of their own abuse, sexually abused boys have been found to be more likely than non-abused boys to turn into offenders against the next generation of children, and sexually abused girls are more likely to become mothers of children who are abused. And studies show that adult male aggressive behavior, particularly sexual aggression, is associated with the trauma of childhood sexual abuse. Thus, apart from the substantial personal trauma caused to the victims of such crimes, sexual crimes against children exact heavy social costs as well.

[Brief for the United States at 5–8 (citations omitted).]

On the critical issue of recidivism, the Legislature presumably adopted the view suggested in the following information, supportive of that stated in the studies relied on by the Attorney General:

Sex offender recidivism compounds the problem. As a group, sex offenders are significantly more likely than other repeat offenders to reoffend with sex crimes or

other violent crimes, and that tendency persists over time. A 15–year follow-up study by the California Department of Justice of 1,362 sex offenders arrested in 1973 found that 19.7% were rearrested for a subsequent sexual offense. Those first arrested for rape by force or threat had the highest recidivism rate, 63.8% for any offense, and 25.2% for a subsequent sex offense. Sex offenders were five times as likely as other violent offenders, and more than six times as likely as all types of offenders, to reoffend with a sex offense. Similarly, a Washington State study of 1,373 adult male sex offenders convicted between 1985 and 1991 and released by the end of 1991 showed that after seven years of follow-up, 12% were rearrested for sex offenses and an additional 3% were rearrested for violent offenses. Of the 110 offenders reconvicted of a sex offense, 43% were reconvicted of a more serious sex offense.

These figures comport with other data on sex offender recidivism. A major Justice Department study of state prisoners released in one year showed that 7.7% of released rapists were rearrested for rape within three years. Moreover, 27.5% of released rapists were rearrested during that period for some kind of violent offense (murder, rape, robbery, or assault). Released rapists were 10.5 times more likely to be rearrested for rape than were other released prisoners; likewise, prisoners who had served time for other sexual assaults were 7.5 times more likely than other released prisoners to be rearrested for sexual assault. A recent review of the most frequently cited studies of sex offender recidivism indicates that rapists repeat their offenses at [ ] rates up to 35%; offenders who molest young girls, at [ ] rates up to 29%; and offenders who molest young boys, at [ ] rates up to 40%. Moreover, the recidivism rates do not appreciably decline over time, and thus, in contrast with other types of offenders, the tendency to reoffend does not appear to decline with an offender's increasing age. It has been estimated that extrafamilial child molesters have an average of as many as 19.8 victims (for those molesting a girl) and 150 victims (for those molesting a boy).

[*Id.* at 8–10 (citations omitted).]

Clearly, both the Legislature's and the public's increasing awareness of the dangers posed by sex offenders triggered laws here, and elsewhere, as the understanding of the problem was accelerated by the occurrence of highly publicized and horrific offenses. In 1994 Congress enacted legislation requiring states, as a condition to some federal funding, to enact registration laws covering certain sex offenders. Those registration laws, aimed particularly at protecting minors and the potential victims of sexually violent offenses, would require registrants to verify their addresses annually for ten years (as well as changes in address) and to provide fingerprints and a photograph, and would explicitly permit release of information necessary to protect the public "concerning a specific person required to register." 42 *U.S.C.A.* § 14071(b) and (d). Apparently, some members of Congress believed the provision allowing community notification was crucial to preventing future crimes. *See, e.g.,* 140 Cong.Rec. H5612–17

(daily ed. July 13, 1994) (remarks of Reps. Dunn and Ramstad); *id.* S10502 (daily ed. August 3, 1994) (remarks of Sen. Lautenberg); *id.* S10710 (daily ed. August 5, 1994) (remarks of Sen. Gorton); *id.* S11889–90 (daily ed. August 16, 1994) (remarks of Sens. Gorton and Lautenberg); *id.* H8981–82 (daily ed. August 21, 1994) (remarks of Rep. Ridge); *id.* S12544–45 (daily ed. August 25, 1994) (remarks of Sens. Lautenberg and Dole).

The laws before us, therefore, do not simply reflect the awful experience of the past year or so in New Jersey, but a national trend reflecting a national problem. The remedy selected by our Legislature goes beyond the ability of citizens to request the criminal record of their neighbors when they may have no reason to make such requests. The remedy goes directly to the question of what a community can do to protect itself against the potential of reoffense by a group the Legislature could find had a relatively high risk of recidivism involving those crimes most feared, and those crimes to which the most vulnerable and defenseless were exposed—the children of society. The spectacle of offenses committed by neighbors, known in the public records as significantly potential reoffenders, but not known to anyone else, and especially not known to those most likely to be affected, their neighbors, suggested the most obvious and practical degree of protection: a law that would tell neighbors and others who might be affected, of the presence of such offenders, no more and no less.

The concern for the potential unfairness of identification has some justification, but it is wrong to assume the people of this State and the media will not understand that potential. The Attorney General points to information, far from complete because of the injunction against the implementation of these laws, that suggests that harassment and vigilantism have been minimal. This Court has no right to assume that the public will be punitive when the Legislature was not, that the public, instead of protecting itself as the laws intended, will attempt to destroy the lives of those subject to the laws, and this Court has no right to assume that community leaders, public officials, law enforcement authori-

ties, will not seek to educate the public concerning the Legislature's intent, including appropriate responses to notification information, responses that are not at all punitive, but seek merely to protect their children, their families, and others from reoffense. And this Court has no right to assume the media will not act responsibly.

The dissent's historical analysis, though relevant, is followed by, and ultimately amounts to, a prediction of a destructive and punitive community reaction that converts the statutory protection into punishment. As we have noted in this opinion, we do not believe the Court should determine this constitutional question based on such a prediction. The Attorney General has strongly warned that vigilantism and harassment will not be tolerated; we have no reason to believe that the Governor and the Legislature will tolerate it; and, for the purpose of constitutional adjudication, despite the branding, stocks, and pillory of prior centuries, we have no right to assume the public will engage in it. We assume that the strongest message will be delivered, and repeated, by the Governor and other public officials at all levels, as well as by community and religious leaders and the media, that this is a law that must be used only to protect and not to punish, and that all citizens must conform their conduct accordingly, a message given at community meetings, schools, churches, synagogues, and everywhere throughout the state.

The dissent refers to two examples of harassment and worse. One has already led to an indictment, the other involves conduct that may very well be subject to criminal sanctions if and when it occurs again. *See N.J.S.A.* 2C:33–4. Obviously, as the dissent acknowledges, future community reactions are impossible to discern. Despite that observation, the heart of the dissent is its prediction of the most severe consequences visited upon previously-convicted sex offenders, the clear implication being that they will regularly, almost invariably, occur. We do not suggest any absolute rule that a court should never pass constitutional judgment in a case on the basis of its unalterable conviction concerning

predicted community conduct. This is not such a case, however. We do not perceive in this case a society clamoring for blood, demanding the names of previously-convicted sex offenders in order to further punish them, but rather families concerned about their children who want information only in order to protect them. Presumably, some citizens will harass, and presumably they will be prosecuted, but we believe that overwhelmingly our citizens are law-abiding citizens. We do not share the certainty of the dissent in the probability of community reaction that would gut the protective purpose of these laws and convert them into punishment. We decline to decide this case on that assumption.

## II

### *The Laws and the Attorney General's Guidelines*

Despite complexities of detail, the Registration Law is basically simple. It requires registration of sex offenders convicted after its effective date and all prior-convicted offenders whose conduct was found to be repetitive and compulsive. The sex offenses that trigger the laws for those previously convicted are aggravated sexual assault, sexual assault, aggravated criminal sexual contact, kidnapping pursuant to *N.J.S.A.* 2C:13–1(c)(2), and for those convicted after their effective date, added to the foregoing are various laws concerning endangering the welfare of a child, luring or enticing, criminal sexual contact if the victim is a minor, and kidnapping, criminal restraint, or false imprisonment if the victim is a minor and the offender not the parent; and in all cases an attempt to commit any of the foregoing. *N.J.S.A.* 2C:7–2b(1) and (2).[2]

---

[2] "Sex offenders" refers to those convicted of those offenses. The policy or legal justification for covering prior offenses only when the offender's conduct was repetitive and compulsive has not been explained or challenged. Precisely the same protection is available in these laws against those committing the same offenses regardless of the presence or absence of repetitive and compulsive conduct if the offense occurred after the adoption of the laws. Given the probability that a fair number of previously-convicted sex offenders may have

Registration requires, in the case of those no longer in custody—generally those who committed the offense before adoption of the laws—appearance at a local police station for fingerprinting, photographing, and providing information for a registration form that will include a physical description, the offense involved, home address, employment or school address, vehicle used, and license plate number. *N.J.S.A.* 2C:7–4(1) and (2). For those in custody, the procedure is effected at that location. The forms, information, fingerprints, and photographs (or copies) are centrally collected by the State Police and prosecutors. The registration requirement applies to all convicts, all juveniles, no matter what their age, found delinquent because of the commission of those offenses, and to all found not guilty by reason of insanity. The requirements apply as well to sex offenders convicted elsewhere who relocate to this state. Registrants whose conduct was repetitive and compulsive must verify their addresses with the local law enforcement agency quarterly, other registrants must do so annually. Upon relocation to another municipality, re-registration is required there, and, apparently, any change of address requires notice to the local law enforcement agency.[3]

All of these are lifetime requirements unless the registrant has been offense-free for fifteen years following conviction or release from a correctional facility (whichever is later) and, on application to terminate these obligations, can persuade the court that he or she is not likely to pose a threat to the safety of others. *N.J.S.A.*

---

been successfully and anonymously integrated in the community and therefore most severely affected by notification, the Legislature may have thought it fairer to limit notification only to those posing the greatest risk of reoffense, *i.e.*, repetitive and compulsive offenders. We note that no such repetitive and compulsive conduct is required as a condition of registration for those who, at the time of the adoption of the laws, are incarcerated, on probation, on parole, or under some other form of community supervision even though their conviction may have antedated the laws' adoption. *N.J.S.A.* 2C:7–2b(2).

[3] We note that neither the laws nor the Attorney General's Guidelines requires notice of other changes, *e.g.*, employment or school address, vehicle and license number.

2C:7–2f. Registration records are open to any law enforcement agency in the state, or any other state, or any federal law enforcement agency. *N.J.S.A.* 2C:7–5. Failure to comply with the Registration Law is a fourth-degree crime. *N.J.S.A.* 2C:7–2a.

The Community Notification Law requires the local chief of police to give notification of the registrant's presence in the community, such notification is also required if the registrant changes address (presumably whether within or outside of the community although the statutory language refers only to the latter). *N.J.S.A.* 2C:7–7.[4] The law provides for three levels of notification (referred to as Tiers One, Two and Three in the Guidelines) depending on the risk of reoffense.

(1) If risk of reoffense is low, law enforcement agencies likely to encounter the person registered shall be notified;

(2) If risk of reoffense is moderate, organizations in the community including schools, religious and youth organizations shall be notified in accordance with the *Attorney General's Guidelines, in addition to the notice required by paragraph (1)* of this subsection;

(3) If risk of reoffense is high, the public shall be notified through means in accordance with the Attorney General's Guidelines designed to reach members of the public likely to encounter the person registered, in addition to the notice *required by paragraphs (1) and (2) of this subsection.*

*[N.J.S.A.* 2C:7–8c.]

No suggestion has been made that any registrant could be classified as posing *no* risk of reoffense: presumably then, all registrants will be subjected at the very least to Tier One Notification (called "Law Enforcement Alert" in the Guidelines). Although the statute provides that the risk of reoffense, and therefore the extent (the level, the Tier) of notification shall be assessed

---

[4] Although the laws literally appear to *require* notification only for registrants released from custody after the effective date of the law (*N.J.S.A.* 2C:7–6) while *authorizing* it for all registrants (presumably including prior offenders) (*N.J.S.A.* 2C:7–5), the Guidelines to some extent suggesting a similar construction (Guideline II, Statutory Responsibilities), the case has been argued by all parties and *amici* on the assumption that notification is required of all those required to register, regardless of the date of conviction, and not just those registrants "to be released from incarceration." *N.J.S.A.* 2C:7–6. We believe this is a fair construction of the law and accept it as the likely legislative intent.

by the prosecutors of the county of conviction and the county of residence together with any law enforcement officials that either deems appropriate, the Guidelines appear to require the final assessment to be made by one prosecutor, apparently the prosecutor of the county of residence.

The "means" of providing notification, after deciding the appropriate Tier or level of notification, is to be determined by the prosecutor of the county of residence. *N.J.S.A.* 2C:7–8d(1) and (2). The Guidelines deal with that subject as well, Guideline VI, Methods of Community Notification, suggesting involvement of local law enforcement in that determination. The Attorney General is given broad powers under the laws to adopt "Guidelines" apparently intended to be binding on all law enforcement agencies. Those Guidelines were adopted within the statutory time period after the Attorney General consulted with members of the "Notification Advisory Council" established by the statute. *N.J.S.A.* 2C:7–11. Those Guidelines are to be reviewed again one year after the effective date of the law for "changes or revisions" at which point "the Council shall expire." *Ibid.*

The Guidelines, in accordance with the statute, add factors to be considered in assessing risk, provide greater specificity in allocating responsibility for that assessment and for determining the scope of notification, significantly define the substance of Tier Two (community organization) notification and its purposes, provide for the maintenance of records of notification and the circumstances under which they may be disclosed, require training of those involved in the notification process, and require levels of confidentiality of the disclosed information, restrictions on its dissemination, and a strong warning against vigilantism and harassment of the offenders, their families, employers, and schools. Appended to the Guidelines are the forms to be used in connection with notification. They conform fairly to the statute's intent to provide only that information needed by organizations or that part of the community likely to encounter the offender—the offense, a de-

scription and photograph of the offender, the offender's automobile and license plate, home address, address of employment or school, along with the warning about vigilantism and harassment.[5]

---

[5] The Attorney General, in accordance with the statute, has added several significant factors to the risk assessment, all designed to assure the risk is not underestimated. The Guidelines' list of factors, however, fails to include several required by the statute that could potentially point either way. Most important is the statutory factor requiring consideration of the offender's "behavior in the community following service of sentence." Although some important aspects of that behavior are included in the Guidelines' factors, the statutory factor itself— "behavior in the community following service of sentence"—is not, and its generality and potential effect on the Tier decision substantially diminished. Obviously, for those convicted some time ago, that factor could be the most significant of all, even though not determinative, in assessing likelihood of recidivism, and in some cases the only factor suggesting a low level of risk. While its relevance and strength are undoubtedly affected by the long-term risk of reoffense, the statutes require that it be considered before any Tier decision is made. Similarly, the statutory factor requiring consideration of "psychological or psychiatric profiles" is included in the Guidelines only as potential support for a high-risk assessment. The Guidelines place it as one of the factors in determining Tier Three classification, its consideration limited to whether the "profiles indicate a *high* risk of recidivism." The statute, however, is neutral. It is listed as a separate factor "relevant to risk of re-offense" and described as "*whether* psychological or psychiatric profiles indicate a risk of recidivism." *N.J.S.A.* 2C:7–8b(5). Clearly, the statutory intent is to use those profiles on their merits in support either of a low-risk assessment or a high-risk assessment and not, as the Guidelines seem to require, only in support of a high-risk assessment.

We note also the provisions for community notification in the Guidelines apparently not in conformance with the statute that requires, for Tier Three notification, notice "designed to reach members of the public likely to encounter the person registered." *N.J.S.A.* 2C:7–8c(3). The methods of notification set forth in the Guidelines include "community meetings, speeches in schools and religious congregations," as well as "such other methods as determined by the prosecutor with the input of local law enforcement." Guideline VI, Methods of Community Notification. The category suggests notification of the entire community regardless of the likelihood of encountering the offender, while the statutory requirement of "likelihood to encounter the offender" is nowhere mentioned. It is obviously a difficult standard to implement but it must be complied with. In such implementation, prosecutors and local law enforcement personnel, in deciding upon the specifics of such community notification, must be guided by it.

We assume these variations from the statute, discussed later, are simply the product of the extreme time pressures imposed by the laws. They should be appropriately revised in accordance with this opinion.

All of these provisions of the laws, the requirements for registration, the provisions for notification, the Tiers, and the many other related parts, are tied together by the statement of legislative purpose mentioned above found at the beginning of the Registration Law: to aid law enforcement in apprehending sex offenders and to enable communities to protect themselves from such offenders. Together these laws are fairly designed to achieve those purposes. The Community Notification Law, along with the Attorney General's Guidelines, provide a coherent system of notification calibrated to the degree of risk of reoffense: low-risk offenders or higher will trigger notification to law enforcement who will thereby have ready access to all offenders in the area when needed either because of reported or perceived threats, or actual incidents when quick response is most important; moderate offenders and higher will trigger a notification calculated to alert organizations charged with the supervision and care of children or women, which are likely to encounter them, to their potential presence and risk; and high-risk offenders will trigger notification to that portion of the community likely to encounter them.

We are aware of the uncertainties that surround all aspects of the subject of sex offender recidivism and the effectiveness of preventive measures. Legislatures, despite uncertainty, must sometimes act to deal with public needs, basing such action on what they conclude, in a welter of conflicting opinions, to be the probable best course. Our Legislature could reasonably conclude that risk of reoffense can be fairly measured, and that knowledge of the presence of offenders provides increased defense against them. Given those conclusions, the system devised by the Legislature is appropriately designed to achieve the laws' purpose of protecting the public.[6]

---

[6] Other laws were passed at the same time along with the Registration and Notification Laws. Chapter 127 increases the punishment of certain sex offenders; Chapter 129 eliminates credits against a term of imprisonment in the Adult Diagnostic and Treatment Center; Chapter 130 provides for community supervi-

## III

### *The Challenges to the Laws*

Although plaintiff is seeking relief only for himself, our decision will affect all sex offenders covered by the laws. Plaintiff's claims are the same as any offender could assert, whether convicted before or after the enactment of these laws, although his *ex post facto* and bill of attainder claims apply only to previously-convicted offenders. The claims that can be made by offenders convicted after the enactment of the laws, double jeopardy, cruel and unusual punishment, invasion of privacy, equal protection, and procedural due process, can also be made by plaintiff.

Plaintiff seeks an injunction against application of both the Registration and Notification Laws to him and seeks in part to confine our ruling to his special situation, a first-time offender who successfully completed treatment at the Adult Diagnostic and Treatment Center at Avenel, was paroled, successfully completed parole, and has been living and working in the community. He has not reoffended, is apparently totally integrated in and accepted by the community, which, except for his employer and co-employees, is ignorant of his offense. He offers proof that notification will lead to the loss of his job.

Despite this attempt to narrow the issue and challenge the laws as applied to him, the record and our view of the applicable legal

---

sion for life for those convicted of certain sex offenses; Chapter 131 expands rights of crime victims, including requiring notification prior to an inmate's anticipated release upon expiration of the inmate's maximum term (not provided for in prior law); Chapter 132 adds as an aggravating factor in capital sentencing proceedings the fact that "the victim was less than fourteen years old"; Chapter 134 redefines mental illness in order to make it possible to impose involuntary civil commitment on certain sex offenders; Chapter 135 requires the Department of Corrections and the Department of Human Services to provide written notice to prosecutors of the anticipated release of certain sex offenders, and requires the prosecutor to notify the Office of Victim and Witness Advocacy for the purpose of informing victims of such anticipated release. Those laws include many other provisions, some also related to the problems of sex offenders.

doctrines leave plaintiff in precisely the same position as any offender making the same attacks (except, obviously, those attacks that can be mounted only by previously-convicted offenders). We do not find plaintiff's alleged special characteristics—not yet subjected to challenge—to confer on him any constitutional or legal rights different from any other offender. Essentially, those characteristics are relevant only to his ultimate Tier classification, but given our view of the law, the fact that an offender may be able to prove an extremely low probability of reoffense does not exempt him from the law, or transform his facial attack to one as applied, or, on this record, entitle him to relief that might resolve the case without passing on the issues. Having no idea what the entire record concerning plaintiff will reveal, we cannot be assured that he will not properly be classified as a Tier Three offender, highly likely to reoffend, since there has as yet been no full inquiry into all of the factors that determine Tier classification, no inquiry into his behavior in the community and no up-to-date psychological profile of plaintiff.

We note, since it is not apparently emphasized by the parties either in their briefs or at oral argument, that if plaintiff's attacks are successful these laws may be invalidated not only for previously-convicted offenders but for all sex offenders who are convicted in the future. Recent United States Supreme Court cases show that plaintiff's double jeopardy claim is no different from that which would be made by future sex offenders who are required after conviction and completion of punishment to register and be subject to notification, alleged by plaintiff to be a second, and therefore impermissible, punishment. Therefore, if plaintiff's *ex post facto* attack is sustained, it seems most likely that the double jeopardy attack will succeed as well for in this case the basis for each seems indistinguishable: both claim registration and notification constitute a second punishment for conduct previously punished.[7]

---

[7] The analysis of this issue is discussed *infra* at 51, 662 A.2d at 392 n. 12.

The asserted invalidity of the process used to determine the extent of notification is similarly available to offenders convicted both prior to and after the enactment of the law. If a "liberty interest" is implicated for one, the same notification infringes it for the other, triggering, if so, procedural due process rights. And quite obviously, if registration and notification are punishment, and moreover cruel and unusual, that characterization would apply to all subject to the laws. And the same may be said with equal force about claims of invasion of privacy.

Plaintiff has claimed that the laws constitute an unreasonable search and seizure. The point was not raised below and appears for the first time in plaintiff's brief before us. We conclude there is no merit to the contention and decline to treat it in detail.[8]

## IV

### Interpretation of Statute; Revision of Attorney General's Guidelines; Judicial Review

Our resolution of the challenges to the laws is based on our interpretation of them and our revision of the Guidelines. Although not essential to our conclusion that the laws and Guidelines together are constitutional, that interpretation and those revisions are strongly supportive of our decision. See, e.g., New Jersey

---

[8] Whether a seizure is unreasonable is determined by balancing the nature of the intrusion with the underlying government interest. See Michigan Dep't of State Police v. Sitz, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990). We conclude that the minimal intrusion involved in appearing quarterly or annually at the local police station for registration is greatly outweighed by the compelling government interest in protecting the public which underlies this statute. Further, because plaintiff has no reasonable expectation of privacy in his fingerprints, photograph or matters of public record, the requirement to provide such information as part of the registration process does not constitute a search. See Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576, 582 (1967); United States v. Dionisio, 410 U.S. 1, 14, 93 S.Ct. 764, 771, 35 L.Ed.2d 67, 79 (1973); Cupp v. Murphy, 412 U.S. 291, 295, 93 S.Ct. 2000, 2003, 36 L.Ed.2d 900, 905 (1973).

*Chamber of Commerce v. New Jersey Election Law Enforcement Comm'n*, 82 *N.J.* 57, 75, 411 *A.*2d 168 (1980) (noting Court's power to revise statute "to free it from constitutional doubt or defect"); *In re Kimber Petroleum Corp.*, 110 *N.J.* 69, 83, 539 *A.*2d 1181 (1988) (reading judicially created provision into law in order to avoid its invalidation). We describe them here in order to provide a better understanding of our analysis and conclusions set forth in later sections of this opinion. The basic attack on these laws is the alleged excessiveness of community notification. Our interpretation and revisions strictly confine that notification in accordance with legislative intent. The judicial review required by our opinion assures implementation of that intent. It is therefore also described in this section.

We have interpreted the statute to require for Tier Two notification that the institution or organization to be notified is one that is "likely to encounter" the offender. Later in this section we have defined, both for Tiers Two and Three, what "likely to encounter the offender" means and have also set forth standards intended to clarify the difference between low, moderate, and high risk. As for the Guidelines, we have clarified or revised them in order to assure that they conform to the statute. We have required that the statutory factor "behavior in the community following service of sentence" be considered in all Tier classifications; that the statutory factor "whether psychological or psychiatric profiles indicate a risk of recidivism" be available not only to increase the risk assessment, but to decrease it.

Having interpreted the statute to require Tier Two notification to be based on "likely to encounter," we have modified the automatic nature of Tier Two notification so as to require an individual determination concerning such institutions and organizations. We have underlined the Attorney General's interpretation, and accepted it, limiting Tier Two notification to those organizations that actually are in charge of the care or supervision of children or women. We have limited Tier Three notification to conform to the "likely to encounter" requirement of the statute,

thereby revising those provisions of the Guidelines that suggest the possibility that notification would be extended to the entire community regardless of whether those notified are likely to encounter the offender.

The most significant change, of course, is the requirement, on application, of judicial review of the Tier classification and the manner of notification prior to actual notification. Because we have concluded that despite its constitutionality, the statute sufficiently impinges on liberty interests to trigger both procedural due process and the fairness doctrine in our state, *see infra* Section IX, those subject to the statute are entitled to the protection of procedures designed to assure that the risk of reoffense and the extent of notification are fairly evaluated before Tier Two or Tier Three notification is implemented. Although the provisions of the statute and the implementing Guidelines are obviously designed to assure such evaluation, and although there is no reason to believe that the prosecutors and other law enforcement personnel charged with the decision-making power that controls both the level of notification and the specific steps that will determine the amount of notification will not discharge their duties competently and fairly, we have concluded that judicial review through a summary proceeding should be available prior to notification if sought by any person covered by the law. The Attorney General, therefore, as a condition to the enforcement of this law, shall formulate procedures designed to assure that notice is given in sufficient time prior to Tier Two or Tier Three notification to allow the offender to object. We realize that in some cases it may be impossible as a practical matter to give such notice, or to give it timely, and in those cases it may be dispensed with.

The written notice shall inform the offender of the proposed level and specific manner and details of notification and inform him or her that unless application is made to a court on or before the date mentioned in the notice (which shall not be shorter than two weeks after the giving of the notice), the notification will take

place, but that if such application is made, there will be no notification until and unless affirmed by the court or, if reversed, until and unless the prosecutor provides notification in accord with the reasons for reversal. The notice shall inform the subject of the right to retain counsel (and that counsel will be provided by the court if he or she cannot afford counsel) and of the necessity that the application be timely made, and shall specifically inform him or her how such application should be made if counsel is not retained—a simple letter delivered to the Assignment Judge (named in the notice) in the courthouse in the county of the offender's residence that encloses the prosecutor's notice and indicates the offender's objection to it, disagreement with it, or the simple fact that he or she does not want the notification to be given.

The court shall immediately upon receipt of such objection set down a date for summary hearing and decision of the issue. If the offender does not have counsel, the court shall assign same. We strongly suggest that legislation providing for that representation be adopted. The prosecutor shall forthwith turn over all papers, documents, and other material, including the prosecutor's findings and statement of reasons for the level and manner of proposed notification to the court and to the offender and counsel.

The court shall control the manner of the summary proceeding, which shall be *in camera*, including determining whether and to what extent production of witnesses and cross examination shall be required or allowed, basing its determinations on the apparent complexity of the matter, the extent of doubt concerning the correctness of the level and manner of notification selected by the prosecutor, as well as the apparent need for prompt determination, presumptively present in all cases. The rules of evidence shall not apply and the court may rely on documentary presentations, including expert opinions, on all issues. The court shall either affirm or reverse the prosecutor's determination, and in the case of a reversal the court shall indicate those respects in which the proposed notification does not conform to the laws and the

requirements found in this opinion. Upon affirmance, or compliance with the terms of the reversal, notification may be given in the absence of any contrary judicial order. The trial court shall not automatically stay the effect of an affirmance to allow time for application to an appellate court, but shall grant same only if justified by the circumstances of the case.

We attempt by these procedures to reach a difficult accommodation between the State's legitimate and substantial interest in effecting prompt notification and the offender's legitimate interests in assuring accurate evaluation of the risk of reoffense and the proper determination of the manner of notification.

In these proceedings, the State shall have the burden of going forward, that burden satisfied by the presentation of evidence that *prima facie* justifies the proposed level and manner of notification. Upon such proof, the offender shall have the burden of persuasion on both issues, that burden to remain with the offender. In other words, the court, assuming the State has satisfied its burden of going forward, shall affirm the prosecutor's determination unless it is persuaded by a preponderance of the evidence that it does not conform to the laws and Guidelines.

We mention some of the substantive considerations that will control the court's decisions. The most difficult question is the standard for reviewing the Tier classification, for it is expressed in the statute simply in terms of "moderate risk" and "high risk," the determination aided somewhat by the factors listed in the law as well as those in the Guidelines. We have mentioned some respects in which the factors set forth in the Guidelines do not conform to the statute, and the prosecutors and the court shall interpret those factors as we have indicated in this opinion. But the factors do not sufficiently define moderate risk and high risk to allow for adequate review of the determination.

The only issue for the court on the Tier level of notification is the risk of reoffense. In that sense the factors of the Guidelines noting the characteristics of prior offenses or of the offender are relevant only to the risk of reoffense, *i.e.,* the likelihood of its

occurrence. That is the clear intent of the statute. All offenders required to register are, by statute, subject to at least Tier One notification, meaning that no matter how low the risk of reoffense, the Legislature has concluded Tier One notification is required.

We conclude that the legislative intent was to use the word "moderate" in comparison to the "low" risk that the Legislature found was minimally characteristic of all those sex offenders required to register. Where Tier Two notification is sought, the State's *prima facie* case shall include a description of the class of sex offenders required to register who constitute low-risk offenders, including a description of that risk, which need not necessarily be statistical; a further description of that class of sex offenders required to register who constitute moderate-risk offenders, including a description of that risk, not necessarily statistical; some proof, in the form of expert opinion or otherwise, that the moderate-risk offender class poses a risk of reoffense substantially higher than the low-risk class, and that the offender before the court is a moderate-risk offender who poses such a substantially higher risk.

Where Tier Three notification is sought, the State's *prima facie* case shall include, in addition to the description of low-risk and moderate-risk offenders and of the risks associated with each class, a description of the class of sex offenders required to register who constitute high-risk offenders, including a description of that risk, not necessarily statistical; some proof, in the form of expert opinion or otherwise, that the high-risk offender class poses a risk of reoffense substantially higher than the moderate-risk offender class, and that the offender before the court is a high-risk offender who poses that substantially higher risk.

We realize the generality of the standard against which the court will decide the correctness of the Tier level decision, but given the unavoidable uncertainties in this entire area, we do not believe it is realistic to impose requirements of proof of some statistical differentiation of the risk of reoffense between the classes or between the offender before the court and the typical

offender of the other classes. We can say no more about the meaning of "substantially higher" other than that it is intended to portray a difference in risk so significant as to warrant the conclusion that the Legislature intended this most substantial difference in the level and therefore the manner of notification.

We note that in *Schall v. Martin*, 467 *U.S.* 253, 104 *S.Ct.* 2403, 81 *L.Ed.*2d 207 (1984), the pretrial detainment of juveniles, which depended on a finding that there is a "serious risk" that the juvenile if released would commit a crime prior to his next court appearance, was challenged on the grounds that "the risk of erroneous and unnecessary detentions [wa]s too high ... because the standard for detention [wa]s fatally vague." *Id.* at 278, 104 *S.Ct.* at 2417, 81 *L.Ed.*2d at 226. The contention was that "it is virtually impossible to predict future criminal conduct with any degree of accuracy," thereby undermining, if correct, the Court's conclusion that detention of juveniles on the basis of future dangerousness "serves legitimate regulatory purposes." *Ibid.* The Court responded by noting that "our cases indicate, however, that from a legal point of view there is nothing inherently unattainable about a prediction of future criminal conduct." *Ibid.*

We note further that quite obviously none of these standards or classes suggests the court must make a finding of likelihood of reoffense, for the Legislature did not impose either Tier Two or Tier Three notification only when it was probable that reoffense would occur, but rather only when the risk—however quantified— was sufficient to warrant such notification. The quality of the offense—a sex offense—undoubtedly led to this legislative conclusion that notification was warranted even when reoffense was not probable, and that legislative conclusion is unassailable in any proceedings before the court. Therefore the probability of reoffense on the part of moderate or high-risk offenders is not the issue before the court, but rather the relatively greater risk of reoffense compared either to the low-risk offender class or the moderate-risk offender class.

In these proceedings the prosecutor, or someone designated by the prosecutor, shall, if offered as such, be presumptively accepted by the court as an expert on the risk of reoffense. We do not mean to diminish the court's power to reject that person as an expert, but simply note that a fair degree of experience with sex offenders and their characteristics, along with adequate knowledge of the research in this area—much of which is conflicting in its conclusions—should ordinarily be regarded as sufficient. The procedures we have adopted are intended to assure fairness in implementing the law; they are not to thwart its implementation, and they should not be converted into long drawn-out contests between experts. Certainly we do not foreclose or discourage the production of expert testimony on both sides, but we grant to the court substantial power, beyond that permitted or used in ordinary litigation, to allow, reject, control, and limit expert testimony in order to render these proceedings administratively effective, practical, and timely. We would anticipate that in many of these cases the proceedings would last no more than several days.

As for the manner of notification, the limitations set forth in our opinion are mandatory. For Tier Two notification, only those community organizations that own or operate an establishment where children gather under their care, or where women are cared for, shall qualify, and only those that are "likely to encounter" the offender as discussed in connection with Tier Three. The notice that goes out to such organizations shall specifically direct them *not* to notify anyone else, that being the acknowledged intent of the statute as interpreted by the Attorney General, an interpretation with which we agree. Organizations concerned with the welfare of children and women, but not having them under their custody or care, do not qualify, and as we understand the Guidelines, the Attorney General does not take a different position. There shall be no automatic inclusion of an organization simply because it is "registered." Tier Two notification can easily amount to the same notification as required for Tier Three if these limitations are not observed.

That dangers exist beyond those organizations "likely to encounter" the offender is obvious, for the offender may travel many miles before he or she offends, suggesting the possibility that greater safety would be assured if every organization in the state were notified. That is not at all the intent of the Legislature, the law having struck the balance between the need for safety and individual rights through the "likely to encounter" standard. The word "likely" shall be taken in its usual sense: to mean not "possibly" but "likely," not in the sense of "probably" but rather in the sense of "having a fair chance to encounter."

As for the manner and extent of notification under Tier Three, "likely to encounter" clearly includes the immediate neighborhood of the offender's residence and not just the people next door. It presumably would include (since Tier Three includes Tier Two notification) all schools within the municipality, depending on its size, and we see no reason why it should not include schools and other institutions in adjacent municipalities depending upon their distance from the offender's residence, place of work, or school. We find the Attorney General's Guidelines, however, more extensive in the Tier Three proposed notification than authorized by statute. The statute confines public notification under Tier Three to "means ... designed to reach members of the public likely to encounter the person registered," and it is that standard with which the Attorney General's Guidelines must comply. We do not understand how "community meetings, speeches in schools and religious congregations" conform to the statutory mandate. Those are means apparently designed to inform the entire community of the offender's presence, rather than means designed, as the statute requires, "to reach members of the public likely to encounter the person registered." They are means that exceed the statutory standard and are therefore not permitted.

We do not automatically exclude, however, notification to a group carefully selected to include only those "likely to encounter" the offender. There may be instances where the administrative difficulties of notification will warrant such a procedure. Further-

more, in certain instances the members of the public likely to encounter the offender may include children at a nearby school in which case it may be appropriate for the parents of such children to be notified, as well as the children, and that notification may most effectively be given at a meeting at the school that could include a description of safety measures that would enable the parents to reinforce whatever instructions the children may have been given by the school. Such groups, clearly defined and exclusively limited to those likely to encounter the offender, are quite different from the implied makeup of groups that will attend "community meetings, speeches in schools and religious congregations." Meetings of that kind are clearly inconsistent with the legislative direction that allows notification only to those likely to encounter the offender.

The factor that will ordinarily be critical to a determination of "likely to encounter" is geography—how close is the institution or organization, in the case of Tier Two notification, to the offender's residence or place of work or school. In some municipalities, not every institution or organization that would otherwise qualify for notification may be close enough to warrant same, but in some cases, as suggested above, institutions or organizations in other municipalities may be close enough. The same observations can be made for Tier Three notification. We do not attempt to define the area around the offender's residence or place of work or school that may be included within the notification process, and assume it may differ from one locale to another. Depending upon the particular offender, factors other than geography may be considered if they are relevant to the offender's likely whereabouts, such as an offender's proclivity for certain locations, and geographic considerations may be affected by the nature of the offender's characteristics and the institution in question, *e.g.*, a repetitive and compulsive pedophile and a large elementary school.

We assume that the media will exercise responsibility in this matter in recognition of the critical societal interest involved. In particular, we assume that the media will not knowingly frustrate

the explicit legislative goal of confining notification to those likely to encounter the offender. In other settings, all sectors of the media have voluntarily and on their own initiative, where they thought the public interest was served, consistently restrained their articles, coverage and reporting, *e.g.,* withholding the name of rape victims. We do not believe that the response of the media to this law, whatever it may be, can determine or affect its constitutionality, but clearly there is no occasion to pass on that issue for to do so assumes conduct on the part of the media that should not be attributed to it hypothetically in this litigation, and, we believe, unfairly. Whether such feared reaction would affect the legislative policy judgment in the future is not a matter for us to determine. We note only that uncertain assumptions of inappropriate and destructive future behavior on the part of either the media or the public do not, and should not, govern judicial constitutional rulings.

We suggest—not as a measure to prevent publication for we believe that only the voluntary restraint of the media will accomplish that, or to prevent excessive notification by members of the public—that the Legislature consider adopting a statute similar to those now in place that would impose criminal penalties on those specifically charged with keeping the information confidential, if they exceed the bounds of the confidentiality restriction. *See N.J.S.A.* 2A:4A–60 (unauthorized disclosure or use of juvenile record is disorderly persons offense); *N.J.S.A.* 2A:82–46 (unauthorized disclosure of identity of child sexual assault victim is disorderly persons offense). We note that other notification statutes apparently sometimes have such sanctions for violation of confidentiality. We note further the First Amendment problems involved in any attempt either to restrain or punish the exercise of free speech where the actor is an ordinary member of the public. *See Cox Broadcasting Corp. v. Cohn,* 420 *U.S.* 469, 95 *S.Ct.* 1029, 43 *L.Ed.*2d 328 (1975) (holding that state may not constitutionally punish a television station for broadcasting the name of a seventeen-year old rape-murder victim when the victim's name appeared in court records open to the public); Laurence H. Tribe,

*American Constitutional Law* 965 (2d ed. 1988) (stating that "once someone outside government acquires official information, the government cannot, absent an extraordinary showing, penalize its publication"). The need for community education in preserving confidentiality is apparent where that confidentiality is either implicit in the statute or explicit in the Guidelines. The conduct of the media and of community leaders, including public officials, may to a great extent determine the success or failure of such efforts.

To the extent the judiciary is involved in review of prosecutorial decisions, we will attempt to assure uniformity of treatment by providing for the appointment, by the Assignment Judge, of one judge in the vicinage (who may be the Assignment Judge) to handle all applications for review. In addition, a three-judge panel will be named to review all matters that have been concluded for the purpose of determining the extent of disparity of treatment, as well as to design a bench manual, if that seems desirable, to help guide all of the reviewing judges throughout the state in their determinations, all in accordance with this opinion. Finally, given the *in camera* nature of the proceedings, we will take whatever steps are needed to keep the public informed about the implementation of these laws through annual reports by the Administrative Office of the Courts. Those reports shall describe every application in opposition to Tier Two or Tier Three classification, along with the proposed manner of notification, in as much detail as possible—without disclosing the identity of the offender, or factors that might lead to such identification—the nature of the proofs presented, the opposing proofs, the determination of the trial court, and its reasons. We hope thereby to avoid the possibility of concern on the part of the public that this law is not being implemented in accordance with the legislative intent.

We have committed to the courts the obligation of providing procedural due process. We do not suggest, however, that entities other than the courts could not constitutionally afford the process required to meet the constitutional obligation. For in-

stance, the Legislature could designate or create an appropriate agency to oversee Tier classifications and manner of notification, so long as the basic elements of due process, such as notice, an opportunity to be heard and to confront witnesses, are provided. Such an agency might better promote uniformity in these matters than would the courts. We do not suggest one is better than the other but simply want to note that our decision does not prevent further legislative action in this area.

The complexity of the social problem addressed by the Legislature in Megan's Law is clear. The recidivism of a repetitive and compulsive sex offender is almost intractable. The problem of this form of recidivism poses an enormous challenge to the Legislature to devise a solution generally designed to remedy the problem without unnecessarily penalizing those who are its source. Those concerns—to devise a remedy without punishing—are of a constitutional dimension, involving both *ex post facto* and double jeopardy provisions. Coupled with constitutional considerations of due process, which involve protectible liberty interests, those concerns impel us to interpret the statute and revise its Guidelines to assure their constitutional application. To that end, we have determined implementation of the statute requires procedural standards while assuring that the Legislature's remedial objectives are effectuated, and to that end, its punitive effects reduced to a necessary minimum consistent with the legislative goal.

## V

### *Challenges Based on the Claim that the Laws Constitute Punishment*

We note at the outset those cases that have already passed on challenges to similar laws and to these laws. Registration statutes for sex offenders have almost universally been sustained in the face of attacks similar to those made here, *State v. Noble*, 171 *Ariz.* 171, 178, 829 *P.*2d 1217, 1224 (1992); *People v. Adams*, 144 *Ill.*2d 381, 163 *Ill.Dec.* 483, 487, 581 *N.E.*2d 637, 641 (1991); *State v. Ward*, 123 *Wash.*2d 488, 869 *P.*2d 1062, 1068–69 (1994), includ-

ing some recent cases involving the statutes now before us, *Artway v. Attorney General of N.J.*, 876 *F.Supp.* 666, 688 (D.N.J. 1995); *Doe v. Poritz*, 283 *N.J.Super.* 372, 384, 661 *A*.2d 1335, 1341 (Law Div.1995); *Roe v. Poritz*, No. UNN–L–1107–95, slip op. at 12 (Law Div.1995) (declining to grant temporary restraining order against enforcement of registration provision and Tier One notification); the exceptions are rare, *Rowe v. Burton*, 884 *F.Supp.* 1372, 1385 (D.Alaska 1994) (concluding that Registration Act would likely be unconstitutional because it provided for public notification); *In re Reed*, 33 *Cal.*3d 914, 191 *Cal.Rptr.* 658, 664–65, 663 *P.*2d 216, 222 (1983). Community notification laws are not as common as registration laws,[9] although the pace of recently

---

[9] Most states have adopted sex-offender registration statutes. *Ala.Code* § 13A–11–200 (1994); *Alaska Stat.* §§ 12.63.010, 18.65.087 (1994); *Ariz.Rev.Stat.Ann.* §§ 13–3821, 41–1750(B) (1995); *Ark.Code Ann.* § 12–12–901 (Michie 1994); *Cal.Penal Code* § 290 to 290.7 (West 1995); *Colo.Rev.Stat.Ann.* § 18–3–412.5 (West 1995); *Conn.Gen.Stat.* §§ 54–102r (1995); *Del.Code Ann.* tit. 11 § 4120 (1994); *Fla.Stat.* ch. 775.21 (1995); *Ga.Code Ann.* § 42–9–44.1 (Michie 1995); *Idaho Code* §§ 18–8301 to 8311 (1995); *Ill.Rev.Stat.* ch. 730 para. 150/1 (1995); *Ind.Code* § 5–2–12–1 to 12 (1995); *Kan.Stat.Ann.* § 22–4902 to 4909 (1995); *Ky.Rev.Stat.Ann.* § 17.510 (Baldwin 1995); *La.Rev.Stat.Ann.* § 15:540 to 549 (1995); *Me.Rev.Stat.Ann.* tit. 34–A, §§ 11003, 11004 (West 1994); *Mass.Gen. Laws Ann.* ch. 22C, § 37 (1995); *Minn.Stat.* § 243.166 (1995); *Miss.Code Ann.* § 45–33–1 (1995); *Mo.Rev.Stat.Ann.* § 566.600 (1995); *Mont.Code Ann.* § 46–23–501 to 507 (1994); *Nev.Rev.Stat.* § 207.151 to .157 (1993); *N.H.Rev.Stat.Ann.* § 632–A:12 (1994); *N.D.Cent.Code* § 12.1–32–15 (1993); *Ohio Rev.Code Ann.* § 2950.01 (Baldwin 1995); *Okla.Stat.Ann.* tit. 57 § 581 to 587 (1995); *Or.Rev. Stat.* §§ 181.508, 181.518 (1994); *R.I.Gen.Laws* § 11–37–16, (1994); *S.D.Codified Laws Ann.* § 22–22–30 to 39 (1995); *Tenn.Code Ann.* § 40–39–101 to 108 (1994); *Tex.Civ.Stat.Code Ann.* § 6252–13c.1 (West 1995); *Utah Code Ann.* § 77–27–21.5 (1994); *Va.Code Ann.* §§ 19.2–298.1 to 3, 19.2–390.1 (Michie 1995); *Wash Rev.Code Ann.* §§ 9A.44.130, 4.24.550 (1995); *W.Va.Code* § 61–8F–1 to 8 (1994); *Wis.Stat.Ann.* § 175.45 (1995); *Wyo.Stat.* § 7–19–301 (1995). A few states have legislation pending. *Mich.Comp.Laws Ann.* § 28.731 (West 1995) (effective October 1, 1995); *N.Y.* Senate Bill 11B (1995). Of these, the following states provide, in their statutes, some form of community notification: Alaska, Arizona, California, Connecticut, Florida, Georgia, Idaho, Indiana, Kansas, Louisiana, Maine, Montana, Nevada, North Dakota, Oklahoma, Oregon, South Dakota, Tennessee, Virginia, and Washington. New Jersey's statute is unique in that it is the only one in which community notification is mandatory (for those in the highest risk category) rather than up to the discretion of local officials.

adopted ones suggests they may become common, and we are aware of only five cases litigating them: they were upheld in Judge Wells' trial court decision in this case, and in *Ward, supra,* 869 *P.*2d at 1072; similar notification laws were ruled unconstitutional in *State v. Babin,* 637 *So.*2d 814, 824 (La.Ct.App.1994), *writ denied,* 644 *So.*2d 649 (La.1994), and the very law before us was ruled unconstitutional in *Artway, supra,* 876 *F.Supp.* at 692, with the finding of probable invalidity for interlocutory injunction purposes in *Diaz v. Whitman,* No. 94–, slip. op. at 9 (D.N.J. January 3, 1995).

Our discussion and determination rely almost exclusively on federal cases, although plaintiff's constitutional challenge is based on both the State and Federal Constitutions. We know of no relevant New Jersey cases on any of these issues, except for some language in related matters, *State v. Ulesky,* 100 *N.J.Super.* 287, 241 *A.*2d 671 (Monmouth County Ct.1968) (holding narcotics registration ordinance did not violate either the Bill of Attainder or *Ex Post Facto* Clause of the State Constitution), *rev'd on other grounds,* 54 *N.J.* 26, 252 *A.*2d 720 (1969), and *Hazelton v. Murray,* 21 *N.J.* 115, 121 *A.*2d 1 (1956) (holding constitutional in face of *ex post facto* challenge law barring collection of funds by union officers or agents who had been convicted of certain crimes), and for general language in cases dealing with the constitutional obligation to honor the plea bargain, *e.g., State v. Warren,* 115 *N.J.* 433, 558 *A.*2d 1312 (1989); *State v. Salentre,* 242 *N.J.Super.* 108, 576 *A.*2d 36 (App.Div.1990). No suggestion of merit has been made that New Jersey's Constitution in relation to these challenges (as distinguished from the procedural due process challenge) should be interpreted in any way different from the Federal Constitution.[10]

---

[10] *Amicus* Diaz contends that our interpretation of the State Constitution's *Ex Post Facto* Clause should not necessarily follow the United States Supreme Court's interpretation of the federal clause. *Amicus* bases this argument on the contention that New Jersey adopted the *Ex Post Facto* Clause in 1947, and intended to implement it as federal law interpreted the clause at that time. We

██ Our review of the law leads to the following conclusions: a statute that can fairly be characterized as remedial, both in its purpose and implementing provisions, does not constitute punishment even though its remedial provisions have some inevitable deterrent impact, and even though it may indirectly and adversely affect, potentially severely, some of those subject to its provisions. Such a law does not become punitive simply because its impact, in part, may be punitive unless the only explanation for that impact is a punitive purpose: an intent to punish.

These are towering constitutional provisions of great importance to individual dignity, freedom, and liberty. They were adopted in England and in this country to protect against real evils: to protect against the worst, and lesser, punishments, most of them obvious on their face. The search today for hidden intent is appropriate; the scrutiny of effects in order to unmask intent and purpose, even to attribute purpose, is similarly appropriate. But while the role of these constitutional provisions as protectors of individual rights must always be fully enforced, care should be exercised not to convert them into obstacles that prevent the enactment of honestly-motivated remedial legislation by subjecting laws to tests unsuited to the underlying purpose of these constitutional provisions. *See, e.g., Kennedy v. Mendoza–Martinez,* 372 *U.S.* 144, 83 *S.Ct.* 554, 9 *L.Ed.2d* 644 (1963). These provisions were aimed at arbitrary and unjust actual punishment, intentionally inflicted, and their application should be guided accordingly. This does not mean that only those laws that clearly and intentionally inflict substantial punishment are to be condemned, but that the most searching inquiry is required before condemning honest laws that are free of punitive intent and designed to protect society.

Before tracing the course of the development of these rules, we deal at the outset with plaintiff's two main contentions, for they

---

reject that suggestion and hold that like its federal counterpart, the State *Ex Post Facto* Clause cannot be violated without the imposition of punishment.

help explain the relevance of some of the decisional history. Plaintiff asserts, correctly, that deterrence and retribution are the main characteristics of criminal sanctions and, not correctly, that any law or sanction having either of those characteristics is to that extent punitive, and the sanction, proceeding, or law, therefore constitutes "punishment" for constitutional purposes, even if only in part. The contention here is that the Registration and Notification Laws not only protect against crime but deter it: both for the potential reoffender who must register and face notification, as well as for those who might otherwise commit a first sex offense but for the potential impact of registration and notification. The second contention is that government is responsible for the potential impacts that may result from notification, whether they were intended or not, and that they may be so severe as to constitute punishment.

We deal more fully with both of those contentions in our treatment of this subject, but note here that neither of those consequences invalidates a law whose sole purpose is remedial and whose provisions are designed solely to achieve that purpose; that except for the recent decisions mentioned above, no case has ever held that the inevitable but unintended deterrent impact of a regulatory law by itself renders it punitive or that non-governmental reaction to that law does. We assume that if the legislative purpose was to deter sex offenders, the law would be invalid; and we have no doubt that if the government ordered punishment, the law would be invalid. Neither, however, is the case here.

In the *ex post facto* area, careful reading of some of the cases is necessary to avoid misunderstanding the rule that a law solely remedial does not violate this constitutional provision simply because it may have inevitable deterrent consequences. Some *ex post facto* cases deal with a different section of the constitutional provision and their results cannot be transported to the section involved in this case—prohibiting a statute that inflicts punishment in addition to that imposed by law at the time of the offense. For example, in *Collins v. Youngblood*, 497 *U.S.* 37, 110 *S.Ct.* 2715, 111 *L.Ed.*2d 30 (1990) (overruling *Kring v. Missouri*, 107 *U.S.* 221,

235, 2 *S.Ct.* 443, 455, 27 *L.Ed.* 506, 511 (1883)), a law was held not to violate the *Ex Post Facto* Clause even if its passage, after defendant's commission of the crime, would result in his execution which would not have occurred without it. The section of the *ex post facto* law involved in both *Collins* and *Kring*, however, prohibited modifications of the law after commission of the offense that would have the effect of increasing the substantive aspects of a defense to the crime charged, *Collins'* holding (contrary to *Kring*) being that repeal of a procedural provision that would have prevented defendant's execution did not violate that provision of the constitutional clause. Certainly the *Collins* case does not in any way mean that under the "additional punishment" provision of *ex post facto*, remedial purposes will justify any impact—including death—so long as it is a consequence of the law's remedial purpose. Similarly, those laws that affect the length of a prisoner's term, or are likely to affect it, passed after commission of the crime, obviously constitute "additional punishment"—no one ever believed or contended that a Legislature that concluded society would be better off if those guilty of burglary were imprisoned for twenty years rather than ten could impose that additional punishment on those presently in prison serving their ten-year term on the grounds that the Legislature's intent was remedial. Similarly, laws changing qualifications for parole consideration that are likely to result in added time in prison, or that eliminate "good time" as a credit against a term of imprisonment, and that are practically certain to result in added time in prison, violate the "additional punishment" provision of the *Ex Post Facto* Clause. Imprisonment is a very special deterrent consequence, and in the *ex post facto* context, as well as in double jeopardy and other contexts, it is conclusively punishment. *California Dep't of Corrections v. Morales,* —— *U.S.* ——, 115 *S.Ct.* 1597, 131 *L.Ed.*2d 588 (1995); *Weaver v. Graham,* 450 *U.S.* 24, 101 *S.Ct.* 960, 67 *L.Ed.*2d 17 (1981). Similarly, even though the cases are instructive for purposes of defining punishment, we do not read *Schall, supra,* ·467 *U.S.* at 253, 104 *S.Ct.* at 2403, 81 *L.Ed.*2d at 207, and *United States v. Salerno,* 481 *U.S.* 739, 107 *S.Ct.* 2095, 95 *L.Ed.*2d 697

(1987), which upheld the constitutionality of pretrial imprisonment in the face of a substantive due process attack, as suggesting imprisonment might not be punishment for *ex post facto* or double jeopardy purposes.

## A

The parties and all *amici* are in general agreement that the laws' validity, measured against the various constitutional attacks, depends on whether they inflict punishment. The determination of punishment has ordinarily consisted of several components. An initial inquiry is whether the legislative intent was regulatory or punitive: if the latter, that generally is the end of the inquiry, for punishment results; if the former, the inquiry changes to whether the impact, despite the legislative intent to regulate, is in fact punitive, usually analyzed in terms of the accepted goals of punishment, retribution and deterrence. Despite some ambivalent language, a punitive impact—one that effects retribution or accomplishes deterrence—renders the law or the specific provision of the law that is attacked, punishment, but only if the sole explanation for that impact is a punitive intent. In other words, the law is characterized as regulatory in accordance with the legislative intent even if there is some punitive impact, if that impact is simply an inevitable consequence of the regulatory provisions themselves. The law is characterized as punitive only if the punitive impact comes from aspects of the law unnecessary to accomplish its regulatory purposes—that is, if the law is "excessive," the excess consisting of provisions that cannot be justified as regulatory, that result in a punitive impact, and that, therefore, can only be explained as evidencing a punitive intent.

Our starting point will be the first case defining the scope of the *Ex Post Facto* Clause, *Calder v. Bull,* 3 *U.S.* (3 *Dall.*) 386, 1 *L.Ed.* 648 (1798), the clause on which plaintiff most strenuously bases his claim. In *Calder,* the Court held that a Connecticut law, enacted after a civil decree of a probate court and allowing an appeal where none had previously been allowed, did not violate the constitutional prohibition, since that prohibition applied only to

crimes, pains, and penalties that were affected by subsequent laws and not to civil matters like the probate proceeding. One of the categories of law within the proscription of the clause is a "law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." *Id.* at 390, 1 *L.Ed.* at 650.[11] The critical role of punishment in triggering the *Ex Post Facto* Clause was duplicated thereafter in other cases interpreting the prohibition against double jeopardy and excessive fines, the determination of what constitutes punishment substantially similar for each.

There was a movement away from punishment as the critical element in *ex post facto* analysis. *See Kring, supra,* 107 *U.S.* at 235, 2 *S.Ct.* at 455, 27 *L.Ed.* at 511 (*Calder* definition not exclusive, the prohibition triggered not only by laws imposing additional punishment but those that " 'alter[ ] the situation of a party to his disadvantage' "); *Thompson v. Utah,* 170 *U.S.* 343, 352, 18 *S.Ct.* 620, 623, 42 *L.Ed.* 1061, 1067 (1898) (*ex post facto* provision triggered by laws that deprive one of "a substantial right involved in his liberty"). That movement was not halted until the Court's decision in *Collins v. Youngblood,* 497 *U.S.* 37, 110 *S.Ct.* 2715, 111 *L.Ed.*2d 30 (1990), which held that the *Calder* definition was exclusive, that "disadvantage" and deprivation of "a substantial right" involved in liberty were not the test, and restored punishment as the sole measuring rod, overruling *Kring* and *Thompson* in the process. Even during those intervening years, however, punishment was the central "fact" determinative of the outcome of challenges to laws based on these constitutional provisions. It still is today.

In *Trop v. Dulles,* 356 *U.S.* 86, 78 *S.Ct.* 590, 2 *L.Ed.*2d 630 (1958), the Court invalidated revocation of citizenship on the grounds of military desertion, the plurality opinion holding that it

---

[11] A history of the extra-judicial circumstances surrounding the limitation of the *Ex Post Facto* Clause to criminal cases in *Calder, supra,* is found in William W. Crosskey, *The True Meaning of the Constitutional Prohibition of Ex–Post–Facto Laws,* 14 *U.Chi.L.Rev.* 539 (1947).

was cruel and unusual punishment. The initial question was whether the sanction constituted punishment at all, determined in part by reference to *ex post facto* cases dealing with the same issue. *Id.* at 95, 78 *S.Ct.* at 595, 2 *L.Ed.*2d at 639.

> In deciding whether or not a law is penal, this Court has generally based its determination upon the purpose of the statute. If the statute imposes a disability for the purposes of punishment—that is, to reprimand the wrongdoer, to deter others, etc., it has been considered penal. But a statute has been considered nonpenal if it imposes a disability, not to punish, but to accomplish some other legitimate governmental purpose. The Court has recognized that any statute decreeing some adversity as a consequence of certain conduct may have both a penal and a nonpenal effect. The controlling nature of such statutes normally depends on the evident purpose of the legislature.
>
> [*Id.* at 96, 78 *S.Ct.* at 595–96, 2 *L.Ed.*2d at 639–640 (footnotes omitted).]

Having concluded from its analysis of the statute that there was "no other legitimate purpose that the statute could serve" other than "simply to punish him," the Court concluded that taking away citizenship constituted punishment, *id.* at 97, 78 *S.Ct.* at 596, 2 *L.Ed.*2d at 640, and, in that case, cruel and unusual punishment. *Id.* at 103, 78 *S.Ct.* at 599, 2 *L.Ed.*2d at 644.

In *De Veau v. Braisted,* 363 *U.S.* 144, 80 *S.Ct.* 1146, 4 *L.Ed.*2d 1109 (1960), a New York law that prohibited unions from collecting dues if any officer or agent of the union was a convicted felon was attacked on *ex post facto* grounds. The claim was that the felon, convicted before the passage of the law, was subjected to additional punishment because of the law's impact in causing the union to suspend him from his position as an officer in order to enable it to continue to collect dues, the response being that the law was regulatory, its only goal being to cleanse the unions that controlled the waterfront of criminal control. In ruling that there was no punishment the Court said:

> The mark of an ex post facto law is the imposition of what can fairly be designated punishment for past acts. The question in each case where unpleasant consequences are brought to bear upon an individual for prior conduct, is whether the legislative aim was to punish that individual for past activity, or whether the restriction of the individual comes about as a relevant incident to a regulation of a present situation, such as the property qualifications for a profession. No doubt is justified regarding the legislative purpose of § 8. The proof is overwhelming that New York sought not to punish ex-felons, but to devise what was felt to be a much-

needed scheme of regulation of the waterfront, and for the effectuation of that scheme it became important whether individuals had previously been convicted of a felony.

[*Id.* at 160, 80 *S.Ct.* at 1155, 4 *L.Ed.*2d at 1120 (citation omitted).]

The "restriction of the individual" was the alleged punishment. However, the Court held that since it was not "the legislative aim ... to punish that individual for past activity," and since the restriction was a "relevant incident to a regulation of a present situation," no punishment was involved. In other words, where the alleged punitive effect is not intended as such, but rather is an inevitable consequence of a law that is clearly regulatory, there is no punishment. To the same effect, in *Flemming v. Nestor,* 363 *U.S.* 603, 80 *S.Ct.* 1367, 4 *L.Ed.*2d 1435 (1960), where an unusually harsh law was alleged to violate a different aspect of the *Ex Post Facto* Clause by making past conduct a crime, the majority quoted the plurality language of *De Veau, id.* at 614, 80 *S.Ct.* at 1374–75, 4 *L.Ed.*2d at 1446, and noted that "[w]here no persuasive showing of a purpose 'to reach the person, not the calling,' has been made, the Court has not hampered legislative regulation of activities within its sphere of concern, despite the often-severe effects such regulation has had on the persons subject to it." *Id.* at 616, 80 *S.Ct.* at 1375, 4 *L.Ed.*2d at 1447 (footnote and citation omitted).

The federal law permitting pretrial detention of those accused of certain crimes on the basis of future dangerousness was sustained in the face of a substantive due process claim in *Salerno, supra,* 481 *U.S.* at 739, 107 *S.Ct.* at 2095, 95 *L.Ed.*2d at 697. Although none of the constitutional clauses aimed at restraining government's power to punish was involved, the question whether such detention constituted punishment was critical, for the government "never argued that pretrial detention could be upheld if it were 'punishment.'" *Id.* at 746, 107 *S.Ct.* at 2101, 95 *L.Ed.*2d at 708.

To determine whether a restriction on liberty constitutes impermissible punishment or permissible regulation, we first look to legislative intent. Unless Congress expressly intended to impose punitive restrictions, the punitive/regulatory distinction turns on "'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].'"

[*Id.* at 747, 107 *S.Ct.* at 2101, 95 *L.Ed.*2d at 708 (citations omitted).]

Finding that "Congress ... perceived pretrial detention as a potential solution to a pressing societal problem" and that "the incidents of pretrial detention [are not] excessive in relation to the regulatory goal Congress sought to achieve," *id.* at 747, 107 *S.Ct.* at 2095, 95 *L.Ed.*2d at 709, the Court sustained the law, despite its obvious severe punitive consequences.

### B

One of the points urged by plaintiff, and strongly supported by *amici,* is that any punitive impact, no matter how minimal, no matter how clearly the product of a provision otherwise solely remedial, standing alone, *compels* the conclusion that punishment has been inflicted for *ex post facto* purposes (and presumably for double jeopardy and excessive fine purposes) regardless of all other considerations. It is argued not only that the registration and notification provisions amount to punishment, but that even the slightest degree of deterrent effect renders them punitive under United States Supreme Court cases. The argument notes the incontrovertible fact that registration and notification will have *some* deterrent effect, even if only, in the case of registration, because those realizing their presence in the community is known to the police may be less likely to reoffend. This somewhat extreme position arises from language in numerous cases that arguably supports it, but that on fair examination says nothing of the kind. We reject this contention, as well as the reading of the cases asserted to compel its conclusion.

The language that has caused the problem appears to have had its origin in *United States v. Halper,* 490 *U.S.* 435, 109 *S.Ct.* 1892, 104 *L.Ed.*2d 487 (1989), a double jeopardy case in which monetary sanctions were sought under the Civil False Claims Act subsequent to defendant's criminal conviction for the same false claims, the contention being that the monetary sanctions constituted

multiple punishment.[12] The question, as stated by the Court, was "whether and under what circumstances a civil penalty may constitute punishment for the purpose of the Double Jeopardy Clause." *Id.* at 446, 109 *S.Ct.* at 1901, 104 *L.Ed.*2d at 500–01.

We have recognized in other contexts that punishment serves the twin aims of retribution and deterrence. *See, e.g., Kennedy v. Mendoza–Martinez,* 372 *U.S.* 144, 168, 83 *S.Ct.* 554 [567] 9 *L.Ed.*2d 644 (1963) (these are the "traditional aims of punishment"). Furthermore, "[r]etribution and deterrence are not legitimate nonpunitive governmental objectives." *Bell v. Wolfish,* 441 *U.S.* 520, 539, n 20, 99 *S.Ct.* 1861 [1874, n. 20] 60 *L.Ed.*2d 447 (1979). From these premises, it follows that a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term. *Cf. Mendoza–Martinez,* 372 *U.S.*, at 169, 83 *S.Ct.* 554 [at 568], 9 *L.Ed.*2d 644 [at 661–62] (whether sanction appears excessive in relation to its nonpunitive purpose is relevant to determination whether sanction is civil or criminal). We therefore hold that under the Double Jeopardy Clause a defendant who already has been punished in a criminal prosecution may not be subjected to an additional civil sanction to the

---

12 It should be noted that in *Halper* the Court stated that the Government could "seek[ ] and obtain[ ] both the full civil penalty and the full range of statutorily authorized criminal penalties in the same proceeding," so long as the cumulative punishments were authorized, *Halper, supra,* 490 *U.S.* at 450, 109 *S.Ct.* at 1903, 104 *L.Ed.*2d at 503, but that "when the Government already has imposed a criminal penalty and seeks to impose additional punishment in a second proceeding," the protections of the Double Jeopardy Clause are triggered. *Id.* at 451 n. 10, 109 *S.Ct.* at 1903 n. 10, 104 *L.Ed.*2d at 503 n. 10. If, therefore, the registration and notification laws impose punishment, the Double Jeopardy Clause protection against multiple punishments for the same offense would be triggered, because such punishment would be imposed in a second proceeding. *But see, Montana Dep't of Revenue v. Kurth Ranch,* 511 *U.S.* ——, ——, 114 *S.Ct.* 1937, 1958, 128 *L.Ed.*2d 767, 791 (1994) (Scalia, J., dissenting) (concluding that there is no multiple punishment component of the Double Jeopardy Clause); *United States ex rel. Marcus v. Hess,* 317 *U.S.* 537, 555, 63 *S.Ct.* 379, 389–90, 87 *L.Ed.* 443, 455 (1943) (Frankfurter, J., concurring) (concluding that "where two ... proceedings merely carry out the remedies which Congress has prescribed in advance for a wrong, they do not twice put a man in jeopardy for the same offense"). *Halper* clearly indicates that successive proceedings constituting two punishments for the same conduct violate double jeopardy even if authorized by the same statute. We need not, and do not, decide whether the court's advice to future offenders, upon sentencing or acceptance of plea, that they are subject to the registration and notification laws would have the constitutional effect of imposing both "punishments" in the same proceeding for double jeopardy purposes.

extent that the second sanction may not fairly be characterized as remedial, but only as a deterrent or retribution.

[*Id.* at 448–49, 109 *S.Ct.* at 1902, 104 *L.Ed.*2d at 502.]

The context of the case provides a simple explanation for the need to formulate a rule: a statutory penalty under the False Claims Act might be regarded as either remedial or punitive. Ultimately, the issue was resolved by noting that the amount of the civil penalty compared to the government's loss constituted "a sanction overwhelmingly disproportionate to the damages [defendant] has caused." *Id.* at 449, 109 *S.Ct.* at 1902, 104 *L.Ed.*2d at 502. It was a civil penalty that bore "no rational relation to the goal of compensating the Government for its loss, but rather appear[ed] to qualify as 'punishment' in the plain meaning of the word." *Ibid.* In other words, to the extent that the penalty exceeded the government's loss, it served no purpose other than to punish.

That context gives the language quoted above, perhaps otherwise confusing, a fairly clear significance. The "civil sanction" could not "fairly be said solely to serve a remedial purpose" given that the remedial purpose was to compensate the government for its costs. It went so far beyond that need as to be characterized as "overwhelmingly disproportionate," and the case itself was described as "rare." *Ibid.* The excess over the amount necessary to compensate the government could "only be explained as also serving either retributive or deterrent purposes." Given the legitimate goal of the statute, there simply was no other explanation for it, and based on that fact, it constituted punishment.

The language was never meant to apply to a provision that is wholly remedial in purpose but has, for example, some deterrent impact, but only to a sanction, or that part of a sanction, that may fairly be characterized "only as a deterrent or retribution." *Ibid.* The Court's remedy bears this out, for it remanded the matter to the trial court to determine how much of the civil penalty exceeded what was necessary to compensate the government and to eliminate that portion, assuming the government could not justify the entire amount.

The use of the word "serve" is also clarified by the context of the case. Standing alone, "a civil sanction that cannot fairly be said solely to serve a remedial purpose" might be thought to mean that a provision that is clearly remedial in intent and effect somehow becomes punitive because the very same provision has some deterrent impact, *i.e.,* it is not *solely* remedial because it does not "solely serve a remedial purpose." But what the Court meant by "serve" is very much tied to the word "purpose," in the sense of an intended goal, as seen when the Court very shortly thereafter refers to the difficulty of determining the precise dollar figure at which "a civil sanction has accomplished its remedial purpose of making the government whole, but beyond which the sanction takes on the quality of punishment." *Halper, supra,* 490 *U.S.* at 450, 109 *S.Ct.* at 1902, 104 *L.Ed.*2d at 502–03.

We do not mean to imply that the foregoing totally clarifies the intent of the language or eliminates any ambiguity. Nonetheless, we believe that the language itself provides a fair indication that mere impact of a provision was not being referred to by the use of the phrase "serve the purpose of punishment." Had impact been the critical factor, regardless of design and intent, the quote would have read, "from these premises, it follows that a civil sanction that cannot fairly be said solely to have a remedial impact, but rather also having either retributive or deterrent impacts, is punishment." When a sanction is tested differently as one "that cannot fairly be said solely to *serve* a remedial *purpose*," the connotation is that there is a purpose to the provision, and the test is whether that is what the provision is meant to achieve, that is what it "serves." When it is said that the sanction "can only be *explained* as also serving either retributive or deterrent purposes," the use of the word "explained" clearly suggests an examination of something more than the impact; it suggests the question of whether the impact is simply an inevitable consequence of the remedial provision, or whether it is such that the only explanation is another purpose to the sanction, a punitive purpose. If the punitive purpose must be so clear that the sanction can be characterized as punishment only if, and to the

extent that, it may not fairly be characterized as remedial and can *only* be characterized as a deterrent or retribution, that means that the sanction is being examined not to see if there is some incidental punitive impact that is an inevitable consequence of its remedial purpose and function, but whether punishment is "the *purpose* [ ] that the [sanction] may *fairly* be said to serve." *Id.* at 448, 109 *S.Ct.* at 1901, 104 *L.Ed.*2d at 501. The language does not suggest that what is being called for is something akin to painstaking chemical analysis or sophisticated spectrography to find a trace of deterrence or retribution.

Although we believe the language of *Halper* to be fairly clear, the facts and results of cases following *Halper* better explain its meaning. The quoted *Halper* language appears again in *Austin v. United States,* 509 *U.S.* ——, 113 *S.Ct.* 2801, 125 *L.Ed.*2d 488 (1993), there in response to the government's claim that the statutory *in rem* civil forfeiture did not impose punishment, but rather was remedial. The forfeiture proceeding followed defendant's conviction for possession and distribution of two grams of cocaine and resulted in the loss of his mobile home, where the cocaine had been kept, and his auto body shop, where the sale took place. The defendant claimed that the forfeiture violated the Excessive Fines Clause of the Eighth Amendment, the issue before the Court being whether this forfeiture was a "fine" at all, in other words whether the Excessive Fines Clause was applicable at all, and if it was, the question of its excessiveness would thereafter have to be determined. The Court's disposition of the case and its analysis of the *Halper* language make it clear that the purpose and the intent of the civil sanction is the touchstone that determines the sanction's characterization as either remedial or punitive, rather than simply its impact.

All members of the Court were of the view that the question of whether the forfeiture was a fine depended on whether or not it was "punishment," and the Court held that it was. Going beyond the specific forfeiture in the case before it, the majority's analysis led it to the conclusion that *all* forfeitures under the statute

involved constituted punishment regardless of the underlying crime and the value of the property forfeited, and regardless of the relationship between the two in terms of the connection between the property and the crime. It based its decision on the clear purpose and intent of Congress to impose punishment. Noting the "historical understanding of forfeiture as punishment, the clear focus of [the statute] on the culpability of the owner"— only culpable owners were subject to forfeiture, the statute expressly exempting "innocent owners"—"and the evidence that Congress understood those provisions as serving to deter and to punish," *id.* at ——, 113 *S.Ct.* at 2812, 125 *L.Ed.*2d at 505, the Court concluded the forfeiture constituted punishment. Proof of the congressional intent was impressive; the innocent-owner defense revealed an intent to punish only those involved in drug trafficking, and the legislative history "confirm[ed] the punitive nature" of the statute, the congressional report stating " 'that the traditional criminal sanctions of fine and imprisonment are inadequate to deter or punish the enormously profitable trade in dangerous drugs.' " *Id.* at ——, 113 *S.Ct.* at 2811, 125 *L.Ed.*2d at 504 (citation omitted).

The *Halper* language was used by the Court in response to the government's claim that the statute was remedial because it removed the " 'instruments' of the drug trade [the auto body shop and the mobile home] 'thereby protecting the community from the threat of continued drug dealing,' " and generated revenues through the forfeited assets "to compensate the Government for the expense of law enforcement activity and for its expenditure on societal problems such as urban blight, drug addiction, and other health concerns resulting from the drug trade." *Ibid.* (citation omitted).[13] The Court rejected both contentions on their merits, *i.e.*, its language makes it clear that it found *no* remedial purpose

---

[13] The primary contentions of the government, disposed of at the outset of the Court's opinion, were that the excessive fines clause applied only in criminal proceedings—this proceeding was admittedly a civil *in rem* forfeiture proceeding—and applied only to *criminal* punishment. The Court disagreed.

whatsoever. *Id.* at ——, 113 *S.Ct.* at 2811–12, 125 *L.Ed.*2d at 504–05.

Furthermore, the Court noted, and fundamentally so, that even if it assumed that these statutory provisions "serve[d] some remedial purpose, the [g]overnment's argument must fail," for a " 'civil sanction that cannot fairly be said *solely* to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term.' " *Id.* at ——, 113 *S.Ct.* at 2812, 125 *L.Ed.*2d at 505 (quoting *Halper, supra,* 490 *U.S.* at 448, 109 *S.Ct.* at 1902, 104 *L.Ed.*2d at 502). *Austin* thus uses the *Halper* language not for its usual significance—that a remedial statute may be said to impose punishment if, despite its remedial purpose, it is designed in part as punishment—but rather to demonstrate *a fortiori* that a statute found to be punitive, to have punishment as its goal, is not transformed into a remedial statute simply because it may also have *some* remedial purpose.

Essentially the same question involved in *Austin* was determined in *United States v. $405,089.23,* 33 *F.*3d 1210 (9th Cir.1994), a civil forfeiture action following criminal conviction for the same illegal drug activities. The only difference is that the forfeiture action was claimed to violate the Double Jeopardy Clause, rather than the Excessive Fines Clause. Noting prior decisions that fairly clearly regard such forfeiture actions, including the sanction, as totally civil, largely because of the label Congress had always affixed to it, the court concluded that *Halper* had changed the law and that *Austin* had confirmed that change in the civil forfeiture context. After quoting the usual *Halper* language, and referring to the Supreme Court's decision in *Austin,* the Court of Appeals said that "[j]ust last year [the Court] reaffirmed its new found wisdom, emphasizing again that a sanction which is *designed* even in part to deter or punish will constitute punishment, regardless of whether it also has a remedial purpose." *Id.* at 1219 (emphasis added). Reinforcing the fact that the purposes intended to be served must be assessed, the Court of Appeals, summarizing

*Austin*, said that "because of 'the historical understanding of forfeiture as punishment' there is a strong presumption that any forfeiture statute does not serve *solely* a remedial purpose," that "where such a statute focuses on the culpability of the property owner by exempting innocent owners or lienholders, it is likely that the enactment serves at least in part to deter and punish guilty conduct," and finally, that "where Congress has tied forfeiture directly to the commission of specified offenses, it is reasonable to presume that the forfeiture is at least partially intended as an additional deterrent to or punishment for those violations of law." *Id.* at 1221.

More recently, the Court of Appeals for the Seventh Circuit rejected an *ex post facto* claim based on debarment proceedings—the defendant was permanently prohibited from aiding in drug approval applications—following defendant's conviction for bribing Federal Drug Administration officials in order to obtain such approvals, the debarment based on a statute passed after that conviction. *Bae v. Shalala*, 44 *F*.3d 489 (7th Cir.1995). The claim was that the debarment proceedings constituted additional punishment prohibited by the *Ex Post Facto* Clause. The Court of Appeals observed:

A civil sanction that can fairly be said solely to serve remedial goals will not fail under *ex post facto* scrutiny simply because it is consistent with punitive goals as well. A civil sanction will be deemed to be punishment in the constitutional sense only if the sanction "may not fairly be characterized as remedial, but *only* as a deterrent or retribution."

[*Id.* at 493 (quoting *Halper, supra*, 490 *U.S.* at 449, 109 *S.Ct.* at 1902, 104 *L.Ed.*2d at 502).]

Emphasizing the point, the Court of Appeals noted that "[t]he Supreme Court has consistently required 'unmistakable evidence of punitive intent' to characterize a sanction as punishment." *Id.* at 494.

Considering the Act's focus to be "exclusively on its remedial purpose" and its provisions to be aimed solely at achieving the " 'need to establish procedures to bar individuals who have been convicted of crimes pertaining to the regulation of drug products from working for companies that manufacture or distribute such

products,'" the court concluded, "[w]ith these objective *goals,* the [Act] can fairly be said solely to serve a remedial purpose." *Id.* at 493 (emphasis added and citations omitted). As the court stated, "Without question, the GDEA serves compelling governmental interests unrelated to punishment. The punitive effects of the GDEA are merely incidental to its overriding purpose to safeguard the integrity of the generic drug industry while protecting public health." *Ibid.*

In *United States v. Hudson,* 14 *F.*3d 536 (10th Cir.1994), a criminal prosecution for illegal banking activities was found not to constitute double jeopardy, the claim being that a previous administrative sanction partially debarring the defendants from further banking activities constituted punishment. The Court of Appeals carefully noted "that a determination that a sanction is at least in part punishment requires that it *must* be explained as also serving as a deterrent or retribution, not merely that it *may* be so explained." *Id.* at 540. The Court of Appeals thus came to grips with what is meant when it is said that a "particular remedial sanction can only be explained as also affecting deterrence or retribution." It means that the only possible explanation for the sanction, at least in part, is that it must have been intended to effect punishment.

That reading is confirmed at the end of the Court's consideration of this aspect of the matter when it said,

> we are convinced that the government's nonparticipation sanction was *solely designed* to protect the integrity of the banking industry by purging the system of corrupt influences. We therefore hold that [a]ppellants' irrevocable ban from further participation in banking activities is solely remedial even though it carries the sting of punishment in the eyes of [a]ppellants.
>
> [*Id.* at 542 (emphasis added).]

What counts, therefore, is the purpose and design of the statutory provision, its remedial goal and purposes, and not the resulting consequential impact, the "sting of punishment," that may inevitably, but incidentally, flow from it.

Lastly, in *United States ex rel. Marcus v. Hess,* 317 *U.S.* 537, 63 *S.Ct.* 379, 87 *L.Ed.* 443 (1943), a civil penalty following criminal

conviction was held not to constitute "punishment" despite the obvious deterrent impact of the penalty. Though that deterrent impact was not explicitly identified, and the case decided on the same basis as those mentioned above (the remedial intent and effect of the civil penalty was the deciding factor, namely, compensating government for the costs and damages it suffered as a result of defendant's collusive bidding practices) from the point of view of one contemplating such a crime there was not only the prospect of the criminal sanctions explicitly provided, but a civil penalty of double the government's damages plus $2,000 for each act, which in that case amounted to a penalty of $315,000 paid to make the government whole for the actual $101,500 of damages. *Id.* at 540, 63 *S.Ct.* at 382, 87 *L.Ed.* at 447.

The *Hess* case involved real deterrence, not just the minimal amount that is contended here to compel the conclusion that a sanction constitutes "punishment." Despite that deterrent impact, not only did the Court hold there was no punishment and therefore no double jeopardy, but the very case (*Halper*) that originated the language leading to this kind of contention approved of and justified the result. *See Halper, supra*, 490 *U.S.* at 444–45, 109 *S.Ct.* at 1899–1900, 104 *L.Ed.*2d at 499. The issue before the Court in *Hess*, as recognized in *Halper*, was not whether the proceeding was a second prosecution for the same offense, but rather whether it involved additional punishment. As the *Halper* Court noted: "Because the defendants in *Hess* had been punished in a prior criminal proceeding ..., the Court faced a further double jeopardy problem: whether (as in the instant case) the second sanction was barred because it constituted a second *punishment.*" *Id.* at 444, 109 *S.Ct.* at 1899–1900, 104 *L.Ed.*2d at 499 (emphasis added). *Hess* held that the sanction did not constitute "punishment," even though " '[p]unishment in a certain and very limited sense, may be the result of the statute before us so far as the wrong-doer is concerned.' " *Hess, supra*, 317 *U.S.* at 551, 63 *S.Ct.* at 388, 87 *L.Ed.* at 453.

The foregoing cases, concluding there was no punishment in the constitutional sense where there was clearly a deterrent impact, demonstrate the invalidity of plaintiff's contention that even the slightest degree of deterrent impact, intended or otherwise, renders a sanction punishment. Other cases recognize this somewhat more explicitly in their comments about the subject. *See, e.g., Montana Dep't of Revenue v. Kurth Ranch,* 511 *U.S.* ——, —— n. 14, 114 *S.Ct.* 1937, 1945 n. 14, 1947, 128 *L.Ed.*2d 767, 777 n. 14, 779 (1994) (stating that "whether a sanction constitutes punishment is not determined from the defendant's perspective, as even remedial sanctions carry the 'sting of punishment,'" and that "while a high tax rate *and deterrent purpose* lend support to the characterization of the drug tax as punishment, these features, in and of themselves, do not necessarily render the tax punitive") (emphasis added); *Manocchio v. Kusserow,* 961 *F.*2d 1539, 1542 (11th Cir. 1992) (finding that primary goal of civil sanction was remedial and that existence of secondary punitive goal did not defeat characterization of sanction as remedial).

■ The contention, therefore, based on the language that initially appeared in *Halper,* that even the slightest deterrent consequence, whether intended or not, whether the inevitable consequence of remedial provisions or not, renders the statute or the sanction involved "punishment" is not borne out either by a careful reading of the language relied on or by the judicial analysis of the issue. Furthermore, the contention is not supported by the outcome in various cases where the claim of punishment is rejected despite some obvious deterrent impact. The exceptions to these observations are several cases involving the statute before us today, as well as two cases in California and Alaska, and several in Louisiana. All of these decisions involve sex offender registration statutes, but we believe they result from a misreading of the governing law, including, in some, misapplication of the test formulated in *Kennedy v. Mendoza–Martinez,* 372 *U.S.* 144, 83 *S.Ct.*

554, 9 *L.Ed.*2d 644 (1963) (hereinafter referred to as the *Mendoza–Martinez* test).[14] *See infra* at 63–73, 662 *A.*2d at 399–404.

Much of the foregoing suggests that the question whether statutory provisions constitute punishment for certain constitutional purposes is not ordinarily answered through an analysis that suggests precision and consequently that results in certainty. The problem is most difficult when remedial laws clearly have beneficent societal goals that can be achieved only through sanctions with some punitive impact. At that point, the characterization becomes difficult for the constitutional clauses are not perceived as intending to prevent government from performing its legitimate functions, especially when its regulatory intent is totally free of any suggestion of concealed punitive purpose. As the punitive impact becomes more pronounced, however, the balance may shift and the fact of punishment may overwhelm the purity of the government's action, imputing to it, perhaps for doctrinal consistency, perhaps incorrectly, a punitive purpose.

The test of punishment, that it depends, in the words of *Halper*, on whether the statute or sanction can "fairly be characterized" as remedial or punitive, reflects the recognition both that the determination is not precise and, we believe, that it must fairly reflect the underlying constitutional goal of preventing government from using its power to punish either in an excessive or unjust manner.

---

[14] The *Mendoza–Martinez* test has been used in many of the recent cases dealing with registration and notification laws. The attraction of such an apparent solution to the sometimes difficult problem these cases present is strong. In *Artway, supra,* 876 *F.Supp.* at 692, for instance, which held the notification laws before us unconstitutional, both parties apparently took the position that *Mendoza–Martinez* did *not* apply. The court disagreed. Its use of the *Mendoza–Martinez* "test," however, is unpersuasive, its rationale being that the rejection of *Mendoza–Martinez* never occurred in the *ex post facto* context. *But see Bae, supra,* 44 *F.*3d at 496 (rejecting *Mendoza–Martinez* in *ex post facto* context). The clear thrust of repeated Supreme Court decisions is that the *Mendoza–Martinez* "test" has been rejected in all contexts other than those that present the question whether the *proceedings* are civil or criminal, the question whether Fifth and Sixth Amendment rights are triggered by the finding that, no matter how labeled, the proceedings are in effect criminal proceedings.

It reflects a concern that application of the constitutional clauses might have the unintended consequence of restricting legitimate government power through formulaic applications of the clauses without accomplishing that constitutional goal.

█ Where the stated legislative intent is remedial, the burden on those claiming there is a hidden punitive intent is "the clearest proof" of that intent. *United States v. Ward*, 448 *U.S.* 242, 248–49, 100 *S.Ct.* 2636, 2641, 65 *L.Ed.*2d 742, 749–50 (1980) (requiring the clearest proof that the sanction was punitive in either purpose or effect before concluding that Congress, "despite its manifest intention to establish a civil, remedial mechanism," provided for sanctions so punitive that what was clearly intended as a civil remedy was transformed into a criminal penalty); *Flemming*, *supra*, 363 *U.S.* at 617, 619, 80 *S.Ct.* at 1376, 1377, 4 *L.Ed.*2d at 1448, 1449 (observing "that only the clearest proof could suffice to establish the unconstitutionality of a statute on [ground that punitive purpose in fact lay behind the statute]," and concluding that "[i]t is impossible to find in this meagre history the unmistakable evidence of punitive intent which ... is required before a congressional enactment of this kind may be struck down,"); *Bae*, *supra*, 44 *F.*3d at 494 (noting that although the legislative history was replete with references to deterrent objective, "[t]he Supreme Court has consistently required 'unmistakable evidence of punitive intent' to characterize a sanction as punishment").

The foregoing is not intended to diminish the common-sense rule that where a provision or sanction bears no rational relationship to the remedial goal and can only be explained as evidencing an intent to punish, it will be held to constitute punishment for constitutional purposes. Labels, of course, do not "immunize [a law] from scrutiny under the Ex Post Facto Clause. Subtle ex post facto violations are no more permissible than overt ones." *Collins*, *supra*, 497 *U.S.* at 46, 110 *S.Ct.* at 2721, 111 *L.Ed.*2d at 41. But when all the evidence is in, the ultimate question is whether this statute, this sanction, is an impermissible use of government's power to punish, or whether it is an honest, rational exercise of

government's power, aimed solely at effecting a remedy, its provisions explainable as addressed to that which is being remedied, its deterrent or punitive impact, if any, a necessary consequence of its remedial provisions. There is a judgment to be made by the courts, not preordained by a calculus, and not dependent on judicial conceptions of policy, but rather a judgment guided by well-established rules. The judiciary's responsibility in these cases is not only to follow those rules, but equally to assure that they do not accomplish what was never intended, striking down a remedial statute passed by a Congress or a Legislature addressing a problem clearly within legislative competence, addressing it rationally, and without any intention of punishing.

### C

Some recent cases, and especially some involving the laws before us today, and similar laws elsewhere, have used a different test to determine whether a provision or sanction constitutes punishment. They use the so-called "test" of *Mendoza–Martinez, supra,* in which the Supreme Court in effect held that the statute employed the sanction of loss of citizenship for the purpose of inflicting punishment for the offense of leaving or remaining outside the country to avoid the draft, that it was a criminal statute, and that it was therefore unconstitutional because it failed to provide the procedural safeguards of the Fifth and Sixth Amendments. *Mendoza–Martinez, supra,* 372 *U.S.* at 165–66, 83 *S.Ct.* at 566, 9 *L.Ed.*2d at 659. The court below correctly observed that the *Mendoza–Martinez* "test" is not relevant to our analysis. 283 *N.J.Super.* at 382, 661 *A.*2d at 1340.

The Court in *Mendoza–Martinez* described seven factors that could be useful in determining whether a law or a sanction was civil or criminal, whether the proceeding was a civil proceeding or a criminal proceeding. The Court set forth the factors that "may often point in differing directions," and that "[a]bsent conclusive evidence of congressional intent as to the penal nature of a statute

... must be considered in relation to the statute on its face." [15] *Id.* at 169, 83 *S.Ct.* at 568, 9 *L.Ed.*2d at 661. Having noted before listing the factors that if the statute imposed punishment—and the Court plainly thought it did—"[w]e need go no further," *id.* at 167, 83 *S.Ct.* at 567, 9 *L.Ed.*2d at 660, and after listing them, that "the objective manifestations of congressional purpose indicate conclusively that the provisions in question can only be interpreted as punitive," *id.* at 169, 83 *S.Ct.* at 568, 9 *L.Ed.*2d at 661, the Court not surprisingly never again addressed them.

What seemed clear from the Court's language was that it was not suggesting any "test" to determine whether a proceeding is civil or criminal. The Court described the factors as "the *tests* traditionally applied to determine whether an Act of Congress is penal or regulatory in character." *Id.* at 168, 83 *S.Ct.* at 567, 9 *L.Ed.*2d at 660–61 (emphasis added). Rather than delineating *the* list of factors that must be considered *together* in order to reach that determination, the Court simply listed various factors, the *tests*, each of which had been used by itself in reaching a determination of whether a statute was penal (criminal) or regulatory (civil), and each of which therefore might be relevant in the future in making that determination, whether alone or in conjunction with the others. Although in the interim some cases have transformed this into *the* test, requiring consideration and weighing of each of the factors, the use of it as a test is not at all attributable to the *Mendoza–Martinez* decision itself, for it clearly suggests that each one of the seven factors had been used in distinguishing

---

[15] The factors are:

Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned. [*Mendoza–Martinez, supra,* 372 *U.S.* at 168–69, 83 *S.Ct.* at 567–68, 9 *L.Ed.*2d at 661 (footnotes omitted).]

between regulatory and punitive statutes, citing for each factor the group of cases that had used it, but nowhere suggesting that consideration of all of the factors together is somehow the legally required method of resolving the issue.

The *Mendoza–Martinez* "test" is really not used as a "test" at all even in those cases where it is properly considered—cases involving the question of the nature of the proceedings, to determine whether they are civil proceedings or criminal proceedings that trigger the Fifth and Sixth Amendments—or cases like *Mendoza–Martinez* itself that determine whether the sanction is such as to require a criminal trial under the Due Process Clause—and, more importantly, is *never* properly used to determine whether a provision, statute, or sanction imposes "punishment" in violation of the *Ex Post Facto,* Double Jeopardy, Excessive Fines, or Cruel and Unusual Punishment Clauses.

The definitive indicator of the appropriate treatment of the *Mendoza–Martinez* "test" is found in *Ward, supra,* 448 *U.S.* at 242, 100 *S.Ct.* at 2636, 65 *L.Ed.*2d at 742. There the Court was faced with the question of whether a proceeding should be characterized as civil or criminal, the clearest instance of a situation where the *Mendoza–Martinez* test would be used. The contention made was that the proceeding was criminal and that therefore the Fifth Amendment applied, in particular the privilege against self-incrimination. The Court held that it was not a criminal case and that therefore the privilege did not come into play.

The significance of the Court's opinion is best understood by considering the concurring and dissenting opinions. The concurring Justices noted that the Court of Appeals carefully considered each one of the *Mendoza–Martinez* factors in reaching its conclusion, a conclusion which the majority reversed. They therefore conducted their own review of each of the seven *Mendoza–Martinez* factors, one at a time, agreeing with the Court that only one pointed to the characterization of the proceeding as "criminal" and the others weighed in the opposite direction. *Ward, supra,* 448 *U.S.* at 257, 100 *S.Ct.* at 2645, 65 *L.Ed.*2d at 754–55 (Black-

mun, J., concurring). The dissent similarly went through the factors of the *Mendoza–Martinez* "test," but found that they led "to the conclusion that the penalty is a criminal sanction rather than a purely regulatory measure." *Id.* at 258, 100 *S.Ct.* at 2646, 65 *L.Ed.*2d at 755 (Stevens, J., dissenting).

The majority, however, without reference to *Mendoza–Martinez*, stated that its inquiry to determine whether a particular statutorily defined penalty is civil or criminal has traditionally proceeded on two levels: first, to determine whether Congress intended a civil or criminal label, and, second, if the intent was to establish a civil penalty, to determine whether the scheme nevertheless was so punitive, either in purpose or effect, as to negate that intention. *Id.* at 248–49, 100 *S.Ct.* at 2641, 65 *L.Ed.*2d at 749. The Court pursued the inquiry on that basis, simply noting that the District Court and the Court of Appeals had pursued an analysis based explicitly on the seven factors of the *Mendoza–Martinez* "test." The most it could say for *Mendoza–Martinez* was that "this list of considerations, while certainly neither exhaustive *nor dispositive*, has proved helpful in our own consideration of similar questions and provides *some* guidance in the present case." *Id.* at 249, 100 *S.Ct.* at 2641, 65 *L.Ed.*2d at 750 (emphasis added). The Court did not even find it necessary to give its assessment of each of the seven *Mendoza–Martinez* factors, for it found that only one aided the party attacking the statute. It found that the factor "seems to point toward a finding that [the statute] is criminal in nature," although "that indication is not as strong as it *seems* at first blush." *Id.* at 250, 100 *S.Ct.* 2642, 65 *L.Ed.*2d at 750 (emphasis added).

Not having made its view of the importance of *Mendoza–Martinez* sufficiently clear, it saw fit to repeat it almost verbatim less than one page later: "In sum, we believe that the factors set forth in *Mendoza–Martinez, while neither exhaustive* nor conclusive on the issue, are in no way sufficient to render unconstitutional the congressional classification of the penalty established in [the statute] as civil." *Id.* at 250–51, 100 *S.Ct.* at 2642, 65 *L.Ed.*2d at

751 (emphasis added). Then reverting to what it had initially used as its analysis, the Court went on to say, "[n]or are we persuaded by any of respondent's other arguments that he has offered the 'clearest proof' that the penalty here in question is punitive in either purpose or effect." *Id.* at 251, 100 *S.Ct.* at 2642, 65 *L.Ed.*2d at 751. One might wonder of the importance of *Mendoza–Martinez* as a "test" when the two most important cases to which it has been applied, *Mendoza–Martinez* and *Ward,* have treated it so cavalierly, *Mendoza–Martinez,* the originator, not using it at all, and *Ward* considering but one factor and dismissing it as unpersuasive.

In *Bell v. Wolfish,* 441 *U.S.* 520, 99 *S.Ct.* 1861, 60 *L.Ed.*2d 447 (1979), *Schall, supra,* 467 *U.S.* at 253, 104 *S.Ct.* at 2403, 81 *L.Ed.*2d at 207, and *Salerno, supra,* 505 *U.S.* at 317, 112 *S.Ct.* at 2503, 120 *L.Ed.*2d at 255, the Court was faced with the issue of whether pretrial incarceration violated the Due Process Clause of the Fifth or Fourteenth Amendments, the claim being that it constituted punishment without an adjudication of guilt. That was the same contention made and passed on in *Mendoza–Martinez,* and in all three of those cases it was relied on, providing further light on its use as a "test." In *Bell,* the claim was that the conditions of confinement for ordinary pretrial detainees—the constitutionality of the confinement itself was not challenged—were so bad as to amount to punishment. The Court noted the *Mendoza–Martinez* "tests traditionally applied to determine whether a governmental act is punitive in *nature,"* *Bell, supra,* 441 *U.S.* at 537, 99 *S.Ct.* at 1873, 60 *L.Ed.*2d at 467 (emphasis added), and described them as "provid[ing] useful guideposts in determining whether particular restrictions and conditions accompanying pretrial detention amount to punishment in the constitutional sense of that word." *Id.* at 538, 99 *S.Ct.* at 1873, 60 *L.Ed.*2d at 468. But it used only two of them, without even commenting on the others, and those two substantially equate with the inquiry made in most of the cases in determining for *ex post facto* and double jeopardy (multiple punishment) purposes whether a provision, statute, or sanction

is remedial or constitutes punishment.[16] Those happened to be the only two factors relevant to the Court's determination. The description of *Mendoza–Martinez* as providing factors that are "useful guideposts" is a far cry from the status they are given in recent cases as the determinative test.

In *Schall, supra,* pretrial detainment of juveniles was challenged under the Fourteenth Amendment both because of the conditions of incarceration, and on the grounds that no legitimate remedial purpose was served by the detention. "It is axiomatic that '[d]ue process requires that a pretrial detainee not be punished.'" *Schall, supra,* 467 *U.S.* at 269, 104 *S.Ct.* at 2412, 81 *L.Ed.*2d at 220 (citation omitted). The Court's determination was premised on *Mendoza–Martinez,* but again only on the two factors used in *Bell.* The Court did not even mention that there were other factors or what those factors were.

In *Salerno, supra,* pretrial detention, there preventive detention based on "future dangerousness," was challenged under the due process clause of the Fifth Amendment on the grounds that it constituted impermissible punishment before a trial. The Court held that detention on that basis did not constitute "punishment." Then, reverting to the *Mendoza–Martinez* "test," and citing *Bell* and *Schall,* the Court relied on the same two factors of *Mendoza–Martinez* that those cases had relied on.

> We conclude that the detention imposed by the Act falls on the regulatory side of the dichotomy. The legislative history of the Bail Reform Act clearly indicates that Congress did not formulate the pretrial detention provisions as punishment for dangerous individuals. Congress instead perceived pretrial detention as a potential

---

16 As the Court stated,

> A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]."
> [*Bell, supra,* 441 *U.S.* at 538, 99 *S.Ct.* at 1873–74, 60 *L.Ed.*2d at 468.]

solution to a pressing societal problem. There is no doubt that preventing danger to the community is a legitimate regulatory goal.

[*Salerno, supra*, 481 *U.S.* at 747, 107 *S.Ct.* at 2101, 95 *L.Ed.*2d at 708–09 (citations omitted).]

The Court repeated the statement in *Schall* that " 'there is nothing inherently unattainable about a prediction of future criminal conduct.' " *Id.* at 751, 107 *S.Ct.* at 2103–04, 95 *L.Ed.*2d at 711 (citation omitted).

Thus, in cases where it would be naturally applied, the *Mendoza–Martinez* test has been given short shrift. More importantly, for our purposes, the test is not applied at all by the Supreme Court in *ex post facto* or double jeopardy (multiple punishment) cases to determine whether a sanction constitutes punishment. In *Halper, supra*, the Supreme Court faced the question whether a civil penalty constituted punishment for the purpose of the Double Jeopardy Clause. The government, taking the position that the question could be answered only by determining the nature of the proceedings as either civil or criminal, adopted what the Court characterized as an "abstract approach [that the Court has followed] when determining whether the procedural protections of the Sixth Amendment applies to proceedings under a given statute," an approach "appropriate in identifying the apparent nature of a proceeding" and "in determining whether double jeopardy protections should be applied." *Halper, supra*, 490 *U.S.* at 447, 109 *S.Ct.* at 1901, 104 *L.Ed.*2d at 501. The "abstract approach" referred to is clearly the *Mendoza–Martinez* test, for that was the test exclusively referred to in the pages cited by the *Halper* Court from *Ward, supra*, 448 *U.S.* at 242, 100 *S.Ct.* at 2636, 65 *L.Ed.*2d at 742.

This abstract approach, the *Mendoza–Martinez* test, however, was deemed not appropriate by the Court when determining whether a proceeding imposes punishment, regardless of whether it is a civil proceeding or a criminal proceeding, the question of punishment being critical in the other aspect of the Double Jeopardy Clause that prohibits the infliction of multiple punishments, regardless of the nature of the proceeding, for the same

offense. Underlining its holding in that respect, the Court noted that whether a civil sanction constitutes punishment depends on "the purposes actually served by the sanction in question, not the underlying nature of the proceeding giving rise to the sanction." *Halper, supra,* 490 *U.S.* at 447 n. 7, 109 *S.Ct.* at 1901 n. 7, 104 *L.Ed.*2d at 501 n. 7. *Mendoza–Martinez,* in other words, is useful only in determining the underlying nature of the proceeding, not the question of whether punishment is imposed by a civil sanction.

This reading of *Halper* is confirmed in *Austin, supra,* 509 *U.S.* at ——, 113 *S.Ct.* at 2801, 125 *L.Ed.*2d at 488, where the Supreme Court faced the same question, whether punishment was imposed, but in the excessive fines context. Noting that "the question is not, as the United States would have it, whether forfeiture under [the statute] is civil or criminal, but rather whether it is punishment," *id.* at ——, 113 *S.Ct.* at 2806, 125 *L.Ed.*2d at 498, the Court explicitly rejected the use of the *Mendoza–Martinez* test for determining that question.

> For this reason, the United States' reliance on *Kennedy v. Mendoza–Martinez* and *United States v. Ward* is misplaced. The question in those cases was whether a nominally civil penalty should be reclassified as criminal and the safeguards that attend a criminal prosecution should be required. In addressing the *separate question* whether punishment is being imposed, the Court has not employed the tests articulated in *Mendoza–Martinez* and *Ward. See, e.g., United States v. Halper,* 490 *U.S.* 435, 447, 109 *S.Ct.* 1892 [1901], 104 *L.Ed.*2d 487 (1989). Since in this case we deal only with the question whether the Eighth Amendment's Excessive Fines Clause applies, we need not address the application of those tests.
>
> [*Id.* at —— n. 6, 113 *S.Ct.* at 2806 n. 6, 125 *L.Ed.*2d at 498 n. 6 (citations omitted).]

The reference in *Austin* to *Halper,* indicating *Halper's* rejection of the *Mendoza–Martinez* test in the double jeopardy (multiple punishment) context, explicitly confirms the foregoing reading of *Halper,* and solidly rejects the *Mendoza–Martinez* test for the purpose of determining punishment not only in the double jeopardy context, but in the excessive fines context. Since all of the cases indicate that punishment for *ex post facto* purposes and cruel and unusual punishment purposes is substantially indistinguishable from punishment in the double jeopardy and excessive

fines context, the rejection of the *Mendoza–Martinez* test is applicable to those clauses as well.

The Court of Appeals for the Ninth Circuit, when confronted with the contention that the *Halper* test of punishment should be strictly confined not only to the constitutional clause invoked in the cases that applied it, but to the specific sanction challenged in those cases, concluded that since the issue in all of those cases was whether the sanction constituted "punishment," the *Halper* test governed. *$405,089.23, supra*, 33 *F*.3d at 1219. Specifically, the Court of Appeals rejected the contention that the *Halper* test should not be applied where the constitutional attack on civil forfeiture sanctions was that they violated the Double Jeopardy Clause, since it had only been previously applied to such a sanction when challenged under the Excessive Fines Clause in *Austin*. *Ibid.* The Court of Appeals, in effect, held that punishment means punishment no matter which clause is involved, specifically holding that *Austin's* finding of "punishment" in the excessive fines context fully applied to the same sanction in the double jeopardy context. That court noted, perhaps with some irony, that *Austin* itself, an excessive fines case applied to a civil forfeiture action, relied on the *Halper* test, a double jeopardy case involving a civil monetary penalty. *Ibid.*

Relying on *Austin, Halper*, and *Ward*, the Court of Appeals for the Seventh Circuit in *Bae* explicitly noted that the *Mendoza–Martinez* test is not applicable in *ex post facto* cases where the question is whether punishment is being imposed, just as it is inapplicable to the same question in excessive fines cases. *Bae, supra*, 44 *F*.3d at 496. After quoting the *Mendoza–Martinez* test, which it characterized as a list of "those factors to be considered to determine whether a civil penalty divesting an individual's citizenship was in effect a criminal penalty requiring the procedural safeguards of the Fifth and Sixth Amendments," the Court of Appeals observed that "[i]n deciding the related, but independent, question of whether a civil sanction imposes punishment, the Supreme Court has refused to apply the *Mendoza–Martinez* test."

*Ibid.* In the challenge under the *Ex Post Facto* Clause, the court explicitly rejected the use of the *Mendoza–Martinez* test, holding that *Halper* should be used to determine whether a civil sanction constitutes "punishment" in the *Ex Post Facto* context and implicitly in all other similar constitutional contexts. *Ibid.*

There are unfortunate aspects to the use, particularly the literal use, of *Mendoza–Martinez.* The mechanical assessment of each of the seven factors, the weighing of each, and the unguided indeterminate balancing of the various weights has the potential, and, we believe, in some cases, the practical effect of distracting a court from a significant analysis of the issues, distracting it from an analysis of the regulatory intent of the statute or sanction, the societal goals served by the regulation, the extent to which its punitive consequences are but an inevitable result of the statute or sanction, and ultimately from an evaluation of the fair characterization of the statute to decide whether the purposes served by the constitutional provisions require its invalidation. If one agrees with Justice Scalia in *Kurth Ranch, supra,* the *Mendoza–Martinez* test, if applied in the manner of these recent cases, would permit a statute, provision, or sanction to withstand constitutional attack despite punitive intent and impact if other factors "outweigh" the punitive pointers, a result contrary not only to the contentions of plaintiff, but to this Court's understanding of the relevant law.

The general and unqualified nature of the language used in Supreme Court cases constitutes a clear rejection of the *Mendoza–Martinez* test to determine punishment not only in the double jeopardy and excessive fines context, but in the *ex post facto* context as well. We do not suggest that there are absolutely no differences depending on the constitutional provision involved, in determining the question of punishment, although none have been noted in the analysis of the cases in which the Supreme Court has passed on this question, punishment found or not found, the finding in one constitutional context supported by citation of cases in other contexts. The rejection of the *Mendoza–Martinez*

"tests," clearly articulated in *Austin,* and expressed in the most general terms, without the slightest implication that it is limited to challenges under the Excessive Fines Clause, includes the observation that "[i]n addressing the separate question whether punishment is being imposed, the Court has not employed the tests articulated in *Mendoza–Martinez* and *Ward,*" *Austin, supra,* 509 *U.S.* at —— n. 6, 113 *S.Ct.* at 2806 n. 6, 125 *L.Ed.*2d at 498 n. 6, citing as authority for that proposition *Halper,* not an excessive fines case, but a double jeopardy case.

## D

■ The laws, as we have described them above, when measured against the standards of the cases that determine whether a provision, statute or sanction constitutes punishment, leave no doubt that they are remedial. The legislative intent, based on the history of the legislation and the recitals in the laws themselves, is clearly and totally remedial in purpose and no challenge whatsoever is made to that proposition by any of the parties. They were designed simply and solely to enable the public to protect itself from the danger posed by sex offenders, such offenders widely regarded as having the highest risk of recidivism. Unarguably, as the Supreme Court pointed out in *Salerno, supra,* 481 *U.S.* at 747, 107 *S.Ct.* at 2101, 95 *L.Ed.*2d at 709, "There is no doubt that preventing danger to the community is a legitimate regulatory goal."

We find it difficult to accept the notion that the Registration and Notification Laws are designed or are likely to deter repetitive and compulsive offenders who were not previously deterred by the threat of long-term incarceration. Even assuming that removing the shield of anonymity constitutes deterrence, and therefore is arguably punitive, that is the inevitable consequence of these remedial provisions, uniformly sustained in other cases. It is not intended as punishment but rather is a consequence that is simply unavoidable, for it goes to the very heart of the remedy: that which is allegedly punitive, the knowledge of the offender's record

and identity, is precisely that which is needed for the protection of the public. There are various possible responses to the punishment contention to the extent that it is based on the assertion that the punishment is being inflicted for prior conduct already punished, for the fact is that the notification is not based solely on prior conduct, but on the offender's record after conviction, after release, the record up to the very date of Tier classification and notification, including responsiveness to treatment, whether positive or negative. But such arguments, though legally significant, are really not needed: this law is so clearly remedial, its impact so carefully limited, that it can be said to be solely remedial with no need to explain anything.

The law does not apply to all offenders but only to sex offenders, and as for those who may have committed their offenses many years ago, it applies only to those who were found to be repetitive and compulsive offenders, *i.e.*, those most likely, even many years later, to reoffend, providing a justification that strongly supports the remedial intent and nature of the law. It applies to those with no culpability, not guilty by reason of insanity, those who would clearly be excluded if punishment were the goal but included for remedial purposes. And it applies to juveniles, similarly an unlikely target for double punishment but included for remedial protective purposes.

The notification provisions are as carefully tailored as one could expect in order to perform their remedial function without excessively intruding on the anonymity of the offender. The division of notification into Tiers has that as its clear purpose, and the definition of the factors that determine the Tiers are those not only rationally related, but strongly related to the risk of reoffense and the consequent need for greater or lesser notification. The warnings against vigilantism, the requirements of confidentiality, the restriction of notification to those likely to encounter the offender, all point unerringly both at a remedial intent and remedial implementation.

We do not hold that legislative intent is the sole determinant of "punishment" despite the dissent's claim that we do. Obviously, what the Legislature does is as important as what it says. Characterization of a provision or sanction as punishment depends, as we have noted, not only on the legislative purpose but on the implementing provisions. If the implementing provisions go beyond that regulatory purpose—if they are "excessive" in fact—and have a punitive impact, punishment results, regardless of claimed regulatory intent. That is the central thrust of *Austin* and *Halper* and of our analysis in this opinion. The conclusion of our analysis is that the laws before us today not only have a regulatory purpose, and solely a regulatory purpose, but also have implementing provisions that are similarly solely regulatory, provisions that are not excessive but are aimed solely at achieving, and, in fact, are likely to achieve, that regulatory purpose. The fact that some deterrent punitive impact may result does not, however, transform those provisions into "punishment" if that impact is an inevitable consequence of the regulatory provision, as distinguished from an impact that results from "excessive" provisions, provisions that do *not* advance the regulatory purpose.[17]

---

[17] We note that the dissent continues the misapplication of *Mendoza–Martinez* despite its clear rejection by the Supreme Court in *Halper* and *Austin*. Those two cases provide the test, used in this opinion, for determining whether the provisions of a statute impose punishment in violation of the additional punishment part of the *Ex Post Facto* Clause, the multiple punishment part of the Double Jeopardy Clause, the Cruel and Unusual Punishment Clause, and the Excessive Fines and Penalties Clause; and they explicitly reject the *Mendoza–Martinez* test for that purpose. The cases cited by the dissent in support of the proposition that *Mendoza–Martinez* should be used here do not involve those constitutional provisions but rather apply, or purport to apply, the *Mendoza–Martinez* test to determine whether proceedings are criminal or civil, whether the Due Process Clause has been violated, or whether a law constitutes a bill of attainder. *United States v. Brown*, 381 *U.S.* 437, 85 *S.Ct.* 1707, 14 *L.Ed.*2d 484 (1965) (bill of attainder); *Nixon v. Administrator of General Services*, 433 *U.S.* 425, 97 *S.Ct.* 2777, 53 *L.Ed.*2d 867 (1977) (bill of attainder); *United States v. Ward*, 448 *U.S.* 242, 100 *S.Ct.* 2636, 65 *L.Ed.*2d 742 (1980) (whether proceedings are criminal triggering self-incrimination privilege); *Bell v. Wolfish*, 441 *U.S.* 520, 99 *S.Ct.* 1861, 60 *L.Ed.*2d 447 (1979), *Schall v. Martin*, 467 *U.S.* 253, 104 *S.Ct.* 2403, 81 *L.Ed.*2d 207 (1984), *United States v. Salerno*, 481 *U.S.* 739, 107

■ Plaintiff's additional claims that the challenged provisions of Megan's Law violate the Bill of Attainder and Cruel and Unusual Punishment Clauses of the State and Federal Constitutions rest upon the premise that the provisions impose punishment. The Bill of Attainder Clause prohibits the legislature from determining guilt and inflicting punishment upon an individual or an easily ascertainable group of individuals without the protections of a judicial trial, *Selective Serv. Sys. v. Minnesota Pub. Interest Research Group*, 468 *U.S.* 841, 846–47, 104 *S.Ct.* 3348, 3352, 82 *L.Ed.*2d 632, 640 (1984), and the Cruel and Unusual Punishment Clause prohibits the imposition of punishment which is "grossly disproportionate" to the offense involved. *Trop, supra,* 356 *U.S.* at 99–103, 78 *S.Ct.* at 597–99, 2 *L.Ed.*2d at 641–644. Because the challenged provisions do not constitute punishment, they do not violate any constitutional prohibition against punishment. We briefly address punishment under the bill of attainder analysis, however, as there is some distinction.

In determining whether a statute imposes punishment under the Bill of Attainder Clause, the Court has applied this test:

(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, "viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes"; and (3) whether the legislative record "evinces a [legislative] intent to punish."

[*Selective Service, supra,* 468 *U.S.* at 852, 104 *S.Ct.* at 3355, 82 *L.Ed.*2d at 643 (citations omitted).]

That test embraces an analysis virtually identical to that underlying the determination of punishment for purposes of the *Ex Post*

---

*S.Ct.* 2095, 95 *L.Ed.*2d 697 (1987) (all involving claims of violation of due process arising from pretrial incarceration); *United States v. One Assortment of 89 Firearms*, 465 *U.S.* 354, 104 *S.Ct.* 1099, 79 *L.Ed.*2d 361 (1984) (whether proceedings are criminal, constituting a second criminal prosecution in violation of the Double Jeopardy Clause, but not involving the question whether the second proceeding constitutes "punishment" in violation of the multiple punishment aspect of double jeopardy). It should be noted, however, that even when *Mendoza–Martinez* is allegedly applied, its use as a practical matter, as the dissent notes, is limited to its last two factors, those factors being the functional equivalent of the *Halper* rule.

*Facto* and Double Jeopardy Clauses, the only distinguishing characteristic being that it explicitly encompasses an examination of the historical meaning of legislative punishment. While the analysis of the other constitutional prohibitions against punishment does not *require* a determination of the historical character of the challenged law, it may be helpful. Certainly, an intensive examination of the legislative intent in enacting a law should include all information relevant to the law's history, and therefore, its characterization as either regulatory or punitive.

Because that historical factor is not dispositive, even if we were to find, and we do not, that the "public stigma" and "ostracism" that petitioner claims is inextricably linked to the registration and notification provisions of Megan's Law is historically associated with punishment, those provisions would not violate the ban against bills of attainder. The relation between any burdens imposed and the nonpunitive purpose and legislative intent must be accorded greater weight, and we have already concluded that the challenged provisions do not constitute punishment under those inquiries.[18]

## VI

### *Privacy*

Grounded in the Fourteenth Amendment's concept of personal liberty, the right of privacy safeguards at least two different kinds of interests: "the individual interest in avoiding disclosure of personal matters," and "the interest in independence in making certain kinds of important decisions." *Whalen v. Roe,* 429 *U.S.* 589, 598 n. 23, 599–600, 97 *S.Ct.* 869, 876 and n. 23, 51 *L.Ed.*2d 64,

---

[18] Because the laws do not inflict punishment, plaintiff's plea agreement is not violated by subjecting him to the registration requirement, and its associated notification. Although the defendant must be aware of all penal consequences of a guilty plea, not every collateral consequence need be disclosed at the time the plea is accepted. *State v. Heitzman,* 107 *N.J.* 603, 527 *A.*2d 439 (1987). Because these laws are not punitive, the registration and notification requirements are collateral consequences of defendant's guilty plea.

73 and n. 23 (1977). Those interests have been characterized as the "confidentiality" and "autonomy" strands of the right of privacy. *Shields v. Burge*, 874 *F*.2d 1201, 1209 (7th Cir.1989). The right to confidentiality encompasses two strands: "the right to be free from the government disclosing private facts about its citizens and from the government inquiring into matters in which it does not have a legitimate and proper concern." *ACLU v. Mississippi*, 911 *F*.2d 1066, 1069–70 (5th Cir.1990) (emphasis omitted); *Ramie v. City of Hedwig Village*, 765 *F*.2d 490, 492 (5th Cir.1985), *cert. denied*, 474 *U.S.* 1062, 106 *S.Ct.* 809, 88 *L.Ed.*2d 784 (1986). Plaintiff contends that the Registration and Notification [19] Laws impermissibly infringe on his interest in confidentiality. We disagree.

In assessing plaintiff's claim, we must determine whether, and to what extent, plaintiff has a reasonable expectation of privacy in the information disclosed under the Registration and Notification Laws. *See National Treasury Employees Union v. Department of Treasury*, 25 *F*.3d 237, 243 (5th Cir.1994) (citing *Fraternal Order of Police, Lodge 5 v. City of Philadelphia*, 812 *F*.2d 105, 112 (3d Cir.1987)); *Walls v. City of Petersburg*, 895 *F*.2d 188, 192 (4th Cir.1990). If there is a reasonable expectation of privacy in the information disclosed, we must decide whether the intrusion on the right of privacy is justified, balancing the governmental interest in disclosure against the private interest in confidentiality.[20]

---

[19] In accordance with *N.J.S.A.* 2C:7–8d, the Attorney General has developed procedures for implementation of the community notification. Organizations and members of the public receiving notification under Tiers Two and Three, according to the Guidelines, should receive the offender's name and a recent photograph, along with a physical description, the offense for which he or she was convicted, address, place of employment and/or schooling, and vehicle license plate. Guideline VI, Methods of Community Notification.

[20] As noted in *Snyder v. Mekhjian*, 125 *N.J.* 328, 342, 593 *A.*2d 318 (1991) (Pollock, J., concurring), the confidentiality interest "has not fared as well as . . . autonomy." Most courts addressing the right to confidentiality have applied a balancing, or intermediate, standard of review. *See National Treasury Employ-*

We first address plaintiff's expectation of privacy in the information disclosed under the Registration Law. Information that is readily available to the public, which an individual cannot expect to remain private, is not within the ambit of constitutional protection. *Nilson v. Layton City*, 45 *F*.3d 369, 372 (10th Cir.1995). "[A]n individual cannot expect to have a constitutionally protected privacy interest in matters of public record." *Doe v. City of New York*, 15 *F*.3d 264, 268 (2d Cir.1994). Requiring disclosure of plaintiff's prior arrest and conviction, therefore, does not implicate the right to privacy, as those records are publicly available. *See Walls, supra,* 895 *F*.2d at 193–94 (holding that police department could require officers to disclose marriages, divorces, births of children, arrests or convictions of family members because they are freely available in public records); *Fraternal Order of Police, supra,* 812 *F*.2d at 117 (holding that arrest records are not entitled to privacy protection).

New Jersey specifically guarantees public access to all court records, including criminal records. *R.* 1:38; *Executive Order* No. 123 (1985). In most New Jersey counties, it is possible to go to the courthouse and request an individual's criminal record within that vicinage, providing only the individual's name and address. *N.J.S.A.* 53:1–20.6, enacted in 1994, provides that, upon adoption of implementing rules, any person may obtain a complete criminal history from the State Police by providing a name and either date of birth or social security number and paying a fifteen-dollar fee.

Since 1979, moreover, the Parole Board has been required to give public notice prior to considering any adult inmate for release. The inmate's name, crimes, and place of conviction are

---

*ees Union, supra,* 25 *F*.3d at 242, 243 n. 2; *Doe v. Attorney Gen. of the U.S.,* 941 *F*.2d 780, 796 (9th Cir.1991); *Igneri v. Moore,* 898 *F*.2d 870, 873 (2d Cir.1990); *Walls, supra,* 895 *F*.2d at 192; *Fraternal Order of Police, supra,* 812 *F*.2d at 110; *but see Sheets v. Salt Lake County,* 45 *F*.3d 1383, 1387 (10th Cir.1995) (applying strict scrutiny). Some courts, however, apply heightened scrutiny if the information involved is considered "fundamental," *Walls, supra,* 895 *F*.2d at 192, or "sensitive," *Doe, supra,* 941 *F*.2d at 796.

released to the local prosecutor's offices of each county, police departments, and the press pursuant to *N.J.S.A.* 30:4–123.48(g) and 30:4–123.45(b)(5). It should be noted, furthermore, that pursuant to an amendment—which was enacted along with the Registration and Notification Laws but is not a subject of this appeal—crime victims are notified by prosecutors of a defendant's release from custody. *N.J.S.A.* 52:4B–44b(21).

Likewise, requiring the disclosure of other information, such as plaintiff's age and legal residence or a description of his vehicle, does not infringe on any expectation of privacy. As the trial court noted, that information is readily available through public records. The records of the Division of Motor Vehicles, which are public records, *see N.J.S.A.* 47:1A–2,[21] include applications for driver's licenses and vehicle registrations, and indicate an applicant's name, street address of residence or business, and a vehicle description. *N.J.S.A.* 39:3–4 and –9b. Plaintiff therefore cannot have a reasonable expectation of privacy in the information contained therein.

Lastly, an individual cannot expect to have a constitutionally protected privacy interest in matters that are exposed to public view. *See Katz v. United States*, 389 *U.S.* 347, 351, 88 *S.Ct.* 507, 511, 19 *L.Ed.*2d 576, 582 (1967) (stating that Fourth Amendment does not protect what "a person knowingly exposes to the public"). Because a person's physical appearance is necessarily and constantly exposed to public view, no person can have a reasonable expectation of privacy in his appearance. *See United States v. Dionisio*, 410 *U.S.* 1, 14, 93 *S.Ct.* 764, 771, 35 *L.Ed.*2d 67, 79 (1973). Similarly, no person can have a reasonable expectation of privacy in her fingerprints. *See Cupp v. Murphy*, 412 *U.S.* 291, 295, 93 *S.Ct.* 2000, 2003, 36 *L.Ed.*2d 900, 905 (1973) (characterizing

---

[21] Although federal law, effective September 13, 1997, will impose some restrictions on the release of information contained in state motor vehicle records, it will permit release if specifically authorized under state law and if related to public safety. 18 *U.S.C.A.* § 2721(b)(14).

fingerprints as "mere 'physical characteristics ... constantly exposed to the public'") (quoting *Dionisio, supra,* 410 *U.S.* at 14, 93 *S.Ct.* at 771, 35 *L.Ed.*2d at 79). Requiring a description or photograph and fingerprints, therefore, does not implicate any privacy interest. *See Trade Waste Management Ass'n. v. Hughey,* 780 *F.*2d 221, 234 (3d Cir.1985) (concluding that requirement of fingerprinting as condition for obtaining or keeping hazardous and solid waste license, although intrusive, could "hardly be said to involve a violation of a privacy interest protected by the federal constitution").

Having found no expectation of privacy in the information disclosed under the Registration Law, we now address plaintiff's expectation of privacy in the information disclosed under the Notification Law. With respect to that information, the analysis is substantially the same as that under the Registration Law. Plaintiff has no expectation of privacy in many of the individual pieces of information disclosed, such as his name, convictions, appearance, place of employment or school attended, and the fact of public disclosure of these pieces of information, rather than mere disclosure to the State, does not alter the analysis.

Matters of public record, such as criminal background, may be disclosed without impinging on privacy interests. As stated in *Nilson, supra,* 45 *F.*3d at 372,

government disclosures of arrest records, *see Paul v. Davis,* 424 *U.S.* 693, 96 *S.Ct.* 1155, 47 *L.Ed.*2d 405 (1976), judicial proceedings, *see Cox Broadcasting Corp. v. Cohn,* 420 *U.S.* 469, 492, 95 *S.Ct.* 1029, 1044, 43 *L.Ed.*2d 328 (1975) and information contained in police reports, *see Scheetz v. The Morning Call, Inc.,* 946 *F.*2d 202, 207 (3d Cir.1991), *cert. denied,* 502 *U.S.* 1095, 112 *S.Ct.* 1171, 117 *L.Ed.*2d 417 (1992), do not implicate the right to privacy.

In that case, the court concluded that a sergeant's post-expungement disclosure, in an interview with a television news reporter, of the plaintiff's sexual abuse charges and conviction did not violate the right of privacy. *See Puricelli v. Borough of Morrisville,* 820 *F.Supp.* 908, 917 (E.D.Pa.1993) (finding no violation where an assistant district attorney and detectives, in the course of investigation, discussed plaintiff's criminal record and status as the

subject of a grand jury probe with members of the public), *aff'd*, 26 *F*.3d 123 (3d Cir.), *cert. denied*, —— *U.S.* ——, 115 *S.Ct.* 321, 130 *L.Ed.*2d 282 (1994).

Matters exposed to public view may be disclosed without implicating privacy interests. *See Paul v. Davis*, 424 *U.S.* 693, 712–14, 96 *S.Ct.* 1155, 1166, 47 *L.Ed.*2d 405, 420–21 (1976) (finding that disclosure of plaintiff's name and arrest, along with his photograph, did not violate due process); *Flanagan v. Munger*, 890 *F.*2d 1557, 1570 (10th Cir.1989) (holding that the plaintiffs, police officers who had been publicly reprimanded for running a video store that rented sexually explicit films, had no reasonable expectation of privacy in the reason for the reprimand, because they often worked in the store and were observed telling customers they were police officers).

Our analysis is altered, however, by the disclosure of plaintiff's home address, and more importantly, by the totality of the information disclosed to the public. We believe that public disclosure of plaintiff's home address does implicate privacy interests. "We are reluctant to disparage the privacy of the home, which is accorded special consideration in our Constitution, laws, and traditions." *United States Dep't of Defense v. Federal Labor Relations Authority*, 510 *U.S.* ——, ——, 114 *S.Ct.* 1006, 1015, 127 *L.Ed.*2d 325, 338 (1994).

In the context of Exemption 6 of the Freedom of Information Act, which prohibits disclosure of files that would constitute a clearly unwarranted invasion of privacy, the Court concluded that the virtually non-existent public interest in disclosure was outweighed by the "not insubstantial" interest of nonbargaining unit employees in nondisclosure of their home addresses to the unions.[22] *Id.* at ——, 114 *S.Ct.* at 1015, 127 *L.Ed.*2d at 337. According to the Court,

---

[22] The Court did not purport to quantify exactly the privacy interest involved. The Court did note, however, that although courts of appeal have agreed that there is some privacy interest in nondisclosure of a home address, the courts

> It is true that home addresses often are publicly available through sources such as telephone directories and voter registration lists, but "[in] an organized society, there are few facts that are not at one time or another divulged to another." The privacy interest protected by Exemption 6 "encompass[es] the individual's control of information concerning his or her person." An individual's interest in controlling the dissemination of information regarding personal matters does not dissolve simply because that information may be available to the public in some form.
> [*Ibid.* (citations omitted).]

The fact that plaintiff's home address may be publicly available, therefore, does not lead ineluctably to the conclusion that public disclosure of his address implicates no privacy interest. We note in particular that the issue here is not whether plaintiff has a privacy interest in his address, but whether the inclusion of plaintiff's address, along with other information, implicates any privacy interest. As stated in *Aronson v. Internal Revenue Service,* 767 *F.Supp.* 378, 389 n. 14 (D.Mass.1991), *modified,* 973 *F.*2d 962 (1st Cir.1992),

> the question of whether an individual has a privacy interest in his or her *bare* address does not fully frame the issue. The more meaningful question is whether inclusion of the address in the context of the particular requested record raises significant privacy concerns, for example because the inclusion of the address can invite unsolicited contact or intrusion based on the additional revealed information.

*See National Ass'n of Retired Fed. Employees v. Horner,* 879 *F.*2d 873, 877 (D.C.Cir.1989), *cert. denied,* 494 *U.S.* 1078, 110 *S.Ct.* 1805, 108 *L.Ed.*2d 936 (1990), ("[T]he disclosure of names and addresses is not inherently and always a significant threat to the privacy of those listed; whether it is a significant or a *de minimis* threat depends upon the characteristic(s) revealed by virtue of being on the particular list, and the consequences likely to ensue.").

 Indeed, privacy interests may be implicated where disclosure of a person's address results in unsolicited contact. *See*

---

have divided over the weight to accord that interest, with some labelling it as "significant" or "important," and others as "minimal." *Department of Defense, supra,* 510 *U.S.* at —— n. 8, 114 *S.Ct.* at 1015 n. 8, 127 *L.Ed.*2d at 338 n. 8; *see id.* at —— n. 4, 114 *S.Ct.* at 1018 n. 4, 127 *L.Ed.*2d at 341 n. 4 (Ginsburg, J., concurring) (emphasizing that the interest has been generally appraised as "relatively modest").

*Department of Defense, supra,* 510 *U.S.* at ——, 114 *S.Ct.* at 1015–16, 127 *L.Ed.*2d at 338 (recognizing significance of disclosure of home address where commercial advertisers and solicitors would have access); *Painting Indus. of Hawaii Mkt. Recovery Fund v. United States Dep't of Air Force,* 26 *F.*3d 1479, 1483 (9th Cir.1994) (noting that an "invasion of privacy ... can result from release of a list of names and addresses coupled with a characteristic susceptible to commercial exploitation"). In this case, where as a result of the information disclosed under the Notification Law, plaintiff may be exposed to uninvited harassment, we conclude that disclosure of plaintiff's home address, particularly when coupled with the other information disclosed, implicates a privacy interest.

We underscore that while we recognize the possibility of such action on the part of the public in determining plaintiff's privacy interests, we expect that the information disclosed will be used as intended: as a means of protection, not as a means of harassment. It should be unmistakably clear that the Registration and Notification Laws are not a license for public lawlessness against registered sex offenders. As the Attorney General has emphasized, there will be, in conjunction with community notification, "a strong emphasis on providing ... advice concerning the consequences of vigilante activity," for "law enforcement will carefully investigate all allegations of criminal conduct taken by any person against the offender, the offender's family, employer or school and will criminally prosecute where appropriate." Guideline VI, Methods of Community Notification.

We find, moreover, that considering the totality of the information disclosed to the public, the Notification Law implicates a privacy interest. That the information disseminated under the Notification Law may be available to the public, in some form or other, does not mean that plaintiff has no interest in limiting its dissemination. As the Court recognized in *United States Department of Justice v. Reporters Committee for Freedom of the Press,* 489 *U.S.* 749, 763, 109 *S.Ct.* 1468, 1476, 103 *L.Ed.*2d 774, 789

(1989), privacy "encompass[es] the individual's control of information concerning his or her person."

In *Reporters Committee*, the Court had to determine whether the Freedom of Information Act authorized access to rap sheets. Exemption 7(C) of the Act excluded information compiled for law enforcement purposes to the extent that production of such information could reasonably be expected to constitute an unwarranted invasion of privacy. As a preliminary matter, therefore, the Court had to decide whether the interest in nondisclosure of a rap sheet was the sort of personal privacy interest protected by Exemption 7(C). Respondents argued that because events summarized in a rap sheet had been previously disclosed to the public, the privacy interest in avoiding disclosure of a federal compilation of those events approached zero. *Id.* at 762–63, 109 *S.Ct.* at 1476, 103 *L.Ed.*2d at 789. The Court dismissed respondents' "cramped notion of personal privacy," *id.* at 763, 109 *S.Ct.* at 1476, 103 *L.Ed.*2d at 789, and found privacy interests implicated by disclosure of the information compiled in a rap sheet. As the Court stated, "the fact that 'an event is not wholly 'private' does not mean that an individual has no interest in limiting disclosure or dissemination of the information.' " *Id.* at 770, 109 *S.Ct.* at 1480, 103 *L.Ed.*2d at 794 (citation omitted).

In reaching that conclusion, the Court recognized a "distinction ... between scattered disclosure of the bits of information contained in a rap sheet and revelation of the rap sheet as a whole." *Id.* at 764, 109 *S.Ct.* at 1477, 103 *L.Ed.*2d at 790. As the Court explained,

> The very fact that federal funds have been spent to prepare, index, and maintain these criminal-history files demonstrates that the individual items of information in the summaries would not otherwise be "freely available" ... to the general public. Indeed, if the summaries were "freely available," there would be no reason to invoke the FOIA to obtain access to the information they contain.
>
> *[Ibid.]*

The Court therefore found "a vast difference between the public records that might be found after a diligent search of courthouse files, county archives, and local police stations throughout the

country and a computerized summary located in a single clearing-house of information," and concluded that "the compilation of otherwise hard-to-obtain information alter[ed] the privacy interest implicated by disclosure of that information." [23] *Ibid.*

The Court noted, furthermore, that there was a "privacy interest inherent in the nondisclosure of certain information even when the information may have been at one time public." *Id.* at 767, 109 *S.Ct.* at 1479, 103 *L.Ed.*2d at 792. In *Department of Air Force v. Rose,* 425 *U.S.* 352, 96 *S.Ct.* 1592, 48 *L.Ed.*2d 11 (1976), the Court noted, law students had sought access to Honor and Ethics Code case summaries that had already been publicly posted on squadron bulletin boards, but *"[e]ven though the summaries, with only names redacted, had once been public,* we recognized the potential invasion of privacy through later recognition of identifying details...."* Reporters Committee, supra,* 489 *U.S.* at 769, 109 *S.Ct.* at 1480, 103 *L.Ed.*2d at 793. The Court concluded that "[i]f a cadet has a privacy interest in past discipline that was once public but may have been 'wholly forgotten,' the ordinary citizen surely has a similar interest in the aspects of his or her criminal history that may have been wholly forgotten." *Ibid.*

The distinction between merely providing access to information and compiling and disclosing that information is evident in this

---

[23] In support of that distinction, the Court noted the "web of federal statutory and regulatory provisions that limits the disclosure of rap-sheet information." *Reporters Committee, supra,* 489 *U.S.* at 764–65, 109 *S.Ct.* at 1477, 103 *L.Ed.*2d at 790. That careful and limited pattern of disclosure not only fit the definition of privacy, by restricting access to the information, but "evidence[d] a congressional intent to protect the privacy of rap-sheet subjects, and a concomitant recognition of the power of compilations to affect personal privacy that outstrips the combined power of the bits of information contained within." *Id.* at 765, 109 *S.Ct.* at 1477, 103 *L.Ed.*2d at 790.

Although there is no such web of restrictions on the disclosure of the information at issue in this case, and although *Reporters Committee* involved the statutory, and not the constitutional, meaning of privacy, *id.* at 762 n. 13, 109 *S.Ct.* at 1476 n. 13, 103 *L.Ed.*2d at 789 n. 13, we nevertheless believe that the Court's analysis may be applied to the facts before us because of the active compilation and dissemination of information under Tiers Two and Three.

case. Government dissemination of information to which the public merely has access through various sources eliminates the costs, in time, effort, and expense, that members of the public would incur in assembling the information themselves. Those costs, however, may severely limit the extent to which the information becomes a matter of public knowledge. The Notification Law therefore exposes various bits of information that, although accessible to the public, may remain obscure. Indeed, as in *Reporters Committee*, if the information disclosed under the Notification Law were, in fact, freely available, there would be no need for the law.

In exposing those various bits of information to the public, the Notification Law links various bits of information—name, appearance, address, and crime—that otherwise might remain unconnected. However public any of those individual pieces of information may be, were it not for the Notification Law, those connections might never be made. We believe a privacy interest is implicated when the government assembles those diverse pieces of information into a single package and disseminates that package to the public, thereby ensuring that a person cannot assume anonymity—in this case, preventing a person's criminal history from fading into obscurity and being wholly forgotten. Those convicted of crime may have no cognizable privacy interest in the fact of their conviction, but the Notification Law, given the compilation and dissemination of information, nonetheless implicates a privacy interest. The interests in privacy may fade when the information is a matter of public record, but they are not non-existent. *See Reporters Committee, supra,* 489 *U.S.* 749, 763 n. 15, 109 *S.Ct.* 1468, 1476 n. 15, 103 *L.Ed.*2d 774, 789 n. 15.

Having found privacy interests implicated only by the Notification Law, however diminished those interests may be by the public nature of the individual pieces of information disclosed, we must determine whether the state interest justifies disclosure. Courts in this circuit have considered the following factors:

(1) the type of record requested; (2) the information it does or might contain; (3) the potential for harm in any subsequent nonconsensual disclosure; (4) the injury from disclosure to the relationship in which the record was generated; (5) the adequacy of safeguards to prevent unauthorized disclosure; (6) the degree of need for access; and (7) whether there is an express statutory mandate, articulated public policy, or other recognized public interest militating toward access.

[*Faison v. Parker,* 823 *F.Supp.* 1198, 1201 (E.D.Pa.1993) (citing *United States v. Westinghouse Elec. Corp.,* 638 *F.2d* 570, 578 (3d Cir.1980)).]

Although those factors have generally been applied in cases involving disclosures to the government, they also provide the proper framework for assessing government disclosure of information. *See Ms. B. v. Montgomery County Emergency Serv., Inc.,* 799 *F.Supp.* 534, 537–38 (E.D.Pa.1992), *aff'd,* 989 *F.2d* 488 (3d Cir.), *cert. denied,* —— *U.S.* ——, 114 *S.Ct.* 174, 126 *L.Ed.*2d 133 (1993) (granting motion for summary judgment to state mental health professionals who disclosed threats made by patient during course of treatment).

 We find, based on those factors, that the state interest in public disclosure substantially outweighs plaintiff's interest in privacy. First, the information requested is not deserving of a particularly high degree of protection. We are not dealing with thoughts and feelings revealed in the course of psychiatric treatment, *Ms. B., supra,* 799 *F.Supp.* at 538, medical information in general, *Westinghouse, supra,* 638 *F.2d* at 577, or medical information regarding HIV status, *Doe v. Borough of Barrington,* 729 *F.Supp.* 376, 384 (D.N.J.1990). Plaintiff, therefore, can claim only a most limited expectation of privacy in the information to be disseminated. Second, because of the public nature of the information, we cannot speak of harm either from non-consensual disclosure or damage to the relationship in which the records were generated. We neither risk exposing intimate details of plaintiff's life, like those laid bare to a psychiatrist, nor do we risk damaging a relationship like that between patient and doctor by releasing plaintiff's name, address or description. *See Ms. B., supra,* 799 *F.Supp.* at 538.

Counterbalanced against plaintiff's diminished privacy interest is a strong state interest in public disclosure. There is an express

public policy militating toward disclosure: the danger of recidivism posed by sex offenders. The state interest in protecting the safety of members of the public from sex offenders is clear and compelling. *Compare Ms. B., supra,* 799 *F.Supp.* at 538 (finding strong state interest in protecting citizens from violent assault by mentally ill) *with Doe, supra,* 729 *F.Supp.* at 385 (concluding that disclosure of the Does' confidential information—that Jane Doe's husband had tested HIV positive—did not advance compelling state governmental interest in preventing the spread of AIDS because there was no risk of exposure to HIV virus from casual contact with Jane Doe). The Legislature has determined that there is a substantial danger of recidivism by sex offenders, and public notification clearly advances the purpose of protecting the public from that danger.

We note that the degree and scope of disclosure is carefully calibrated to the need for public disclosure: the risk of reoffense. The greater the risk of reoffense, the greater is the scope of disclosure. The extent or degree of the information disclosed is similarly limited by the need for disclosure. *See Ms. B., supra,* 799 *F.Supp.* at 539 (noting that disclosure by mental health professionals was limited to fact that the plaintiff had made threats and apparently had the means to carry them out, and that disclosure was made only to law enforcement personnel and one of the threatened individuals). Only that information necessary to alert the public of, and protect the public from, the risk posed by the offender is released. The public is notified of an individual's criminal history to alert it of the possible danger, and is provided with sufficient information to identify that individual.

Our inquiry is not at an end, however; we must determine plaintiff's rights under the State Constitution. With its declaration of the right to life, liberty, and the pursuit of happiness, Article I, § 1 of the New Jersey Constitution encompasses the right of privacy. *Right to Choose v. Byrne,* 91 *N.J.* 287, 303, 450 *A.2d* 925 (1982); *State v. Baker,* 81 *N.J.* 99, 114 n. 10, 405 *A.2d* 368 (1979). We have found a constitutional right of privacy in many

contexts, including the disclosure of confidential or personal information. *Hennessey v. Coastal Eagle Point Oil Co.*, 129 *N.J.* 81, 96, 609 *A.*2d 11 (1992) (citing *In re Martin*, 90 *N.J.* 295, 447 *A.*2d 1290 (1982)).

In resolving conflicts between the government's need for information and the individual's right of confidentiality, this Court has adopted a balancing test similar to that adopted by the federal courts. *Martin, supra*, 90 *N.J.* at 318, 447 *A.*2d 1290. We concluded, in *Martin*, that " 'even if the governmental purpose is legitimate and substantial ... the invasion of the fundamental right of privacy must be minimized by utilizing the narrowest means which can be designed to achieve the public purpose.' " *Ibid.* (quoting *Lehrhaupt v. Flynn*, 140 *N.J.Super.* 250, 262, 264, 356 *A.*2d 35 (App.Div.1976), *aff'd o.b.*, 75 *N.J.* 459, 383 *A.*2d 428 (1978)); *In re Solid Waste Util. Customer Lists*, 106 *N.J.* 508, 522, 524 *A.*2d 386 (1987) (stating that "the legitimate public interest in certain information must be balanced with the competing right of privacy of the individuals possessing such information").

■ Under the State Constitution, the result of our balancing is no different than that under the Federal Constitution. We find that the state interest in protecting the public is legitimate and substantial. *See Martin, supra*, 90 *N.J.* at 319, 447 *A.*2d 1290 (recognizing "substantial government interest in strict regulation of casino gambling"). We find, more importantly, that the interest in disclosure substantially outweighs the interest in nondisclosure. Because none of the information disclosed under the Registration Law is confidential, requiring disclosure of such information results in a minimal invasion of privacy. *See id.* at 320, 447 *A.*2d 1290 (concluding that incursion resulting from challenged questionnaire was minimal because the questions "concern predominantly information of public record, such as ... prior arrests or convictions, ... and driver's license information"). Although the potential consequences of active dissemination under the Notification Law alter the privacy interests, the incursion on those

interests is necessary for the protection of the public, as the means chosen are narrowly tailored to that interest.

Thus, we conclude, under both the State and Federal Constitutions, that neither the Registration, nor the Notification Law, violates the right to privacy.

## VII

### *Equal Protection*

Plaintiff Doe asserts that the notification and registration requirements of the statute violate his right to equal protection under the Federal and State Constitutions. The trial court, while relying only on federal equal protection analysis, nonetheless held that neither equal protection provision is violated. "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 *U.S.* 432, 439, 105 *S.Ct.* 3249, 3254, 87 *L.Ed.*2d 313, 320 (1985). Plaintiff argues that he is entitled to be treated as an individual and not classified with other sex offenders who, unlike plaintiff, have not successfully completed treatment at Avenel. He emphasizes that he is one of few offenders who have been determined to be repetitive compulsive offenders but have earned release from Avenel because they have been determined to be no longer dangerous. He asserts that his right to equal protection requires that he be viewed by the law individually rather than as part of a class. This argument mischaracterizes the Equal Protection Clause.

Equal protection does not preclude the use of classifications, but requires only that those classifications not be arbitrary. *State v. Mortimer*, 135 *N.J.* 517, 536, 641 *A.*2d 257 *cert. denied*, —— *U.S.* ——, 115 *S.Ct.* 440, 130 *L.Ed.*2d 351 (1994).

[W]here individuals in the group affected by a law have distinguishing characteristics relevant to interests the State has the authority to implement, the courts have

been very reluctant, as they should be in our federal system and with our respect for the separation of powers, to closely scrutinize legislative choices as to whether, how, and to what extent those interests should be pursued. In such cases, the Equal Protection Clause requires only a rational means to serve a legitimate end. [*City of Cleburne, supra,* 473 *U.S.* at 441–42, 105 *S.Ct.* at 3255, 87 *L.Ed.*2d at 321.]

Plaintiff's classification as a sex offender subject to the Notification Law is based on the distinguishing characteristic that he was convicted of one of the enumerated sex offenses. His classification as Tier One, Two, or Three for notification purposes will also be based on his individual characteristics as they relate to the risk that he will commit another offense.

 A classification that does not impact a suspect class or impinge upon a fundamental constitutional right [24] will be upheld if it is rationally related to a legitimate government interest. *Brown v. City of Newark,* 113 *N.J.* 565, 573, 552 *A.*2d 125 (1989) (citing *Barone v. Department of Human Servs.,* 107 *N.J.* 355, 365, 526 *A.*2d 1055 (1987) (citing *Dandridge v. Williams,* 397 *U.S.* 471, 90 *S.Ct.* 1153, 25 *L.Ed.*2d 491 (1970))). "The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational. Furthermore, some objectives ... are not legitimate state interests." *City of Cleburne, supra,* 473 *U.S.* at 446–47, 105 *S.Ct.* at 3258, 87 *L.Ed.*2d at 324. However, "legislation may impose special burdens upon defined classes in order to achieve permissible ends." *State v. Bianco,* 103 *N.J.* 383, 395, 511 *A.*2d 600 (1986) (citing *Rinaldi v. Yeager,* 384 *U.S.* 305, 309, 86 *S.Ct.* 1497, 1499, 16 *L.Ed.*2d 577, 580 (1966)).

 It is well settled that classifying offenders according to the offense committed is subject to rational basis analysis, *see State v. Lagares,* 127 *N.J.* 20, 36, 601 *A.*2d 698 (1992) (holding that statute providing enhanced penalties for drug related offenses

_____

[24] The United States Supreme Court has not held that the confidentiality aspect of the right to privacy is a fundamental constitutional right deserving of the highest level of scrutiny. *See supra* Section VI.

does not violate equal protection), and that the mentally ill are not a class warranting a higher level of scrutiny, *City of Cleburne, supra,* 473 *U.S.* at 442–46, 105 *S.Ct.* at 3255–58, 87 *L.Ed.*2d at 321–24. This Court, moreover, has specifically held that creating a separate classification for repetitive-compulsive sex offenders is not arbitrary and "has a rational basis." *State v. Wingler,* 25 *N.J.* 161, 176, 135 *A.*2d 468 (1957). There is clearly no question but that the trial court was correct in its conclusion that "[p]ublic safety is unquestionably within the Legislature's powers and protecting the public from recidivistic sex offenders is a legitimate state interest."

Plaintiff argues nonetheless that he should not be classified with other repetitive compulsive sex offenders because, unlike most offenders in this category, he was determined to have successfully completed treatment and released on parole. However, the requirements of equal protection, when measured under rational basis standards, are not offended merely because the classification is not narrowly tailored. *See New York City Transit Auth. v. Beazer,* 440 *U.S.* 568, 99 *S.Ct.* 1355, 59 *L.Ed.*2d 587 (1979) (rejecting equal protection challenge to ban on hiring users of any narcotics, including methadone, even though some methadone users are involved in successful drug abuse treatment programs). "Proper classification for equal protection purposes is not a precise science.... As long as the classifications do not discriminate arbitrarily between persons who are similarly situated, the matter is one of legislative prerogative." *Greenberg v. Kimmelman,* 99 *N.J.* 552, 577, 494 *A.*2d 294 (1985).

The Legislature has determined that convicted sex offenders represent a risk to the public safety and that knowledge of their identities and whereabouts is necessary for protection of the public. Since the registration and notification requirements are rationally related to that legitimate state interest, the requirements of equal protection under the Fourteenth Amendment are satisfied.

Although the term "equal protection" does not appear anywhere in the New Jersey Constitution, Article I, paragraph 1 of our Constitution has been interpreted as conferring the right to equal treatment under the law, a right analogous to the guarantee of equal protection under the Fourteenth Amendment to the Federal Constitution. *Barone, supra,* 107 *N.J.* at 367, 526 *A.*2d 1055 (citing *Greenberg, supra,* 99 *N.J.* at 568, 494 *A.*2d 294). Although conceptually similar, the right under the State Constitution can in some situations be broader than the right conferred by the Equal Protection Clause. *Right to Choose, supra,* 91 *N.J.* 287, 450 *A.*2d 925 (holding that statute which satisfies federal equal protection requirements violates equal protection under State Constitution). Although plaintiff has presented no argument for justifying expansion of equal protection beyond the federal right in this case, *see State v. Hunt,* 91 *N.J.* 338, 363–368, 450 *A.*2d 952 (1982) (Handler, J., concurring); *In re Promulgation of Guardianship Servs. Regs.,* 103 *N.J.* 619, 628, 512 *A.*2d 453 (1986), we nevertheless proceed with the state constitutional analysis.

▮▮▮▮ To determine whether the Registration and Notification Laws violate equal protection under the New Jersey Constitution, we apply a balancing test which considers the nature of the right affected, the extent to which the government action interferes with that right, and the public need for such interference. *Brown, supra,* 113 *N.J.* at 573–74, 552 *A.*2d 125 *Barone, supra,* 107 *N.J.* at 368, 526 *A.*2d 1055. We conclude that the public need for information about dangerous sex offenders greatly outweighs plaintiff's right to privacy and the intrusion of that right associated with registration and notification.

Plaintiff asserts that he has the right to individual treatment but, as we have already concluded, there is no such right under either Constitution. More than that, plaintiff's significant individual characteristics are assured recognition under these laws. He is a repetitive and compulsive offender, and his inclusion in the initial class of those required to register is not only rational, but closely related to a strong state interest. These are the sex

offenders most likely to reoffend. Thereafter, he will be placed in a class that is carefully defined to reflect his specific characteristics that reasonably predict his specific risk of reoffense. He will not be lumped together with all sex offenders but will be placed either in Tier One, Two or Three, depending upon his characteristics alone, the notification that results again directly related to a strong state interest.

Classification of plaintiff based on his conviction of one of the enumerated sex offenses and his characterization as a repetitive compulsive offender is rationally related to the government's interest in protection of the public. The need for public safety outweighs the restrictions placed upon plaintiff as a result of his inclusion in this class. We conclude therefore that the registration and notification requirements do not violate plaintiff's right to equal protection under either the Federal or State Constitution.

## VIII

### *Administrative Procedure Act*

Plaintiff challenges the authority of the Attorney General to promulgate Guidelines for implementation of the registration and notification requirements. Plaintiff asserts that the Attorney General's Guidelines are rules which must be adopted in conformance with the notice and hearing requirements of the Administrative Procedure Act (the "APA"), *N.J.S.A.* 52:14B–1 to –15. The APA requires that prior to the adoption of an administrative rule, an agency must provide thirty days notice of its intent to issue the rule, publish a summary and explanation of the rule, and afford "all interested persons reasonable opportunity to submit data, views, or arguments, orally or in writing." *N.J.S.A.* 52:14B–4.

The APA defines an administrative rule as an "agency statement of general applicability and continuing effect that implements or interprets law or policy, or describes the organization, procedure or practice requirements of any agency." *N.J.S.A.* 14B–2(e). Exempt from its requirements are any rules that can

be categorized as "statements concerning the internal management or discipline of any agency" and communications between and within agencies. *Ibid.*

The Attorney General offers three alternative reasons why the Guidelines need not conform to the APA procedures: that the Guidelines are not administrative rules as defined by the APA; that the Guidelines fall under the internal communication exception; and that the Legislature clearly intended that the Guidelines not be subject to the APA notice and hearing requirements.

Because of the widespread impact of the Guidelines, not only on the offenders required to register but also on the members of the general public who seek notification, we disagree with the Attorney General's contention that the Guidelines can be considered internal department communications. *See Woodland Private Study Group v. Department of Envtl. Protection,* 109 *N.J.* 62, 74, 533 *A.*2d 387 (1987) (holding that application of the internal communication exception depends on "whether the agency action has a 'substantial impact' on the rights or interests of the parties"). The Guidelines clearly have a substantial impact on the offender's liberty interest as well as on the public's interest in the protection of children, both of which are interests "sufficiently important [and] worthy of recognition." *Ibid.*

Having determined that the internal communication exception does not apply, we must determine whether the Guidelines otherwise meet the statutory definition of administrative rules. In *Metromedia v. Division of Taxation,* 97 *N.J.* 313, 331–32, 478 *A.*2d 742 (1984), we set forth six factors to be applied when determining whether an agency action constitutes rulemaking which must conform to the requirements of the Administrative Procedure Act. Those factors are whether the action

(1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an

administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy.

[*Ibid.*]

Although in *Metromedia* we were concerned about the distinction between rulemaking and adjudication, the factors are relevant whenever the authority of an agency to act without conforming to the formal rulemaking requirements is questioned. *Woodland Private Study Group, supra,* 109 *N.J.* at 67, 533 *A.*2d 387. The factors need not be given the same weight, and some factors will clearly be more relevant in a given situation than others: "All six of the *Metromedia* factors need not be present to characterize agency action as rulemaking, and the factors should not merely be tabulated, but weighed." *In re Solid Waste Util. Customer Lists, supra,* 106 *N.J.* at 518, 524 *A.*2d 386.

The court below applied those factors and found that the Guidelines did constitute rulemaking. We agree that the Guidelines are intended to have wide coverage, to be applied uniformly and to operate prospectively, thereby satisfying the first three *Metromedia* factors. However, the remaining factors point strongly in the other direction and, in this case, deserve the most weight.

The fourth factor is whether the Guidelines "prescribe[ ] a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization." *Metromedia, supra,* 97 *N.J.* at 331, 478 *A.*2d 742. The Guidelines are to a great extent merely a formalization of the classification requirements explicitly set forth in the statute. To the extent that the classification criteria, or any other requirements of the Guidelines, deviate substantially from the explicit or implied standards of the statute, those aspects of the Guidelines are subject to judicial review, *see, e.g., A.A. Mastrangelo, Inc. v. Department of Envtl. Protection,* 90 *N.J.* 666, 449 *A.*2d 516 (1982), as well as review by the Legislature, *N.J. Const.* art. V, § 4, ¶ 6.

We, have, in this opinion, required revisions to the Guidelines which would tailor them more closely to the statutory language. *See supra* at 34–38, 662 *A.*2d at 384–86. Therefore, the fourth factor, and the one we believe to be the most important of the six *Metromedia* factors in this instance, is not satisfied.

In addition, we disagree with the trial court's conclusion regarding the fifth *Metromedia* factor: that the Guidelines reflect a material change in administrative policy which conflicts with the Attorney General's "past agency position on the identical subject matter." *Metromedia, supra,* 97 *N.J.* at 331, 478 *A.*2d 742. The Attorney General could not have a policy concerning a statute which did not previously exist. *See Reuben H. Donnelley Corp. v. Division of Taxation,* 128 *N.J.* 218, 607 *A.*2d 1281 (1992) (holding that change in policy as a result of amendment to tax statute is not a change in past agency position for purposes of applying the fifth *Metromedia* factor).

Similarly, the sixth *Metromedia* factor does not apply, for the Guidelines do not represent a "policy in the nature of the interpretation of law or general policy." *Metromedia, supra,* 97 *N.J.* at 322, 478 *A.*2d 742. The Guidelines do not represent the conclusions of administrative agency policy makers on how best to apply a broad statutory grant of authority. *See, e.g., R.H. Macy & Co. v. Division of Taxation,* 77 *N.J.Super.* 155, 185 *A.*2d 682 (App.Div. 1962), *aff'd o.b.,* 41 *N.J.* 3, 194 *A.*2d 457 (1963) (holding that the Division of Taxation has discretion to value taxpayer corporation's net worth by a method other than that used by the taxpayer as long as it conforms to "sound accounting principles"). Nor are they a statement of policy adopted without any statutory authority. *E.g., Department of Envtl. Protection v. Stavola,* 103 *N.J.* 425, 511 *A.*2d 622 (1986) (concluding that agency must follow rulemaking procedure in order to exert regulatory authority over cabanas since such structures are not mentioned in the enabling statute). Rather, the Guidelines were prepared in response to a specific

statutory mandate and their contents are largely dictated either explicitly or implicitly by the language of the statute.[25]

We therefore hold that the Guidelines are not administrative rules which must conform to the requirements of the Administrative Procedure Act and reverse the ruling of the trial court on that issue.

## IX

### *Procedural Due Process and Fairness and Rightness*

The United States Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law." *U.S. Const.* amend. XIV, § 1. Article I, paragraph 1 of the New Jersey Constitution does not enumerate the right to due process, but protects against injustice and, to that extent, protects "values like those encompassed by the principle[ ] of due process." *Greenberg, supra,* 99 *N.J.* at 568, 494 *A.*2d 294. In examining a procedural due process claim, we first assess whether a liberty or property interest has been interfered with by the State, and second, whether the procedures attendant upon that deprivation are constitutionally sufficient. *Valmonte v. Bane,* 18 *F.*3d 992, 998 (2d Cir.1994) (quoting *Kentucky Dep't of Corrections v. Thompson,* 490 *U.S.* 454, 460, 109 *S.Ct.* 1904, 1908, 104 *L.Ed.*2d 506, 514 (1989)).

We deal here not with the question of substantive constitutional deprivation, for we have held that there is none. The question treated in this section is whether in the implementation of notifica-

---

25 While we have decided that the Guidelines do not meet the statutory definition of administrative rules, we assume that, even if that definition were satisfied, the Legislature could dispense with the APA notice and hearing requirements in a particular case. *In re Adoption of Regulations Governing the State Health Plan,* 262 *N.J.Super.* 469, 486, 621 A.2d 484 (App.Div.1993), *aff'd,* 135 *N.J.* 24, 637 A.2d 1246 (1994). The Legislature's intent to do so with the Attorney General's Guidelines is clear. Not only is the time frame for adoption of the Guidelines inconsistent with the requirements of the APA, but the creation of the Notification Advisory Council suggests the intent to establish a more specialized procedure than that called for by the APA.

tion, procedural protections are required beyond those found in these laws in order to assure fairness and accuracy in carrying them out. Plaintiff contends that the Registration and Notification Laws implicate liberty interests in privacy and reputation. Specifically, he argues that dissemination of information under the Notification Law impinges on the interest in nondisclosure, and that classification under the Notification Law, with its attendant disclosure, not only identifies him as a sex offender but effectively brands him as potentially currently dangerous, thereby infringing his interest in reputation. We find that both interests constitute protectible liberty interests, and therefore that procedural protection is due. We hold that such additional procedures in the form of a hearing are due, that they must, on application, be provided before notification and that they are constitutionally required. *See infra* at 128–35, 662 *A.*2d at 432–35.

■ Public notification implicates a privacy interest in nondisclosure, and therefore triggers due process. The right to privacy is among the protectible interests which due process protects. The Court has suggested that "the 'right of privacy' is founded in the Fourteenth Amendment's concept of personal liberty." *Whalen, supra,* 429 *U.S.* at 598 n. 23, 97 *S.Ct.* at 876 n. 23, 51 *L.Ed.*2d at 73 n. 23 (quoting *Roe v. Wade,* 410 *U.S.* 113, 152–53, 93 *S.Ct.* 705, 726–27, 35 *L.Ed.*2d 147, 176–77 (1973)). Indeed, in his classic statement, Justice Brandeis characterized "the right to be let alone" as the most comprehensive of rights and the right most valued by a civilized society. *Id.* at 599 n. 25, 97 *S.Ct.* at 876 n. 25, 51 *L.Ed.*2d at 73 n. 25 (quoting *Olmstead v. United States,* 277 *U.S.* 438, 478, 48 *S.Ct.* 564, 572, 72 *L.Ed.* 944, 956 (1928) (Brandeis, J., dissenting)).

"The question of whether one's good name and standing, and the interest in protecting that reputation, constitutes a protectible liberty interest" has been addressed in a number of cases. *Valmonte, supra,* 18 *F.*3d at 999. In *Wisconsin v. Constantineau,* 400 *U.S.* 433, 434, 91 *S.Ct.* 507, 508, 27 *L.Ed.*2d 515, 517 (1971), a statute authorized the posting of a notice prohibiting the sale or

gift of liquor to any person who " 'by excessive drinking' produces described conditions or exhibits specified traits, such as exposing himself or family 'to want' or becoming 'dangerous to the peace' of the community." Stating that "[i]t would be naive not to recognize that such 'posting' or characterization of an individual will expose him to public embarrassment and ridicule," *id.* at 436, 91 *S.Ct.* at 509, 27 *L.Ed.*2d. at 518, the Court held that a protectible liberty interest is implicated "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him." *Id.* at 437, 91 *S.Ct.* at 510, 27 *L.Ed.*2d at 519.

A year later, in *Board of Regents v. Roth,* 408 *U.S.* 564, 92 *S.Ct.* 2701, 33 *L.Ed.*2d 548 (1972), the Court again addressed "the nexus between reputation and the due process clause." *Sturm v. Clark,* 835 *F.*2d 1009, 1012 (3d Cir.1987). The plaintiff, a university professor who was not rehired following the end of his one-year appointment, alleged that "the failure of University officials to give him notice of any reason for nonretention and an opportunity for a hearing violated his right to procedural due process of law." *Roth, supra,* 408 *U.S.* at 569, 92 *S.Ct.* at 2705, 33 *L.Ed.*2d at 556. The Court held that no liberty interests were implicated because, in declining to hire the plaintiff, the State neither made "any charge against him that might seriously damage his standing and associations in the community," *id.* at 573, 92 *S.Ct.* at 2707, 33 *L.Ed.*2d at 558, nor "imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities," *id.* at 573, 92 *S.Ct.* at 2707, 33 *L.Ed.*2d at 559. Had the State done either, however, the Court stated that "a different case" would have been presented. *Id.* at 573, 573–74, 92 *S.Ct.* at 2707, 33 *L.Ed.*2d at 558, 559.

In *Paul, supra,* 424 *U.S.* at 701, 96 *S.Ct.* at 1161, 47 *L.Ed.*2d at 414, however, the Court concluded that "reputation alone, apart from some more tangible interests such as employment, is [not] either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause." According to the Court, harm to reputation must be accompanied by the

alteration of "a right or status previously recognized by state law," for it is that "alteration, officially removing the interest from the recognition and protection previously afforded by the State, which [the Court has] found sufficient to invoke the procedural guarantees contained in the Due Process Clause of the Fourteenth Amendment." *Id.* at 711, 96 *S.Ct.* at 1165, 47 *L.Ed.*2d at 420. The Court held, therefore, that because the circulation of flyers publicizing the plaintiff's arrest for shoplifting and labelling him an "active shoplifter" only harmed his reputation, and did not alter his status as a matter of state law, there was no deprivation of a protectible liberty interest.[26] *Id.* at 712, 96 *S.Ct.* at 1166, 47 *L.Ed.*2d at 420.

*Paul* has been interpreted to require "stigma plus" to establish a constitutional deprivation. *See Valmonte, supra,* 18 *F.*3d at 999. "[M]ere damage to reputation, apart from the impairment of some additional interest previously recognized under state law, is not cognizable under the due process clause." *Sturm, supra,* 835 *F.*2d at 1012. As stated in *Borucki v. Ryan,* 827 *F.*2d 836, 842–43 (1st Cir.1987),

---

[26] According to Professor Tribe, "[T]he Court evidently believed that any contrary result would have the unthinkable consequence of federalizing the entire state law of torts whenever government officers are the wrongdoers." Laurence H. Tribe, *American Constitutional Law* 1397 (2d ed. 1988). That concern, however, is not present in the instant case. Finding a protectible interest in this case would not risk federalizing tort law. Plaintiff's claim is not a state defamation action. We are not here dealing with random disclosures, but with systematic disclosures following ex parte classification by local prosecutors. This is precisely the type of adjudication which so troubled Justice Brennan:

> [T]he logical and disturbing corollary of this holding is that no due process infirmities would inhere in a statute constituting a commission to conduct ex parte trials of individuals, so long as the only official judgment pronounced was limited to the public condemnation and branding of a person as a Communist, a traitor, an "active murderer," a homosexual, or any other mark that "merely" carries social opprobrium. The potential of today's decision is frightening for a free people.
> [*Paul, supra,* 424 *U.S.* at 721, 96 *S.Ct.* at 1170, 47 *L.Ed.*2d at 425–26 (Brennan, J., dissenting).]

an allegation that government dissemination of information or government defamation has caused damage to reputation, even with all the attendant emotional anguish and social stigma, does not in itself state a cause of action for violation of a constitutional right; infringement of more 'tangible interests' ... must be alleged as well.

We therefore must assess whether plaintiff has established damage to reputation and impairment of some additional interest.

▮▮▮ Plaintiff has plainly established that classification in Tiers Two or Three will result in damage to his reputation. In *Constantineau, supra,* the Court recognized that public embarrassment and ridicule would result from the posting, and that a person's good name or reputation would therefore be at stake. In *Valmonte,* a case more analogous to the one before us, the court stated that "[t]here is no dispute that Valmonte's inclusion on the [Central Register] potentially damages her reputation by branding her as a child abuser, which certainly calls into question her 'good name, reputation, honor, or integrity.' " *Valmonte, supra,* 18 *F.*3d at 1000 (citation omitted). Similarly, in *Bohn v. County of Dakota,* 772 *F.*2d 1433, 1436 n. 4 (8th Cir.1985), *cert. denied,* 475 *U.S.* 1014, 106 *S.Ct.* 1192, 89 *L.Ed.*2d 307 (1986), the court found that "[b]y identifying the Bohns as child abusers, investigating the quality of their family life, and maintaining data on them, the County Department exposed them to public opprobrium and may have damaged their standing in the community." Thus, we conclude that classification in Tiers Two or Three, with the requisite public notification, would expose plaintiff to public opprobrium, not only identifying him as a sex offender but also labelling him as potentially currently dangerous, and thereby undermining his reputation and standing in the community.

The harm to plaintiff's reputation, when coupled with the incursion on his right of privacy, although justified by the compelling state interest, constitutes a protectible interest. In *Paul,* the Court recognized that in addition to the interests recognized by state law, "[t]here are other interests ... protected not by virtue of their recognition by the law of a particular State but because they are guaranteed in one of the provisions of the Bill of Rights

which has been 'incorporated' into the Fourteenth Amendment."
*Paul, supra,* 424 *U.S.* at 710 n. 5, 96 *S.Ct.* at 1165 n. 5, 47 *L.Ed.*2d
at 419 n. 5. In *Bohn, supra,* 772 *F.*2d at 1436 n. 4, therefore, the
court found a protectible interest in reputation where the stigma
of being identified as child abuser was tied to the protectible
interest in privacy and autonomy of family relationships. That
interest, the court noted, has found protection in the Due Process
and Equal Protection Clauses of the Fourteenth Amendment, as
well as the Ninth Amendment. *Id.* at 1436 (citations omitted).
Thus, we conclude that because the stigma resulting from notifica-
tion is tied to the protectible interest in privacy, which has been
grounded in the Fourteenth Amendment, plaintiff has a protecti-
ble interest in his reputation.

 Under the State Constitution, we find protectible interests
in both privacy and reputation. Our analysis differs from that
under the Federal Constitution only to the extent that we find a
protectible interest in reputation without requiring any other
tangible loss. In interpreting the State Constitution, we "look to
both the federal courts and other state courts for assistance....
[but] [t]he ultimate responsibility for interpreting the New Jersey
Constitution ... is ours." *Greenberg, supra,* 99 *N.J.* at 568, 494
A.2d 294. In fulfilling that responsibility, "we have generally been
more willing to find State-created interests that invoke the protec-
tion of procedural due process than have our federal counter-
parts." *New Jersey Parole Bd. v. Byrne,* 93 *N.J.* 192, 208, 460
A.2d 103 (1983).

 The New Jersey Constitution does not explicitly enumer-
ate the right to possessing or protecting reputation. That right,
however, was understood to be guaranteed by Article I, paragraph
1 of the Constitution of 1844.[27] "The right of a person to be

---

[27] We note that "[f]or Blackstone 'liberty' ... was only one of the three
'absolute rights of every Englishman.' The others were the right of property and
the right of personal security, the latter term ... including 'reputation.' " Henry
P. Monaghan, *Of "Liberty" and "Property",* 62 *Cornell L.Rev.* 405, 411–12 (1977)

secure in his reputation ... is a part of the right of enjoying life and pursuing and obtaining safety and happiness which is guaranteed by our fundamental law." *Neafie v. Hoboken Printing & Publishing Co.,* 75 *N.J.L.* 564, 567, 68 *A.* 146 (E. & A.1907); *Bednarik v. Bednarik,* 18 *N.J.Misc.* 633, 650, 16 *A.2d* 80 (Ch.1940) ("The Constitution of New Jersey deals with [the right to personal privacy and security] in Art. 1, plac. 1. The immunity 'consists in a person's legal and uninterrupted enjoyment of his life, his limbs, his body, his health, and his reputation.' ") (citation omitted), *overruled on other grounds by Cortese v. Cortese,* 10 *N.J.Super.* 152, 160, 76 *A.2d* 717 (App.Div.1950). Where a persons's good name or reputation are at stake because of what the government is doing to that person, we conclude, sufficient constitutional interests are at stake. *See Grodjesk v. Jersey City Medical Ctr.,* 135 *N.J.Super.* 393, 411–12, 343 *A.2d* 489 (Ch.Div.1975) (finding that plaintiff surgeons were entitled to due process where censure by executive committee of publicly funded hospital damaged their reputation and professional standing).

That conclusion is particularly strengthened in this case by the nature of the stigmatization involved. We have held previously that after conviction, "classification as a 'repetitive' and 'compulsive' sex offender under *N.J.S.A.* 2C:47–3a inflicts a greater stigma than that resulting from the conviction for a sex offense," when there is no such classification. *State v. Howard,* 110 *N.J.* 113, 129, 539 *A.2d* 1203 (1988). The defendant's liberty interest was reduced because "[w]hen sentencing a convicted sex offender, the court does not choose between freedom and commitment of the defendant, but only between commitment at one state correctional facility or another." *Id.* at 130–31, 539 *A.2d* 1203. We concluded, however, that "[a]lthough the added stigma may be slight, it should be considered in determining the process due to a

---

(citations omitted). We note, moreover, that "[o]ne does not need the authority of Blackstone for the proposition that without one's reputation 'it is impossible to have the perfect enjoyment of any other advantage or right.' " *Id.* at 426 (citation omitted).

defendant before imposition of an Avenel sentence." *Id.* at 129, 539 *A.*2d 1203.

In this case, plaintiff's liberty interest is more significant than that in *Howard.* If not for the Registration and Notification Laws, or if classified in Tier One, plaintiff would be stigmatized only to the extent that the fact of his incarceration and the crime for which he was convicted might be publicly known. Because only the prosecutor and local law enforcement would receive notification under Tier One, he would be free, to the degree possible, to rehabilitate his name and standing in the community. However, if classified in Tier Two or Three, plaintiff's name and standing in the community would be threatened to the extent that his prior undisclosed criminal history and his new classification become known. We conclude that the consequences to plaintiff's reputation from classification in Tier Two or Three implicate a liberty interest.

 Thus, we conclude that under both the Federal and State Constitutions, the Registration and Notification Laws implicate protectible liberty interests in privacy and reputation, and therefore trigger the right to due process. Due process is not a fixed concept, however, but a flexible one that depends on the particular circumstances. *Zinermon v. Burch,* 494 *U.S.* 113, 127, 110 *S.Ct.* 975, 984, 108 *L.Ed.*2d 100, 114–15 (1990); *Mathews v. Eldridge,* 424 *U.S.* 319, 334, 96 *S.Ct.* 893, 902, 47 *L.Ed.*2d 18, 33 (1976); *Nicoletta v. North Jersey Dist. Water Supply Comm'n,* 77 *N.J.* 145, 165, 390 *A.*2d 90 (1978). Fundamentally, due process requires an opportunity to be heard at a meaningful time and in a meaningful manner. *Kahn v. U.S.,* 753 *F.*2d 1208, 1218 (3d Cir.1985). The minimum requirements of due process, therefore, are notice and the opportunity to be heard. *U.S. v. Raffoul,* 826 *F.*2d 218, 222 (3d Cir.1987) (citing *Goss v. Lopez,* 419 *U.S.* 565, 95 *S.Ct.* 729, 42 *L.Ed.*2d 725 (1975)).

To determine what procedural protections are required in a given case, we must weigh the following factors:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

[*Zinermon, supra,* 494 *U.S.* at 127, 110 *S.Ct.* at 984, 108 *L.Ed.*2d at 115 (quoting *Mathews, supra,* 424 *U.S.* at 335, 96 *S.Ct.* at 903, 47 *L.Ed.*2d at 33).]

Applying that test, the Supreme Court "usually has held that the Constitution requires some kind of a hearing *before* the State deprives a person of liberty...." *Id.* at 127, 110 *S.Ct.* at 984, 108 *L.Ed.*2d at 115.

 Weighing those factors, we find that a hearing is required prior to notification under Tiers Two and Three. First, the private interests in privacy and reputation are significant. Second, additional safeguards would ensure that deprivations of those interests occur only when justified by the risk posed by the offender. Last, the State interest in prompt classification and notification will not seriously be burdened by additional safeguards, and any resulting burden is justified by the benefits of ensuring accurate classification.

We need not impugn the motives of a prosecutor to require that an independent decision-maker review the Tier classification. *See Morrissey v. Brewer,* 408 *U.S.* 471, 485, 486, 92 *S.Ct.* 2593, 2602, 2602–03, 33 *L.Ed.*2d 484, 497 (1972) (concluding that "determination that reasonable ground exists for revocation of parole should be made by someone not directly involved in the case" because "[t]he officer directly involved in making recommendations cannot always have complete objectivity in evaluating them"); *Goldberg v. Kelly,* 397 *U.S.* 254, 271, 90 *S.Ct.* 1011, 1022, 25 *L.Ed.*2d 287, 301 (1970) (stating that "an impartial decision maker is essential" and that prior "involvement in some aspects of a case will not necessarily bar a welfare official from acting as a decisionmaker. He should not, however, have participated in making the determination under review").

Even if principles of due process did not require that defendants classified as Tier Two or Three be granted a pre-notification

hearing, such process would be required by considerations of fundamental fairness. New Jersey's doctrine of fundamental fairness "serves to protect citizens generally against unjust and arbitrary governmental action, and specifically against governmental *procedures* that tend to operate arbitrarily. [It] serves, depending on the context, as an augmentation of existing constitutional protections or as an independent source of protection against state action." *State v. Ramseur*, 106 *N.J.* 123, 377, 524 *A.*2d 188 (1987) (Handler, J., dissenting). This unique doctrine is not appropriately applied in every case but only in those instances where the interests involved are especially compelling. "Fundamental fairness is a doctrine to be sparingly applied. It is appropriately applied in those rare cases where not to do so will subject the defendant to oppression, harassment, or egregious deprivation." *State v. Yoskowitz*, 116 *N.J.* 679, 712, 563 *A.*2d 1 (1989) (Garibaldi, J., concurring and dissenting).

This Court has relied on the concept of fundamental fairness to require procedures to protect the rights of defendants at various stages of the criminal justice process even when such procedures were not constitutionally compelled. *State v. Wingler*, 25 *N.J.* 161, 135 *A.*2d 468 (1957) (affording defendant opportunity to see and respond to diagnostic report from Adult Diagnostic and Treatment Center); *State v. Kunz*, 55 *N.J.* 128, 259 *A.*2d 895 (1969) (mandating that defendants are entitled to inspect presentence report and to be heard on any adverse contents); *Monks v. New Jersey State Parole Bd.*, 58 *N.J.* 238, 277 *A.*2d 193 (1971) (holding that a prisoner is entitled to a statement of reasons for denial of parole). In addition, this doctrine has been invoked when the actions of government, though not quite rising to the level of a constitutional violation, nonetheless included aspects of unfairness which required this Court's intervention. *Rodriguez v. Rosenblatt*, 58 *N.J.* 281, 277 *A.*2d 216 (1971) (holding that an indigent municipal court defendant subject to imprisonment or other "consequence of magnitude" such as loss of driving privilege is entitled to court-appointed counsel at no cost); *Donaldson v. Board of Educ.*, 65 *N.J.* 236, 320 *A.*2d 857 (1974) (public school

teacher denied tenure is entitled to a statement of reasons); *Yoskowitz, supra,* 116 *N.J.* at 679, 563 *A.*2d 1 (concluding that although second prosecution based on same facts did not violate double jeopardy, remand was necessary to determine if fundamental fairness was violated).

Although we have applied the doctrine of fundamental fairness in a variety of contexts, there is one common denominator in all of those cases: a determination that someone was being subjected to potentially unfair treatment and there was no explicit statutory or constitutional protection to be invoked.

> Fundamental fairness is a doctrine that is an integral part of due process, and is often extrapolated from or implied in other constitutional guarantees. The doctrine effectuates imperatives that government minimize arbitrary action, and is often employed when narrowed constitutional standards fall short of protecting individual defendants against unjustified harassment, anxiety, or expense.
>
> [*Id.* at 731, 563 *A.*2d 1 (Handler, J., dissenting) (citations omitted).]

In plaintiff's case, there is no question that he may be subject to serious consequences if he is classified as either Two or Three. Fundamental fairness is appropriately applied to require procedural protections that will ensure that his classification, and its related consequences, are tailored to his particular characteristics and are not the product of arbitrary action.

## X

### *Conclusion*

We sail on truly uncharted waters, for no other state has adopted such a far-reaching statute. All other notification statutes apparently make public notification discretionary on the part of officials; the statute before us, however, mandates it. Despite the unavoidable uncertainty of our conclusion, we remain convinced that the statute is constitutional. To rule otherwise is to find that society is unable to protect itself from sexual predators by adopting the simple remedy of informing the public of their presence. That the remedy has a potentially severe effect arises from no fault of government, or of society, but rather from the

nature of the remedy and the problem; it is an unavoidable consequence of the compelling necessity to design a remedy.

There is no point in predicting the extent of potential ostracism, in avoiding the conclusion that some ostracism will result, or in calming concerns by observing that the offenders themselves are responsible for their plight for having committed their crimes in the first place, for that justification would apply to any excessive punishment by government. Here government has done all it can to confine that impact, allowing it only where clearly necessary to effect public safety, and if the Tier level selected and the methods of notification conform to the statute and its intent, as defined and limited herein, Tier Two and Tier Three public notification will be appropriately confined and applied only to those whose apparent future dangerousness requires it, and the statute will not only have survived constitutional attack, but in fact will operate as the Legislature intended. We must not prejudge society with the ogre of vigilantism or harassment, although its potential obviously calls for the vigorous steps suggested by the Attorney General, and we must not assume that those in responsible positions will violate the intent of this law by giving notification far beyond that which is authorized, and we must not assume that the press, for whatever reason, will disregard the notification confinement which this law requires.

We are satisfied that this statute, rationally and carefully addressed to a pressing societal problem, is not what those who drafted the Constitution had in mind as an abuse of government's power to punish. What government faced here was a difficult problem, a question of policy, and it understandably decided that public safety was more important than the potential for unfair, and even severe, impact on those who had previously committed sex offenses.

The judgment below as modified herein is affirmed. The constitutional and other attacks on the laws are rejected, except that upon application judicial review in accordance with this opinion

shall be accorded prior to notification. The Attorney General's Guidelines, as modified herein, are valid and effective immediately.

STEIN, J., dissenting.

The Court's opinion carefully explains the considerations and events that induced the Legislature to enact and the Governor to sign the Registration Law, *L.*1994, *c.* 133, (codified at *N.J.S.A.* 2C:7–1 to –5), and the Community Notification Law, *L.*1994, *c.* 128, (codified at *N.J.S.A.* 2C:7–6 to –11), those statutes being commonly known as "Megan's Law." A federal statute, enacted as part of the Violent Crime Control and Law Enforcement Act of 1994, Pub.L. No. 103–322, encouraged states to adopt mandatory registration requirements for persons convicted of sexually violent offenses or certain prescribed offenses against minors. 42 *U.S.C.A.* § 14071(a)(1)(A). The tragic murder of Megan Kanka prompted widespread public concern about the danger posed by released convicted sex offenders. The Legislature responded swiftly, enacting the statutes at issue in this appeal.

The relationship between the statutory provisions and the concerns that led to their adoption is self-evident. The registration requirements enable law-enforcement officials to identify and acquire information concerning persons obligated to register because of prior convictions or adjudications of delinquency based on commission of a sex offense. The Community Notification Law, combined with the Attorney General's Guidelines, authorizes the dissemination, to prescribed organizations and members of the community likely to encounter a sex offender, of information concerning an offender, including a photograph, a description of the underlying offense, residence address, place of employment, and vehicle license-plate number. The extent of notification is determined by a three-tier classification procedure. Obviously, the notification provisions of the statute and Guidelines are intended to protect the public by familiarizing those who receive notice with sufficient details about the offender's appearance, prior con-

viction, and other data to permit them to take appropriate precautions.

The Court holds that the Registration and Community Notification Laws do not violate the *Ex Post Facto,* Double Jeopardy, or Cruel and Unusual Punishment Clauses of either the Federal or State Constitutions. Substantially enhancing the protections afforded by the statutes as enacted, the Court properly concludes that the impact of the statutes on those subject to Tier Two and Three notification sufficiently implicates liberty interests to mandate the availability of due-process safeguards. The Court accordingly conditions its decision to sustain the constitutionality of the statutes on the requirement of judicial review of a prosecutor's decision to impose Tier Two and Tier Three notification, that judicial review extending to the means of implementing notification selected by the prosecutor. I am in full agreement with that aspect of the Court's decision.

The Court also has mandated that the scope of notification required by the Attorney General's Guidelines be limited. The Court does not acknowledge that the limitations it imposes are prompted by constitutional considerations, but that inference is inescapable: The broader the scope of community notification, the greater the punitive impact that notification will impose on the offender. The limitations imposed by the Court are salutary, but are insufficient to address the constitutional infirmities in the Community Notification Law.

The Legislature's rationale for enacting these statutes obviates any inquiry about the purpose for their retroactive application to those sex offenders whose offenses had been committed before the statutes were enacted, as well as to those prior offenders who had fully served sentences imposed on them for their offenses and had returned to their communities. If the Registration and Notification Laws did not apply to those offenders their effectiveness would be severely limited, and as a practical matter, delayed for many years. Nevertheless, despite its obvious importance to the statutory scheme, the retroactive application of the notification

statute to prior offenders poses, in my view, a fundamental constitutional impediment to its validity.

The Constitution's prohibition of bills of attainder and *Ex Post Facto* laws is not to be taken lightly. As the Court acknowledges, "These are towering constitutional provisions of great importance to individual dignity, freedom, and liberty." *Ante* at 43, 662 *A.*2d at 388. James Madison emphasized their fundamental role in our Constitution:

> Bills of attainder, ex post facto laws, and laws impairing the obligation of contracts, are contrary to the first principles of the social compact, and to every principle of sound legislation. The two former are expressly prohibited by the declarations prefixed to some of the State Constitutions, and all of them are prohibited by the spirit and scope of these fundamental charters. Our own experience has taught us nevertheless, that additional fences against these dangers ought not to be omitted. Very properly therefore have the Convention added this constitutional bulwark in favor of personal security and private rights.

> [The Federalist No. 44, at 301 (James Madison) (Jacob E. Cooke ed., 1961).]

The Supreme Court summarized the meaning of the *Ex Post Facto* Clause in *Beazell v. Ohio,* 269 *U.S.* 167, 169–70, 46 *S.Ct.* 68, 68, 70 *L.Ed.* 216, 217 (1925):

> It is settled, by decisions of this court so well known that their citation may be dispensed with, that any statute which punishes as a crime an act previously committed, which was innocent when done, which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as *ex post facto.*

> [*Id.* at 169–70, 46 *S.Ct.* at 68.]

Because the Community Notification Law "makes more burdensome the punishment for a crime, after its commission," I conclude that that law, despite its understandable objectives, violates the constitutional prohibition against *ex post facto* laws. The Court concludes otherwise, determining that the inevitable deterrent and punitive effects of the Notification Law cannot constitute punishment because the law "can fairly be characterized as remedial, both in its purpose and implementing provisions." *Ante* at 43, 662 *A.*2d at 388. I disagree with the Court's conclusion, as well as with the standard it applies for determining whether the Notifica-

tion Law imposes enhanced punishment on a sex offender whose crime had been committed before enactment of the law.

## I

Before addressing the *ex post facto* issue, I briefly summarize (1) the pertinent statutory provisions, as construed by the Court, (2) the provisions of the federal statute and those of various state statutes that deal with registration and notification concerning sex offenders, and (3) the references contained in the record that might be pertinent to the question whether the Notification law imposes punishment.

## A

The Registration Law is designed to "permit law enforcement officials to identify and alert the public when necessary for the public safety," *N.J.S.A.* 2C:7–1a, and to "provide law enforcement with additional information critical to preventing and promptly resolving incidents involving sexual abuse and missing persons." *N.J.S.A.* 2C:7–1b.

The Registration Law applies retroactively to certain offenders. Persons convicted, adjudicated delinquent, or found not guilty by reason of insanity (hereinafter collectively referred to as "convicted") of aggravated sexual assault, sexual assault, aggravated criminal sexual contact, kidnapping pursuant to *N.J.S.A.* 2C:13–1c(2), or an attempt to commit any of those crimes, *"regardless of the date of the commission of the offense or the date of conviction,"* must register if the court at sentencing determined that "the offender's conduct was characterized by a pattern of repetitive, compulsive behavior." *N.J.S.A.* 2C:7–2b(1) (emphasis added). (If a court makes such a finding, the sex offender may be sentenced to the Adult Diagnostic Treatment Center "for a program of specialized treatment for his mental condition." *N.J.S.A.* 2C:47–3b.)

All persons convicted on or after the effective date of the Registration Law of one of those offenses, as well as other offenses including endangering the welfare of a child, luring or enticing, criminal sexual contact if the victim is a minor, criminal restraint, and false imprisonment, must register. *N.J.S.A.* 2C:7–2b(2). Moreover, registration is mandatory for all persons convicted of one of those crimes, regardless of the date of conviction, who were serving a sentence of incarceration, probation, parole, or other form of community supervision on the effective date of the Registration Law. *Ibid.* Persons who were convicted of similar sex offenses under federal law or the laws of other states also must register. *N.J.S.A.* 2C:7–2b(3).

An offender who is required to register must provide his or her fingerprints and sign a statement that includes the offender's name, Social Security number, age, physical description, sex, date of birth, address of legal or temporary residence, date and place of employment, date and place of each conviction, and a brief description of the crime or crimes for which registration is required. *N.J.S.A.* 2C:7–4b(1), (2). The offender must further provide any "other information that the Attorney General deems necessary to assess risk of future commission of a crime," including criminal and correction records, nonprivileged personnel, treatment, and abuse registry records, and evidentiary genetic markers if available. *N.J.S.A.* 2C:7–4b(3). The form approved by the Attorney General also requires the offender to provide a photograph and to identify the vehicle he or she uses and its license-plate number. An offender no longer in custody must register with the chief law-enforcement officer in the municipality in which he or she resides. *N.J.S.A.* 2C:7–2c(4). That information is forwarded to the county prosecutor, who then forwards the information to the Superintendent of State Police, who maintains a central registry. *N.J.S.A.* 2C:7–4c, d. Those records are open to any state or federal law-enforcement agency. *N.J.S.A.* 2C:7–5a.

Offenders whose conduct was characterized by a pattern of repetitive and compulsive behavior must verify their address with

local law enforcement every ninety days, while other registrants must do so annually. *N.J.S.A.* 2C:7–2e. That obligation lasts for the offender's lifetime, unless that person proves to a court that he or she did not commit an offense for fifteen years following conviction or release from a correctional facility, whichever is later, and that he or she "is not likely to pose a threat to the safety of others." *N.J.S.A.* 2C:7–2f. If an offender moves, he or she must re-register with law enforcement in the offender's new municipality of residence no less than ten days before he or she intends to reside at the new address. *N.J.S.A.* 2C:7–2d. Failure to register in accordance with the Registration Law is a fourth-degree crime. *N.J.S.A.* 2C:7–2a.

The Community Notification Law as interpreted by the Court requires local chiefs of police to implement notification for all sex offenders obligated to register. (Although *N.J.S.A.* 2C:7–5a *authorizes* notification for all registrants, while *N.J.S.A.* 2C:7–6 *requires* notification concerning registrants to be released from incarceration after the effective date of the laws, the Court construes the statutory scheme to mandate notification for "all those required to register." *Ante* at 22 n. 4, 662 *A.*2d at 378 n. 4.)

The Community Notification Law provides the Attorney General, after consultation with an advisory council established pursuant to *N.J.S.A.* 2C:7–11, with broad powers to adopt guidelines and procedures to effectuate the notification requirements. The law requires the Attorney General to adopt guidelines that provide for three levels of notification (referred to as tiers in the Attorney General's Guidelines) depending on the risk of re-offense:

(1) If risk of re-offense is low, law enforcement agencies likely to encounter the person registered shall be notified;

(2) If risk of re-offense is moderate, organizations in the community including schools, religious and youth organizations shall be notified in accordance with the Attorney General's guidelines, in addition to the notice required by paragraph (1) of this subsection;

(3) If risk of re-offense is high, the public shall be notified through means in accordance with the Attorney General's guidelines designed to reach members of

the public likely to encounter the person registered, in addition to the notice required by paragraphs (1) and (2) of this subsection.

[*N.J.S.A.* 2C:7–8c.]

All offenders, no matter how low the risk of re-offense, are subject to at least Tier One notification.

The law provides a nonexclusive list of factors that must be considered in assessing the risk of re-offense:

(1) Conditions of release that minimize risk of re-offense, including but not limited to whether the offender is under supervision of probation or parole; receiving counseling, therapy or treatment; or residing in a home situation that provides guidance and supervision;

(2) Physical conditions that minimize risk of re-offense, including but not limited to advanced age or debilitating illness;

(3) Criminal history factors indicative of high risk of re-offense, including:

(a) Whether the offender's conduct was found to be characterized by repetitive and compulsive behavior;

(b) Whether the offender served the maximum term;

(c) Whether the offender committed the sex offense against a child.

(4) Other criminal history factors to be considered in determining risk, including:

(a) The relationship between the offender and the victim;

(b) Whether the offense involved the use of a weapon, violence, or infliction of serious bodily injury;

(c) The number, date and nature of prior offenses;

(5) Whether psychological or psychiatric profiles indicate a risk of recidivism;

(6) The offender's response to treatment;

(7) Recent behavior, including behavior while confined or while under supervision in the community as well as behavior in the community following service of sentence; and

(8) Recent threats against persons or expressions of intent to commit additional crimes.

[*N.J.S.A.* 2C:7–8b.]

Pursuant to statutory authority, the Attorney General has added other factors to assess the risk of re-offense. As the majority points out, "[t]he Guidelines' list of factors, however, fails to include several required by statute," *ante* at 24 n. 5, 662 *A.*2d at 379 n. 5, including the inquiry into the offender's "behavior in the community following service of sentence," *N.J.S.A.* 2C:7–8b(7), which could point to a higher or lower risk assessment. Moreover, the Guidelines use the statutory factor that inquires

"[w]hether psychological or psychiatric profiles indicate a risk of recidivism," *N.J.S.A.* 2C:7–8b(5), in a nonneutral manner; that is, that criterion is used to determine whether Tier Two or Tier Three is appropriate, but not whether Tier One notification should apply. However, the Court notes that the Guideline's inconsistencies with the Community Notification Law "are simply the product of the extreme time pressures imposed by the laws[ ] [and] should be appropriately revised in accordance with [the Court's] opinion." *Ante* at 24 n. 5, 662 *A.*2d at 379 n. 5.

Although the Community Notification Law authorized county prosecutors and law-enforcement officials to assess the risk of re-offense, *N.J.S.A.* 2C:7–8d(1), and therefore the level or tier of notification that applied, the Court concludes that judicial review of that determination through a summary proceeding is required prior to Tier Two or Tier Three notification. See *ante* at 29–37, 662 *A.*2d at 382–85.

With respect to Tier Two and Tier Three notification, the Court restricts the scope of notification provided under both the statute and the Guidelines. Although the statutory provision authorizing Tier Two notification contains no such language, the Court limits notification to organizations in the community that are "likely to encounter" the offender, a restriction present in the statutory authorization of both Tier One and Tier Three. *See ante* at 35, 662 *A.*2d at 384. The Court interprets "likely to encounter" to mean neither " 'possibly' " nor " 'probably' " but rather " 'having a fair chance to encounter,' " *ante* at 36, 662 *A.*2d at 385, and reasons that "[t]he factor that will ordinarily be critical to a determination of 'likely to encounter' is geography—how close is the institution or organization, in the case of Tier Two notification, to the offender's residence or place of work or school." *Id.* at 37, 662 *A.*2d at 385. Moreover, consistent with the Attorney General's interpretation, the Court further restricts Tier Two notification "to those organizations that actually are in charge of the care or supervision of children or women." *Ante* at 29, 662 *A.*2d at 382.

Under the Guidelines, organizations receiving Tier Two notification are provided a notification form containing the following information: the offender's name, address, place of employment and/or schooling, a recent photograph, physical description, the offense for which he or she was convicted, and a description of the vehicle he or she uses and its license-plate number. The Court requires that those organizations receive a notice that "shall specifically direct them *not* to notify anyone else." *Ante* at 35, 662 A.2d at 384.

Addressing Tier Three notification, the Court determines that the Guidelines exceed the notification authorized by the statute. The Court concludes that the Guideline's notification method consisting of "community meetings, speeches in schools and religious congregations" is not sufficiently a "means * * * designed to reach members of the public likely to encounter the person registered." *N.J.S.A.* 2C:7–8c(3). Notification could, however, be provided "to a group carefully selected to include only those 'likely to encounter' the offender." *Ante* at 35, 662 A.2d at 385. The Court determines that Tier Three notification "includes the immediate neighborhood of the offender's residence and not just the people next door[,] * * * all schools within the municipality, depending on its size, * * * [and] schools and other institutions in adjacent municipalities depending upon their distance from the offender's residence, place of work, or school." *Ante* at 36, 662 A.2d at 385.

Under the Guidelines, the information conveyed to the public through Tier Three notification is the same as Tier Two. The Guidelines, moreover, stress the need to warn against vigilante activity and to advise the public that allegations of criminal conduct perpetrated against the offender will be carefully investigated and, where appropriate, criminally prosecuted.

B

" 'The fact that a practice is followed by a large number of states is not conclusive in a decision as to whether that practice

accords with due process, but it is plainly worth considering in determining whether the practice "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." ' " *Schall v. Martin*, 467 *U.S.* 253, 268, 104 *S.Ct.* 2403, 2412, 81 *L.Ed.*2d 207, 219 (1984) (quoting *Leland v. Oregon*, 343 *U.S.* 790, 798, 72 *S.Ct.* 1002, 1007, 96 *L.Ed.* 1302, 1309 (1952) (quoting *Snyder v. Massachusetts*, 291 *U.S.* 97, 105, 54 *S.Ct.* 330, 332, 78 *L.Ed.* 674, 677 (1934))). Accordingly, an examination of the federal law and of the laws of other states pertaining to registration of sex offenders—specifically, whether the statutes apply retroactively and the extent to which they provide for community notification—is useful in assessing the validity of New Jersey's law.

The federal statute, 42 *U.S.C.A.* § 14071, was passed as part of the Violent Crime Control and Law Enforcement Act of 1994, and codified under Subchapter VI—Crimes Against Children. To be entitled to funds under 42 *U.S.C.A.* § 3756 (providing funds for drug control), states must comply with 42 *U.S.C.A.* § 14071, which mandates that states implement programs requiring "a person who is convicted of a criminal offense against a victim who is a minor or who is convicted of a sexually violent offense to register" with the state in which he or she resides. 42 *U.S.C.A.* § 14071(a)(1)(A), (f)(2). The federal statute does not require that states apply their sex-offender registration statutes retroactively to offenses committed before the state law was enacted, reflecting a congressional determination that, despite the enhanced effectiveness of retroactive registration statutes, states would be in full compliance with federal law by adopting statutes that apply only prospectively. Moreover, the federal law is more restrictive regarding the personal information about the offender that may be released. Indeed, "the designated State law enforcement agency and any local law enforcement agency authorized by the State agency" may release only "relevant information that is necessary to protect the public concerning a specific person required to register under" 42 *U.S.C.A.* § 14071. 42 *U.S.C.A.* § 14071(d)(3).

In respect of the state sex-offender registration statutes, ten states have not adopted sex-offender registration laws: Hawaii, Iowa, Maryland, Nebraska, New Mexico, New York,[1] North Carolina, Pennsylvania, South Carolina, and Vermont. Of the forty states that have adopted sex-offender registration laws (which includes New Jersey), five states do not apply their laws retroactively: Arkansas, Colorado, Florida, Illinois, and Kansas. In addition, of those states that have adopted sex-offender registration laws, twenty states, excluding New Jersey, provide for some type of community notification: Alaska, Arizona, California, Connecticut, Florida, Georgia, Idaho, Indiana, Kansas, Louisiana, Maine, Montana, Nevada, North Dakota, Oklahoma, Oregon, South Dakota, Tennessee, Virginia, and Washington. The following nineteen states do not provide for any type of community notification: Alabama, Arkansas, Colorado, Delaware, Illinois, Kentucky, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, New Hampshire, Ohio, Rhode Island, Texas, Utah, West Virginia, Wisconsin, and Wyoming.

Excluding New Jersey, eighteen states have notification provisions that apply retroactively: Alaska,[2] Arizona, California, Connecticut, Georgia, Idaho, Indiana, Louisiana,[3] Maine, Montana, Nevada, North Dakota, Oklahoma, Oregon, South Dakota, Tennes-

---

[1] The New York legislature has passed a sex-offender registration bill, but has not yet sent that bill to the Governor.

[2] In the context of a preliminary injunction, a federal-district court in Alaska concluded that the plaintiffs challenging the registration law were "likely to succeed on the merits of the claim that the Registration Act violates the prohibition on ex post facto legislation, because the law includes a provision providing for public dissemination of information concerning sex offenders whose convictions antedate the Registration Act." *Rowe v. Burton*, 884 *F.Supp.* 1372, 1380 (D.Alaska 1994).

[3] The Louisiana Court of Appeal in *State v. Babin*, 637 *So.*2d 814, 824–25, *writ denied*, 644 *So.*2d 649 (La.1994), held that because the registration statute's provisions had not been in effect at the time of the commission of the defendant's crime, their application to the defendant violated the prohibition against *ex post facto* laws in both the United States and the Louisiana Constitutions.

see, Virginia, Washington. Most important, none of the states with retroactive notice provisions provides for notification as extensive as that mandated by New Jersey's statute. *See Ariz.Rev. Stat.Ann.* § 13–3825 (1995) (providing that "chief law enforcement officer * * * shall notify th[e] community of the [offender]'s release to the community, if appropriate, pursuant to guidelines established by the community notification guidelines committee"); *Conn.Gen.Stat.Ann.* § 54–102r(g) (West 1995) (providing that "the information * * * shall be confidential and not subject to disclosure to any person or agency other than to law enforcement agencies * * * or to any specific person if such disclosure is deemed necessary by the chief of police * * * or resident state trooper * * * to protect said person from any [registering offender]"); *La.Rev.Stat.Ann.* § 15.546.A (1995) (authorizing criminal-justice agencies "to release relevant and necessary information regarding sex offenders to the public when the release of the information is necessary for public protection"); *Mont.Code Ann.* § 46–23–507 (1995) ("Information in the register * * * is confidential * * * except * * * if the department believes that release of information concerning [a sexual offender who is to be released from state prison] is necessary for public protection, the department shall petition the district court * * * for an order allowing the department to release relevant and necessary register information regarding the inmate to the public * * * if the court finds that the information is necessary for public protection"); *N.D.Cent.Code* § 12.1–32–15.10 (1995) (stating that "[r]elevant and necessary registration information may be disclosed to the public by a law enforcement agency if the agency determines that the individual registered * * * is a public risk and disclosure of the registration information is necessary for public protection"); *Or. Rev.Stat.* §§ 181.508(3), .509(1) (1994) (stating that if agency determines that notification is necessary, it "may use any method of communication that the agency determines is appropriate," including distribution of several identifying pieces of information, and that "[u]nless the agency determines that release of the information would substantially interfere with the treatment or rehabilita-

tion of the supervised person, an agency * * * shall make any information regarding the person that the agency determines is appropriate * * * available to any other person upon request"); *Tenn.Code Ann.* § 40–39–106(c) (1994) (providing that State Bureau of Investigation or local law-enforcement agency "may release relevant information deemed necessary to protect the public concerning a specific sexual offender who is required to register"); *Wash.Rev.Code Ann.* § 4.24.550 (West 1995) (stating that (1) "[p]ublic agencies are authorized to release relevant and necessary information regarding sex offenders to the public when the release of the information is necessary for public protection," and (2) "[l]ocal law enforcement agencies and officials who decide to release information * * * shall make a good faith effort to notify the public and residents at least fourteen days before the sex offender is released").

Furthermore, the remaining ten states that have retroactive notification provisions either do not require law enforcement to notify the public, or authorize far more limited public notification than that mandated by New Jersey's statute. *See Alaska Stat.* § 18.65.087 (1994) (stating that information contained in central registry "is confidential and not subject to public disclosure except as to" specified information); *Cal.Penal Code* § 290.4(a), (b) (West 1995) (providing (1) for "900" number that people may call to determine whether "a named individual is listed," if that caller produces several pieces of information identifying the offender, and (2) for habitual sex-offender subdirectory containing offender's name, photograph, and physical description, which people may access if they have articulable purpose); *Ga.Code Ann.* § 42–9–44.1 (Michie 1995) (providing that sex-offender registry "shall be open to public inspection" only while offender is on parole); *Idaho Code* § 9–340(11)(f) (1995) (stating that "all information provided to a law enforcement agency for sex offender registration * * * shall be available upon request to a law enforcement agency * * * [and that the offender's name, and a description of his or her offenses are available] to any person upon written request"); *Ind.Code Ann.* § 5–2–12–11 (West 1995) (stating that "sex offend-

er registry available on a computer disk * * * [and] [e]ach time the registry is updated," all school corporations, nonpublic schools, child-care facilities, and state agencies that license persons to work with children, the State personnel department, and other entities providing services to children or requesting registry will receive one "paper copy of the sex offender registry"); *Me.Rev. Stat.Ann.* tit. 16, § 615 (West 1994) (stating that description of person charged and written evidence relating to criminal charge "may be disseminated to any person for any purpose"); *Nev.Rev. Stat.* § 207.155 (1993) (requiring sheriff to provide registration information "to the board of trustees of the county school district in which the sex offender expects to reside" and permitting the board of trustees to "release that the data to any teacher or other educational personnel * * * if it determines that the release of the data is reasonably necessary for public protection"); *Okla.Stat. Ann.* tit. 57, § 584.E (West 1995) (providing that local law-enforcement officials "shall make its sex offender registry available" to schools, child-care facilities, licensed State agencies, State personnel office, and other entities that provide services to children and that request the registry); *S.D.Codified Laws Ann.* §§ 22–22–33, –34 (1995) (stating that sex-offender registration files are "not open to inspection by the public or any other person other than a law enforcement officer," except that files are available "to any regional or national registry of sex offenders"); *Va.Code Ann.* § 19.2–390.1 (Michie 1995) (prohibiting dissemination of sex-offender registry information except on request and only to authorized officers or employees of schools, child-welfare agencies, or day-care centers).

## C

At this time, the future effects of "Megan's Law" on those subject to community and individual notification are not possible to discern. The only relevant information before the Court consists of newspaper accounts of actions taken against two sex offenders who were subject to the registration and notification

provisions. Although I do not suggest that those accounts are typical of the character and nature of the response of the public to the discovery that a sex offender lives among them, I include them to reflect fully the record before the Court.

On December 27, 1994, residents of Phillipsburg were informed of the whereabouts of a recently released sex offender. This individual was "the first Warren County resident subject to community notification under 'Megan's Law.'" Donna M. Weston, *Vigilantes Beat Wrong Man After Rapist's Release,* The Trentonian, Jan. 11, 1995, at 5. Law-enforcement authorities provided neighbors with the address at which the offender was to reside and distributed photographs of him. On January 8, 1995, "[a] father and his son broke into [that] Phillipsburg row house * * * looking for [the] released child molester who had been identified by the police." Iver Peterson, *Mix–Ups and Worse Arising from Sex–Offender Notification,* N.Y. Times, Jan. 12, 1995, at B1, B6. Once inside, the two "attacked a man they thought was a rapist." Sandy McClure, *Christie: Vigilantism Intolerable,* The Trentonian, Jan. 12, 1995, at 4. "But the two ended up attacking the wrong man," John Connolly & Phyllis Plitch, *"Megan's Law" Brings Snafus, Vigilantism,* The Trentonian, Jan. 12, 1995, at 4, allegedly assaulting a forty-one-year-old truck driver who was also staying in the house. The severity of the beating required the man to be hospitalized. Weston, *supra,* The Trentonian, at 5.

Another example also involves "one of the first people to fall under the law's strictures." Peterson, *supra,* N.Y. Times, at B6. On January 1, 1995, Carlos Diaz was released from prison after serving a sentence for rape. Diaz informed authorities that upon his release he intended to reside in Passaic with his mother. Fredrick Kunkle, *Rapist's Plan to Live in Passaic Sparks Demonstration,* The Record, Jan. 6, 1995, at A–11. Diaz sought a preliminary injunction in federal district court, seeking to enjoin the dissemination to schools and community groups of Tier Two level information by law-enforcement officials until he had been afforded the opportunity to enforce his constitutional rights. The

district court granted the preliminary injunction on January 3, 1995, determining that Diaz demonstrated a reasonable likelihood of success on the merits and faced the danger of irreparable injury.

Although the preliminary injunction delayed law-enforcement officials from implementing the provisions of Megan's Law, the Guardian Angels, a New York-based civilian group, organized a community protest outside the residence of Diaz's mother. "And up and down the streets, Guardian Angel founder Curtis Sliwa and his men walked yesterday, handing out fliers with a large photo of Diaz, the warning 'BEWARE' in big black block letters and a phone number to call if Diaz [was] spotted." Rosemarie Ross, *Rapist, Beware: Residents' Fear Turns to Anger, Revenge,* The North Jersey Herald & News, Jan. 6, 1995, at A1, A4. "Hundreds of * * * students streamed down [the street] * * * clutching pictures of convicted rapist Carlos Diaz, handed to them by Guardian Angels who descended on the city to rally in support of Megan's Law." Ron Day, *Rapist, Beware: Angels Hand Out His Photo in Passaic,* The North Jersey Herald & News, Jan. 6, 1995, at A1. "Some * * * residents sounded like would-be vigilantes * * * hinting they might take the law into their own hands if Diaz appeared." *Id.* at A4. Two young men, residents of Passaic, stated: "We're waiting for him to come down[.] * * * We're going to beat him up. He can go back upstairs, come down, we'll beat him up again." Ross, *supra,* The North Jersey Herald & News, at A1, A4. "Sliwa suggested that convicted criminals deserve to be treated as outcasts, and that their ostracism would deter others. 'Guilt—there should be a stigma,' Sliwa said." Kunkle, *supra,* The Record, at A–11. Sliwa stated, "Let the criminal have a taste of being the victim." Day, *supra,* The North Jersey Herald & News, at A1.

## II

In *Fletcher v. Peck,* 10 *U.S.* (6 *Cranch* ) 87, 137–38, 3 *L.Ed.* 162, 178 (1810), Chief Justice John Marshall explained the concerns

that led to the constitutional provision declaring that "[N]o state shall pass any bill of attainder, *ex post facto* law, or law impairing the obligation of contracts":

> Whatever respect might have been felt for the state sovereignties, it is not to be disguised that the framers of the constitution viewed, with some apprehension, the violent acts [that] might grow out of the feelings of the moment; and that the people of the United States, in adopting that instrument, have manifested a determination to shield themselves and their property from the effects of those sudden and strong passions to which men are exposed. The restrictions on the legislative power of the states are obviously founded in this sentiment; and the constitution of the United States contains what may be deemed a bill of rights for the people of each state.

The Supreme Court's more recent opinions also have confirmed that "the Ex Post Facto Clauses were included in the Constitution * * * to assure that federal and state legislatures were restrained from enacting arbitrary or vindictive legislation." *Miller v. Florida*, 482 *U.S.* 423, 429, 107 *S.Ct.* 2446, 2451, 96 *L.Ed.*2d 351, 359 (1987). The Court also identified a second concern underlying the *ex post facto* prohibition: assuring that statutes afford fair warning of their effect and thereby justify reliance on their meaning. The Court observed that "central to the ex post facto prohibition is a concern for 'the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated.'" *Id.* at 430, 107 *S.Ct.* at 2451, 96 *L.Ed.*2d at 360 (quoting *Weaver v. Graham*, 450 *U.S.* 24, 30, 101 *S.Ct.* 960, 965, 67 *L.Ed.*2d 17, 24 (1981)).

According to *Calder v. Bull*, 3 *U.S.* (3 *Dall.*) 386, 1 *L.Ed.* 648 (1798), the earliest case to construe the *Ex Post Facto* Clause, the prohibition of the clause encompasses a "law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." *Id.* at 390, 1 *L.Ed.* at 650. A more recent formulation of the scope of the prohibition is essentially consistent with Calder: "Legislatures may not retroactively alter the definition of crimes or increase the punishment for criminal acts." *Collins v. Youngblood*, 497 *U.S.* 37, 43, 110 *S.Ct.* 2715, 2719, 111 *L.Ed.*2d 30, 39 (1990). Undoubtedly, the Registration and Community Notification Laws apply retroactively to sex offenses committed before their enactment. Their retroactive

application potentially affects every living person who has ever been convicted of a sex offense in this State "if the court found that the offender's conduct was characterized by a pattern of repetitive, compulsive behavior." *N.J.S.A.* 2C:7–2b(1). The critical issue is whether the actual effect of the notification statute's retroactive application constitutes punishment within the meaning of the *Ex Post Facto* Clause.

The Court agrees with that statement of the decisive *ex post facto* issue, but adopts as the standard for resolving the issue a test that totally eliminates the necessity for any reasoned analysis concerning the punitive impact of the Community Notification Law, whether that punitive impact is consistent with historical concepts of punishment, or whether the probable functional effect of the notice mandated by the notification statute is so punitive as to constitute punishment. Rather, the Court's inquiry both begins—and ends—with legislative intent. According to the Court, "a statute that can fairly be characterized as remedial, both in its purpose and implementing provisions, does not constitute punishment * * * simply because its impact, in part, may be punitive unless the only explanation for that impact is a punitive purpose: an intent to punish." *Ante* at 43, 662 *A.2d* at 388.

The Court's exclusive reliance on legislative intent as the test of punishment is misplaced, the decisions advocating that narrow and formalistic approach having been long since superseded. The appropriate standard extends significantly beyond legislative intent. "[I]n determining whether a particular civil sanction constitutes criminal punishment, it is the purposes actually served by the sanction in question, not the underlying nature of the proceeding giving rise to the sanction, that must be evaluated," *United States v. Halper,* 490 *U.S.* 435, 447 n. 7, 109 *S.Ct.* 1892, 1901 n. 7, 104 *L.Ed.*2d 487, 501 n. 7 (1989). That standard requires that a court "assess[ ] the character of the actual sanctions imposed on the individual by the machinery of the state." *Id.* at 447, 109 *S.Ct.* at 1901, 104 *L.Ed.*2d at 501.

The Court relies primarily on three United States Supreme Court decisions for the proposition that legislative intent determines whether a statute can be characterized as imposing punishment for *ex post facto* purposes, or in determining the applicability of the prohibition against double jeopardy and excessive fines. In *Trop v. Dulles,* 356 *U.S.* 86, 78 *S.Ct.* 590, 2 *L.Ed.*2d 630 (1958), the Court invalidated a provision of the Nationality Act of 1940 that mandated loss of citizenship for anyone convicted of and dishonorably discharged for wartime desertion. In determining whether the statute was regulatory or penal the Court noted that it "has generally based its determination upon the purpose of the statute." *Id.* at 96, 78 *S.Ct.* at 595, 2 *L.Ed.*2d at 639. After concluding that "[t]he purpose of taking away citizenship from a convicted deserter is simply to punish him," *id.* at 97, 78 *S.Ct.* at 596, 2 *L.Ed.*2d at 640, the plurality opinion concluded that the statute was invalid because it imposed cruel and unusual punishment. In *De Veau v. Braisted,* 363 *U.S.* 144, 80 *S.Ct.* 1146, 4 *L.Ed.*2d 1109 (1960), which concerned an *ex post facto* challenge to a New York law that prohibited unions from collecting dues if any union officer or agent was a convicted felon, the Court resolved the question of punishment by focusing on whether the legislative purpose was punitive or regulatory, concluding that it was regulatory. *Id.* at 160, 80 *S.Ct.* at 1155, 4 *L.Ed.*2d at 1120. Similarly, in *Flemming v. Nestor,* 363 *U.S.* 603, 80 *S.Ct.* 1367, 4 *L.Ed.*2d 1435 (1960), which involved an *ex post facto* challenge to a provision of the Social Security Act mandating the termination of Nestor's old-age benefits because he had been deported on the basis of his Communist Party membership, the Court in a five-four decision upheld the statute after determining that the legislative purpose was not punitive. *Id.* at 616–17, 80 *S.Ct.* at 1375–76, 4 *L.Ed.*2d at 1447–48.

Dissatisfaction with exclusive reliance on legislative intent for determining whether constitutionally prohibited punishment had been imposed was first expressed by Justice Frankfurter, concurring in *United States ex rel. Marcus v. Hess,* 317 *U.S.* 537, 63 *S.Ct.* 379, 87 *L.Ed.* 443 (1943), where the issue was whether a civil penalty following a criminal conviction constituted punishment in

violation of the Double Jeopardy Clause of the Fifth Amendment. Justice Frankfurter observed:

> The argument seems to run thus: Double jeopardy means attempting to punish criminally twice; this is not an attempt to punish criminally because it is a civil proceeding; it is a civil proceeding because, as a matter of "statutory construction," it is a "civil sanction" which is being enforced here; and the sanction is "civil" because it is "remedial" and not "punitive" in nature.
>
> Such dialectical subtleties may serve well enough for purposes of explaining away uncritical language in earlier cases. * * * But they are too subtle when the problem is one of safeguarding the humane interests for the protection of which the double jeopardy clause was written into the Fifth Amendment.
>
> [*Id.* at 553–54, 63 *S.Ct.* at 389, 87 *L.Ed.* at 454.]

Beginning in 1963, the Court departed from its exclusive reliance on legislative intent for determining whether a statute imposed punishment, in favor of a broader standard. In *Kennedy v. Mendoza–Martinez*, 372 *U.S.* 144, 83 *S.Ct.* 554, 9 *L.Ed.*2d 644 (1963), the issue concerned the constitutionality of provisions of the Nationality Act of 1940 and the Immigration and Nationality Act of 1952, that mandated loss of citizenship for the offense of leaving or remaining outside the country to evade military service. The statutes were challenged as imposing punishment without due process, in that the prospective deportees were not accorded rights guaranteed by the Fifth and Sixth Amendments, including notice, compulsory process, confrontation, trial by jury and assistance of counsel. In determining that the sanction of deportation constituted punishment, the Court referred to "the tests traditionally applied to determine whether an Act of Congress is penal or regulatory," *id.* at 168, 83 *S.Ct.* at 567, 9 *L.Ed.*2d at 660–61, consisting of the following factors:

> Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned * * *.
>
> [*Id.* at 168–69, 83 *S.Ct.* at 567–68, 9 *L.Ed.*2d at 661 (footnotes omitted.)]

Although the Court has subsequently pointed out that the seven-factor *Mendoza–Martinez* test was developed to determine

"whether a nominally civil penalty should be reclassified as criminal and the safeguards that attend a criminal prosecution should be required," and not to determine "whether punishment is being imposed," *Austin v. United States,* 509 *U.S.* ——, —— n. 6, 113 *S.Ct.* 2801, 2806 n. 6, 125 *L.Ed.*2d 488, 498 n. 6 (1993), the last two factors of *Mendoza–Martinez* consistently are referred to as a shorthand test for determining punishment. The brief for the United States as *amicus curiae,* for example, refers to the last two factors of *Mendoza–Martinez* as the Supreme Court's two-part intent-effects test "to determine whether legislation imposes 'punishment' under the Ex Post Facto Clause and other constitutional provisions," describing the test as, first, whether the legislature intended punishment and, if not, whether the restriction is rationally related to a legislative goal and not excessive in relation to that goal. Brief of United States at 29–30.

In 1965, the Court invoked an even broader analysis in resolving a constitutional challenge to a provision of the Labor–Management Reporting and Disclosure Act of 1959 that imposed criminal sanctions on Communist Party members who served as union officers or employees. In *United States v. Brown,* 381 *U.S.* 437, 85 *S.Ct.* 1707, 14 *L.Ed.*2d 484 (1965), the statute was attacked as an unconstitutional bill of attainder that imposed punishment without trial, the government responding that the congressional purpose was remedial and preventive rather than retributive: Congress's aim was "not to punish Communists for what they have done in the past, but rather to keep them from positions where they will in the future be able to bring about undesirable events." *Id.* at 457, 85 *S.Ct.* at 1719, 14 *L.Ed.*2d at 496. Rejecting the government's argument that the punishment issue should be resolved as a question of statutory intent, the Court undertook an historical analysis to demonstrate that punishment frequently has been imposed for preventive purposes:

> Historical considerations by no means compel restriction of the bill of attainder ban to instances of retribution. A number of English bills of attainder were enacted for preventive purposes—that is, the legislature made a judgment, undoubtedly based largely on past acts and associations (as § 504 is) that a given person or group was likely to cause trouble (usually, overthrow the government)

and therefore inflicted deprivations upon that person or group in order to keep it from bringing about the feared event. It is also clear that many of the early American bills attainting the Tories were passed in order to impede their effectively resisting the Revolution.

[*Id.* at 458–59, 85 *S.Ct.* at 1720, 14 *L.Ed.*2d at 497–98 (footnotes omitted).]

The Court in *Brown* invalidated the statute as an unconstitutional bill of attainder, relying in part on *Cummings v. Missouri,* 71 *U.S.* (4 *Wall.*) 277, 18 *L.Ed.* 356 (1867), in which the Court struck down amendments to the Missouri Constitution requiring members of various professions to take an oath swearing that they had not participated in the rebellion against the Union as a condition of practicing their professions, the Court in *Cummings* adopting a broad definition of punishment for bill-of-attainder and *ex post facto* purposes:

"The deprivation of any rights, civil or political, previously enjoyed, may be punishment, the circumstances attending and the causes of the deprivation determining this fact. Disqualification from office may be punishment, as in cases of conviction upon impeachment. Disqualification from the pursuits of a lawful avocation, or from positions of trust, or from the privilege of appearing in the courts, or acting as an executor, administrator, or guardian, may also, and often has been, imposed as punishment."

[*Brown, supra,* 381 *U.S.* at 448, 85 *S.Ct.* at 1714, 14 *L.Ed.*2d at 491 (quoting *Cummings, supra,* 71 *U.S.* (4 *Wall.*) at 320, 18 *L.Ed.* at 362).]

In 1977, the Court broadened its approach yet again, invoking historical analysis, functional evaluation, and legislative motivation to determine whether a federal statute restricting former President Nixon's access to presidential papers and tape recordings constituted a prohibited bill of attainder that imposed retroactive punishment. In *Nixon v. Administrator of General Services,* 433 *U.S.* 425, 97 *S.Ct.* 2777, 53 *L.Ed.*2d 867 (1977), the challenged statute required the General Services Administration to take custody of the presidential papers and tape recordings, and to promulgate regulations to assure public access, and authorized screening of the material by archivists to identify private papers that were returnable to President Nixon. Responding to the contention that the statute's burdensome consequences were imposed only on one president and constituted retroactive punishment prohibited by the Bill of Attainder Clause, the Court first

undertook an historical analysis and determined that the restrictions on access to presidential papers did not "fall[ ] within the historical meaning of legislative punishment." *Id.* at 475, 97 *S.Ct.* at 2806, 53 *L.Ed.*2d at 911. Next, the Court applied a functional test to consider whether enforcement of the legislatively authorized restrictions achieved primarily regulatory or punitive ends. *Id.* at 475–78, 97 *S.Ct.* at 2806–08, 53 *L.Ed.*2d at 911–13. Finally, the Court considered whether the legislative history reflected a legislative purpose to impose punishment. *Id.* at 478–82, 97 *S.Ct.* at 2808–10, 53 *L.Ed.*2d at 913–16. The Court concluded that the statute was not a punitive bill of attainder. *Id.* at 484, 97 *S.Ct.* at 2811, 53 *L.Ed.*2d at 917.

In four cases decided between 1979 and 1987, each one implicating whether a statute or practice constituted the imposition of punishment that mandated due-process protections under the Fifth and Sixth Amendments, the Court rejected the due-process challenges. In each case, however, the Court resolved the punishment issue not by exclusive reliance on legislative intent, but by applying the two-part intent-effects test incorporated in the last two factors identified in the Court's opinion in *Mendoza–Martinez.* *See Bell v. Wolfish,* 441 *U.S.* 520, 538, 99 *S.Ct.* 1861, 1873–74, 60 *L.Ed.*2d 447, 468 (1979) ("Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination [of punishment] generally will turn on 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].'") (quoting *Mendoza–Martinez, supra,* 372 *U.S.* at 168–69, 83 *S.Ct.* at 567–68, 9 *L.Ed.*2d at 661 (footnote omitted)); *United States v. Ward,* 448 *U.S.* 242, 248–49, 100 *S.Ct.* 2636, 2641, 65 *L.Ed.*2d 742, 749 (1980); *Schall, supra,* 467 *U.S.* at 269, 104 *S.Ct.* at 2412, 81 *L.Ed.*2d at 220; *United States v. Salerno,* 481 *U.S.* 739, 747, 107 *S.Ct.* 2095, 2101, 95 *L.Ed.*2d 697, 708 (1987).

Significantly, in 1984, the Court expressly disclaimed exclusive reliance on legislative intent in determining punishment for dou-

ble-jeopardy purposes, importing in its place the *Mendoza–Martinez* intent-effects test. In *United States v. One Assortment of 89 Firearms,* 465 *U.S.* 354, 104 *S.Ct.* 1099, 79 *L.Ed.*2d 361 (1984), the Court held that double-jeopardy principles did not preclude a civil proceeding seeking forfeiture of firearms that was instituted after the owner was acquitted on criminal charges alleging dealing in firearms without a license. Observing that the Double Jeopardy Clause does not apply unless the forfeiture sanction constituted punishment the Court stated:

> The question, then, is whether a § 924(d) forfeiture proceeding is intended to be, or by its nature necessarily is, criminal and punitive, or civil and remedial. *Resolution of this question begins as a matter of statutory interpretation.* * * *
>
> Our inquiry in this regard has traditionally proceeded on two levels. First, we have set out to determine whether Congress, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other. Second, where Congress has indicated an intention to establish a civil penalty, we have inquired further whether the statutory scheme was so punitive either in purpose or effect as to negate that intention.
>
> [*Id.* at 362–63, 104 *S.Ct.* at 1105, 79 *L.Ed.*2d at 368 (quoting *Ward, supra,* 448 *U.S.* at 248–49, 100 *S.Ct.* at 2641, 65 *L.Ed.*2d at 749) (citations omitted) (emphasis added).]

The Court's gradual abandonment of its previously exclusive reliance on legislative intent to determine punishment culminated with its decision in *Halper, supra,* in 1989. Halper had previously been convicted on multiple counts of submitting false claims for Medicare reimbursement and causing governmental overpayments of $585, the convictions resulting in a prison sentence and $5,000 fine. Subsequently, the government instituted a civil action under the False Claims Act to recover $130,000 ($2,000 for each of the sixty-five counts), and Halper challenged the proceeding as imposing multiple punishments in violation of the Double Jeopardy Clause. The government contended that the question whether the civil proceeding constituted "punishment" was solely a matter of statutory intent. The Court firmly rejected that approach:

> As noted above, the Government takes the position that punishment in the relevant sense is meted out only in criminal proceedings, and that whether proceedings are criminal or civil is a matter of statutory construction. The Government correctly observes that this Court has followed this abstract approach when determining whether the procedural protections of the Sixth Amendment apply to proceedings

under a given statute, in affixing the appropriate standard of proof for such proceedings, and in determining whether double jeopardy protections should be applied. But while recourse to statutory language, structure, and intent is appropriate in identifying the inherent nature of a proceeding, or in determining the constitutional safeguards that must accompany those proceedings as a general matter, the approach is not well suited to the context of the "humane interests" safeguarded by the Double Jeopardy Clause's proscription of multiple punishments. See Hess, 317 US, at 554, 87 LEd 443, 63 SCt 379 (concurring opinion of Frankfurter, J.). This constitutional protection is intrinsically personal. Its violation can be identified only by assessing the character of the actual sanctions imposed on the individual by the machinery of the state.

> [*Id.* at 446–47, 109 *S.Ct.* at 1901, 104 *L.Ed.*2d at 501.]

In rejecting exclusive reliance on legislative intent as "not well suited to the context of the 'humane interests' safeguarded by the Double Jeopardy Clause's proscription of multiple punishments," the Court indicated that for purposes of double jeopardy, and the analogous protections afforded by the *Ex Post Facto* and Bill of Attainder Clauses, the determination of punishment would largely depend on a functional test that focused on the purposes actually served by the sanction:

> It is commonly understood that civil proceedings may advance punitive as well as remedial goals, and, conversely, that both punitive and remedial goals may be served by criminal penalties. The notion of punishment, as we commonly understand it, cuts across the division between the civil and the criminal law, and for the purposes of assessing whether a given sanction constitutes multiple punishment barred by the Double Jeopardy Clause, we must follow the notion where it leads. Cf. *Hicks v. Feiock*, 485 U.S. 624, 631, 108 S.Ct. 1423 [1429], 99 L.Ed.2d 721 (1988) ("[T]he labels affixed either to the proceeding or to the relief imposed ... are not controlling and will not be allowed to defeat the applicable protections of federal constitutional law"). To that end, the determination whether a given civil sanction constitutes punishment in the relevant sense requires a particularized assessment of the penalty [imposed and the purposes that the penalty] may fairly be said to serve. Simply put, a civil as well as a criminal sanction constitutes punishment when the sanction as applied in the individual case serves the goals of punishment.
>
> [*Id.* at 447–48, 109 *S.Ct.* at 1901–02, 104 *L.Ed.*2d at 501 (citation and footnote omitted).]

The Court's opinion, *ante* at 50–63, 662 *A.*2d at 392–99, as well as portions of briefs submitted by *amici*, focus on another portion of the *Halper* opinion that states: "[I]t follows that a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand

the term." *Id.* at 448, 109 *S.Ct.* at 1902, 104 *L.Ed.*2d at 502. *Amici* argue that that excerpt compels the conclusion that the Notification Law constitutes punishment because it actually serves a retributive and deterrent purpose. The Court's opinion responds that "[t]he language was never meant to apply to a provision that is wholly remedial in purpose but has, for example, some deterrent impact, but only to a sanction, or that part of a sanction, that may fairly be characterized 'only as a deterrent or retribution.'" *Ante* at 52, 662 *A.*2d at 393. The *Halper* excerpt read in isolation is not crystal-clear, but in the context of the Court's earlier language it should be understood as emphasizing that the actual function of a civil penalty must be evaluated carefully to determine if it imposes punishment. To the extent that the Court's opinion reads *Halper* as somehow preserving the exclusive test of legislative intent to determine if a statute imposes punishment, the Court's conclusion is inconsistent with those of the few commentators that have evaluated the *Halper* standard. *See* Andrew Z. Glickman, Note, *Civil Sanctions and the Double Jeopardy Clause: Applying the Multiple Punishment Doctrine to Parallel Proceedings After United States v. Halper,* 76 *Va.L.Rev.* 1251, 1264 (1990) ("Although the opinion claimed to uphold the Court's earlier decisions, the Court's holding effectively eliminated the role of statutory construction."); Elizabeth S. Jahncke, Note, *United States v. Halper, Punitive Civil Fines, and the Double Jeopardy and Excessive Fines Clauses,* 66 *N.Y.U.L.Rev.* 112, 134 (1991) ("Thus, *Halper* differs from its predecessors in that it does not include any statutory analysis. The *Halper* Court instead enunciated a test that goes beyond statutory construction to consider whether a civil sanction as applied to a particular individual is punishment * * *."). Contrary to the Court's view, *Halper* can be understood only as abandoning legislative intent as the exclusive test for determining whether a statute imposes punishment.

In *Austin, supra,* decided four years after *Halper,* the Court was required to determine whether civil forfeiture proceedings, in which the United States sought forfeiture of Austin's mobile home

and auto body shop that had been used in drug transactions, constituted punishment and thereby violated the Excessive Fines Clause of the Eighth Amendment. The government contended that the statutes authorizing the requested forfeiture were remedial only, protecting the community by removing instruments of the drug trade, and compensating the government for the expense of law enforcement activity required by the drug transactions. Consistent with *Halper*, the Court relied primarily on historical and functional analysis to determine whether the statutes imposed punishment. The Court observed that three kinds of forfeiture were prevalent in England when the Eighth Amendment was ratified, but that only one—statutory forfeiture—was commonly used in colonial times, noting that statutory forfeiture was regarded as a punishment at common law. *Id.* at —— – ——, 113 *S.Ct.* at 2806–08, 125 *L.Ed.*2d at 498–500. Functionally, the Court observed that the statutes at issue expressly provided for an "innocent owner" defense (prohibiting forfeiture if the property's owner neither knew of nor consented to underlying acts), and that the statutes authorized forfeiture only if the property was used or intended to be used for the commission of drug offenses. The Court concluded that the functional effect of the forfeiture statutes was to impose punishment. *Id.* at ——, 113 *S.Ct.* at 2810–11, 125 *L.Ed.*2d at 503–04. Finally, the Court concluded that the legislative history supported its conclusion that the statutes were punitive. *Id.* at ——, 113 *S.Ct.* at 2811, 125 *L.Ed.*2d at 504.

## III

The Supreme Court's punishment jurisprudence confirms that the Court's opinion misses the mark when it holds that "a statute that can fairly be characterized as remedial, both in its purpose and implementing provisions, does not constitute punishment even though its remedial provisions have some inevitable deterrent impact, and even though it may indirectly and adversely affect, potentially severely, some of those subject to its provisions." *Ante* at 43, 662 *A.*2d at 388. The legislature's ostensible purpose, which

rarely can be definitively determined, is relevant but hardly decisive on the issue of punishment. A comprehensive and balanced inquiry into whether the Notification Law imposes punishment would include consideration of whether its impact, the widespread publicizing of information concerning sex offenders within their community, is consistent with practices historically employed as punishment in the past. In addition, a functional inquiry is essential to consider, even on this sparse record, the probable effects of the Notification Law on those sex offenders to whom it is applied.

## A

In addressing the question whether punishment is being imposed, consideration whether the governmental action historically "was understood, at least in part, as imposing punishment" is most appropriate. *Austin, supra,* 509 *U.S.* at ——, 113 *S.Ct.* at 2806, 125 *L.Ed.*2d at 498. The Supreme Court "has probably relied upon historical analysis more often than on any of the other objective factors * * * [to] determin[e] whether some government sanction is punitive." *Bell, supra,* 441 *U.S.* at 590 n. 23, 99 *S.Ct.* at 1901 n. 23, 60 *L.Ed.*2d at 501 n. 23 (Stevens, J., dissenting).

In colonial times, "[t]he colonial frame of mind and the structure of colonial society influenced not only *what* was punished but also *how* crimes were punished." Lawrence M. Friedman, *Crime and Punishment in American History* 36 (1993). Because "[t]he aim was not just to punish, but to teach a lesson, so that sinful sheep would want to get back to the flock," public stigmatization, marking, disgrace, and humiliation of the offender served as a means by which collective society expressed its disapproval. *Id.* at 37.

"Early forms of punishment contained a strong element of gross public humiliation * * *." Jon A. Brilliant, Note, *The Modern Day Scarlet Letter: A Critical Analysis of Modern Probation Conditions,* 1989 *Duke L.J.* 1357, 1360. "The magistrates loved confessions of guilt, open expressions of remorse. They loved to enlist the community, the bystanders; their scorn, and the sin-

ners' humiliation, were part of the process." Friedman, *supra*, at 37. Public and dramatic forms of punishment identified the perpetrator as a "criminal" and served as the basis of subsequent social condemnation. Jack P. Gibbs, *Crime, Punishment, and Deterrence* 84 (1975). "[H]umiliatory punishments sought to elicit feelings of shame, though through manifest, collective disapproval rather than private instruction. * * * The sting of the lash and the contortions of the stocks were surely no balm, but even worse were the piercing stares of lifelong neighbors who witnessed the offender's disgrace, and with whom he would continue to live and work." Adam J. Hirsch, *From Pillory to Penitentiary: The Rise of Criminal Incarceration in Early Massachusetts*, 80 *Mich. L.Rev.* 1179, 1225–26 (1982).

"Shaming punishments were colorful [and] they were certainly used with great frequency." Friedman, *supra*, at 38. Floggings at the whipping-post, hangings, and ritualistic mutilations "were carried out publicly in a ceremonial fashion," Brilliant, *supra*, 1989 *Duke L.J.* at 1360, which served to "focus[ ] the community's attention on the humiliation component of punishment." *Ibid.* The branding of offenders was a common feature in colonial American jurisprudence, having been in wide use in England as well. The practice consisted of burning a letter roughly corresponding to the nature of the crime committed upon the face of the criminal. Murderers were branded with the letter M; thieves with a T; fighters and brawlers with an F; vagrants with a V. *See* Harry E. Barnes, *The Story of Punishment: A Record of Man's Inhumanity to Man* 62 (1930); Brilliant, *supra*, 1989 *Duke L.J.* at 1361. "In the laws of colonial New Jersey it was stipulated, for example, that for burglary the first offense was to be punished by branding with a T on his hand, while the second offense was to be punished by branding an R on his forehead." Barnes, *supra*, at 62. "The message was that *this* offender was not likely to mend his ways; disgrace would and should last until death." Friedman, *supra*, at 40. "This cruel method of marking would preclude those who were branded from finding employment and thus 'render[ing] them desperate.'" Brilliant, *supra*, 1989

*Duke L.J.* at 1361 (quoting G. Ives, *A History of Penal Methods* 53 (1914)).

Indeed, humiliation and stigma were not simply component parts of early punishment, but at times were the *only* element of punishment. "Under the circumstances, the authorities often dispensed with the punishment's physical component entirely: Many humiliated offenders were required simply to stand in public with signs cataloguing their offenses, a punishment that relied solely on mental anguish for its rehabilitative and deterrent effect." Hirsch, *supra*, 80 *Mich.L.Rev.* at 1226. For example, an individual confined in the stocks or pillory might be a legitimate target for rotten vegetables and eggs. However, "[w]hen the pillory was employed in a simple fashion and not accompanied by any other mode of punishment, its operation was chiefly psychological, and it was designed to bring about the feeling of humiliation naturally attendant upon the infliction of public disgrace." Barnes, *supra*, at 62–63. "Indeed, arguably the only punishment inflicted by the pillory was that caused by public display." Brilliant, *supra*, 1989 *Duke L.J.* at 1361. Often, "shaming punishments" were offered as alternatives to fines or other forms of punishment. In Maine, in 1671, "Sarah Morgan, who had the effrontery to strike her husband, was ordered " 'to stand with a gagg in her Mouth halfe an houre at Kittery at a Publique Town meeting & the cause of her offence writt upon her forhead, or pay 50 s[hillings] to the County.' " Friedman, *supra*, at 38 (quoting 2 *Province & Court Records of Maine* (Charles T. Libby ed. 1931)).

"Esteem has always meant much in intimate communities * * *." Hirsch, *supra*, 80 *Mich.L.Rev.* at 1226. Humiliation and stigma were the essential, and at times sole, elements of colonial punishment.

## B

In applying *Halper*'s functional standard to the Notification Law, requiring an assessment of the "character of the actual sanctions imposed on the individual by the machinery of the

state," *Halper, supra,* 490 *U.S.* at 447, 109 *S.Ct.* at 1901, 104 *L.Ed.*2d at 501, the Court's task is to predict fairly the actual effect of the statutory requirements, as construed by the Court, after they are implemented.

The Court holds that for Tier Two notification, schools and other organizations that operate establishments that care for women or children qualify for notification if they are likely to encounter the offender. The Court's opinion suggests that all schools and qualifying organizations within the municipality, depending on its size, shall be notified as well as schools and qualifying organizations in adjacent municipalities "depending upon their distance from the offender's residence, place of work, or school." *Ante* at 36, 662 *A.*2d at 385. The notice to schools and organizations must direct the recipient not to notify anyone else, but the Court does not specifically limit the personnel in the schools and organizations to whom the notice may be distributed. Presumably, all administrators, teachers, and other employees directly engaged in providing instruction and care for children, and comparable personnel in organizations providing care for women, will receive copies of the notice. In addition, day-care centers, nursery schools, day camps, little-league organizations, and similar community athletic programs for children all would appear to qualify for Tier Two notice. In a small municipality with a population of under 10,000 residents, hundreds of persons presumably will be entitled to receive the Tier Two notice and, although instructed to inform no one else about its contents, no enforcement mechanism conceivably can prevent word-of-mouth dissemination of the information contained in the notice required to be distributed.

Tier Three notification includes all entitled to Tier Two notice and members of the public likely to encounter the offender, which the Court construes to include "the immediate neighborhood of the offender's residence and not just the people next door." *Ante* at 36, 662 *A.*2d at 385. The Court expressly authorizes, if appropriate, notification of parents and school children in a neighborhood

school if they are deemed likely to encounter the offender. *Ante* at 36–37, 662 *A*.2d at 385–86. In addition, because the Court instructs that geography as well as an offender's likely whereabouts and proclivity for certain locations are significant factors in determining the scope of notice, *ante* at 36–37, 662 *A*.2d at 385–86, the law might require notice to members of the public who live or work in the vicinity of the offender's place of employment, or in the vicinity of establishments (such as bars or bowling alleys) that the offender regularly frequents, without regard to municipal boundaries. Although the Court has limited Tier Three notification from that authorized by the Attorney General's Guidelines, no creative imagination is necessary for one fairly to conclude that the public notice mandated by the law is expansive. If Tier Two notice typically would reach hundreds of persons employed in a municipality, Tier Three notification could involve double or triple that number, and the numbers of people notified would be even greater in communities of larger size and population.

To receive the notice mandated by law and not to disclose information contained in the notice to family members or neighbors would be contrary to human nature. The Court assumes that the media will act responsibly and not frustrate the legislative goal of targeted notification. *Ante* at 38–39, 662 *A*.2d at 386. Even if the media heeds the Court's admonition, which cannot be assured, the virtual certainty is that the notification mandated by the law, especially Tier Three but probably Tier Two as well, will result as a practical matter in broad and pervasive notice, community-wide in many smaller municipalities, of the presence within the community of someone convicted of a sex offense.

The community's reaction to such notice is impossible to predict, but given the normal range of human emotion one reasonably could anticipate that notice of the presence of a sex offender will trigger fear, suspicion, hostility, anger, evasive behavior, ostracism, and in some cases derision, epithets and violence. To be sure, the sex offender's quality of life will be adversely affected.

Depending on circumstances, the sex offender might lose employment, friends, standing in the community, and might very well be subjected to community hostility so pervasive as to induce the offender to relocate. A likely, although unintended, result of New Jersey's notification statute might be to induce the sex offenders subject to the Community Notification Law to leave the State.

To anticipate that the Community Notification Law, even as limited by the Court's interpretation, will not visit severe, disruptive, and perhaps intolerable consequences on offenders subject to Tier Two and Tier Three notification is simply unrealistic. The two examples of violence and intimidation revealed by the record, *supra*, at 25, 662 *A*.2d at 379–80, might not typify public reaction to notification. However, they fairly suggest the probability that the sex offender subject to Tier Two and Tier Three notification will be a well-known, easily identifiable, and likely target of widespread community rejection, antipathy, and scorn. Based on its functional effect, the conclusion is inescapable that the Community Notification Law imposes punishment within the meaning of the *Ex Post Facto* Clause.

## IV

In determining that the requirements of procedural due process mandate judicial review of Tier Two and Three classifications and the manner in which public notice will be implemented, the Court cites *Paul v. Davis*, 424 *U.S.* 693, 701, 96 *S.Ct.* 1155, 1161, 47 *L.Ed.*2d 405, 414 (1976), for the proposition that "reputation alone, apart from some more tangible interests such as employment, is [not] either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause," noting that the protection is afforded only if harm to reputation is accompanied by the alteration of " 'a right or status previously recognized by state law.' " *Ante* at 101–02, 662 *A*.2d at 418 (quoting *Paul, supra*, 424 *U.S.* at 711, 96 *S.Ct.* at 1165, 47 *L.Ed.*2d at 420). The Court concludes that classification in Tier Two or Tier Three damages the reputation of sex offenders, but that impairment of an addi-

tional interest previously recognized under state law is a prerequisite to entitlement to procedural due-process protections. *Ante* at 101–04, 662 *A.*2d at 418–19. The Court further concludes "that classification in Tiers Two or Three, with the requisite public notification, would expose plaintiff to public opprobrium, not only identifying him as a sex offender but also labelling him as potentially currently dangerous, and thereby undermining his reputation and standing in the community." *Ante* at 103, 662 *A.*2d at 419. Thus, the Court determines that the Community Notification Law not only damages the reputation of sex offenders, but also impairs a previously protected state interest by labeling sex offenders as currently dangerous and intruding on their right of privacy by exposing them to public opprobrium, triggering procedural due-process protections. *Ibid.*

Because "[t]he deprivation of any rights, civil or political, previously enjoyed, may be punishment," *Cummings, supra,* 71 *U.S.* (4 *Wall.*) at 320, 18 *L.Ed.* at 362, the Court's conclusion that the deprivation of rights imposed by the Community Notification Law requires procedural due-process protection also constitutes a recognition that the very same deprivation of rights imposes punishment for *ex post facto* purposes. Nevertheless, the Court concludes that the *Ex Post Facto* Clause of the Constitution "does not prevent society from attempting to protect itself from convicted sex offenders, no matter when convicted, so long as the means of protection are reasonably designed for that purpose and only for that purpose, and not designed to punish." *Ante* at 12, 662 *A.*2d at 372.

The question whether the Registration and Community Notification Laws are "reasonably designed" to protect society from convicted sex offenders is exclusively a legislative determination, but the availability of alternative means of protection may be pertinent to the overriding constitutional issue. The statutes use mandatory public notice as the prescribed means of public protection, although without a notification statute police departments undoubtedly possess and exercise the discretion to notify residents

of the presence of potentially dangerous prior offenders residing in a community. Moreover, continued treatment of convicted sex offenders through State-supported voluntary counseling and rehabilitation programs arguably might be more effective than notification over the long term. In addition, the Legislature undoubtedly recognizes that the limited protection afforded by the Community Notification Law does not address the concern that a sex offender could commit an offense a substantial distance from that offender's community. Finally, the tier classification procedure lacks criteria and reliability, the statute distinguishing only among low, moderate, and high risk of re-offense without specific standards, and the classification decision being left to the informed discretion of the county prosecutor. The likelihood is strong that prosecutors, in making tier-classification decisions, will err on the side of caution and in favor of broader notification, and that courts reviewing those determinations will disturb them infrequently. Thus, the process by which prior sex offenders are classified and subjected to broad community notification, although a subject remitted initially to legislative discretion, is hardly flawless.

The Court appears to conclude, however, despite any deficiencies in the classification and notification process adopted by the Legislature, that its rationality establishes its constitutionality. That is, because the Court concludes that the Legislature reasonably could determine that these statutes prevent harm to the public by mandating notice to the community of the whereabouts of prior sex offenders, the Constitution does not prohibit their enactment.

I disagree. The Legislature's value judgment about these laws is entitled to great respect, but that judgment comprises only one part of the constitutional equation. The judiciary's task is to complete the equation by evaluating the legislative determination in the context of settled Constitutional principles. Those principles are neither negotiable nor flexible, their importance having been conclusively determined more than two hundred years ago by the founding fathers. In applying those principles, we must

bear in mind their origins: "The constitutional prohibitions against the enactment of ex post facto laws and bills of attainder reflect a valid concern about the use of the political process to punish or characterize past conduct of private citizens." *City of Richmond v. J.A. Croson Co.*, 488 *U.S.* 469, 513, 109 *S.Ct.* 706, 732, 102 *L.Ed.*2d 854, 895 (1989) (Stevens, J., concurring). In addition, we are reminded that

> retroactive statutes raise particular concerns. The Legislature's unmatched powers allow it to sweep away settled expectations suddenly and without individualized consideration. Its responsivity to political pressures poses a risk that it may be tempted to use retroactive legislation as a means of retribution against unpopular groups or individuals. As Justice Marshall observed in his opinion for the Court in *Weaver v. Graham*, 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981), the *Ex Post Facto* Clause not only ensures that individuals have "fair warning" about the effect of criminal statutes, but also "restricts governmental power by restraining arbitrary and potentially vindictive legislation." *Id.*, at 28–29, 101 S.Ct. 960 [963–64], 67 L.Ed.2d 17 (citations omitted).
>
> [*Landgraf v. USI Film Products*, 511 *U.S.* ——, —— – ——, 114 *S.Ct.* 1483, 1497–98, 128 *L.Ed.*2d 229, 253 (1994).]

The Constitution's prohibition against *ex post facto* laws reflects an enduring value that transcends the most pressing concerns of this or any day and age. Today, our concern is with prior sex offenders; in the 1950's the legislative concern focused on Communists; and in the 1860's Congress was determined to punish legislatively those who had supported the Confederacy. Future legislatures will doubtlessly find reasons to deal harshly with other groups that pose an apparent threat to the public safety.

Tested against the historical uses and purposes of punishment, public notice and public ostracism concerning prior sex offenders appear to fall squarely within the parameters of punishment as practiced at the time of adoption of the Constitution. The identification, scorn, and humiliation of sex offenders that public notice will achieve is strikingly reminiscent of the punishments commonly imposed in the colonial period. *Supra* at 38–40, 662 *A.*2d at 386–87. Moreover, the functional effect of the Community Notification Law compels the conclusion that it imposes punishment on prior sex offenders. Unlike the laws of other states that operate only prospectively, prohibit public notice, or permit such notice only as

a matter of police discretion where necessary for public safety, *supra,* at 20–25, 662 *A.*2d at 377–79, New Jersey's statute mandates the broadest public notice of any state statute yet enacted, notice so pervasive that community-wide knowledge of every sex offender's whereabouts can be anticipated. The adverse effect on the quality of life of sex offenders subject to notification necessarily will be substantial, undoubtedly compelling many of them to leave the State. The functional effect of the Community Notification Law is to increase the punishment of sex offenders retroactively.

Despite the Legislature's understandable concern about the danger presented by prior sex offenders, the judicial role, mindful of the compelling pressures that led to the statute's enactment, is to test the statute on the basis of the Constitution's fundamental protection against punitive retroactive legislation. I would hold that the devastating impact on prior sex offenders that will occur from implementation of the Community Notification Law constitutes retroactively imposed punishment prohibited by the *Ex Post Facto* Clause of the Constitution.

*For modification and affirmance*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and COLEMAN—6.

*For reversal*—Justice STEIN—1.